**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

WHITNEY EVANS, MICHAEL GOETTING,      :
DAWN FAMIGLIETTI, LACEY SALCIDO,      :
FELICIA WHITE, RUBIN STONE, *on behalf of*  :
*themselves and all individuals similarly situated,*  :
                                      :
                Plaintiffs,           :
                                      :
v.                                    :    Civil Action No. 3:26-cv-00145
                                      :
STRATEGIC SOLUTION SERVICES, INC.     :
d/b/a LINE OF CREDIT NOW, ARROW       :
MOUNTAIN FUNDING, and ARROW VALLEY  :
LOANS; GREEN FUNDS GROUP d/b/a        :
GREEN FUNDS GO; SPEEDY SERVICING d/b/a :
UNCLE WARBUCKS; KAPITAL SOLUTIONS,  :
INC.; WATERS LAW OFFICE, PLLC d/b/a WLO :
PAYMENTS; TRAVIS JACOBS; and          :
JOHN DOES 1-40,                       :
                                      :
                Defendants.           :
_____:

## CLASS ACTION COMPLAINT

Plaintiffs, *on behalf of themselves and all individuals similarly situated*, by counsel, and

for their Complaint against Defendants, allege as follows:

## INTRODUCTION

1.      As this Court is by now well aware, over the last decade or more, multiple groups

of conspirators have attempted to evade state usury statutes by hiding behind the façade of Native

American tribes.  This "most recent incarnation of payday lending companies regulation-

avoidance" has burdened millions of low-income Americans with billions of dollars of small-

dollar, triple-digit-interest loans that they are unable to pay, and that are unlawful and void under

state law. Nathalie Martin & Joshua Schwartz, *The Alliance Between Payday Lenders and Tribes:*

*Are Both Tribal Sovereignty and Consumer Protection at Risk?*, 69 Wash. & Lee L. Rev. 751, 785 (2012).

2.      Under the typical tribal lending model, non-tribal payday lenders and their business partners partner with Native American tribes to originate illegal loans while claiming to be subject only to tribal law and the protections of tribal sovereign immunity.  Using this now debunked legal theory, the tribal lenders then issue payday loans with triple-digit interest rates far higher than the legal rate in nearly every State in the Union.

3.      But as this Court, and the Fourth Circuit, have now repeatedly found, Native American tribes and their co-conspirators cannot evade state usury protections when issuing loans to consumers on non-tribal lands.  *See, e.g.*, *Hengle v. Treppa*, 19 F.4th 324 (4th Cir. 2021), *aff'g*, *Hengle v. Asner*, 433 F. Supp. 3d 825 (E.D. Va. 2020) (Novak, J.).  As a result, consumers like the Plaintiffs here have successfully fought back against these predatory practices, obtaining billions of dollars in loan cancellation and monetary relief against numerous lending enterprises and the non-tribal masterminds behind their operations.[1]

---

[1] *Turner v. ZestFinance, Inc.*, No. 3:19-cv-293, Final Approval Order at Dkt. 114 (E.D. Va. July 9, 2020) (granting final approval of a class settlement providing $170 million in debt cancellation and a common fund of $18.5 million); *Gibbs v. Plain Green, LLC*, No. 3:17-cv-495, Final Approval Order at Dkt. 141 (E.D. Va. Dec. 13, 2019) (granting final approval of a class settlement providing $380 million in debt cancellation and a common fund of $53 million); *Galloway v. Williams*, No. 3:19-cv-470, Final Approval Order at Dkt. 115 (E.D. Va. Dec. 18, 2020) (granting final approval of a class settlement providing $100 million in debt cancellation and a common fund of $8.7 million); *Gibbs v. TCV, V, LLP*, No. 3:19-cv-00789, Final Approval Order at Dkt. 95 (E.D. Va. Mar. 29, 2021) (granting final approval of a class settlement providing $383 million in debt cancellation and a common fund of $50 million); *Hengle v. Asner*, No. 3:19-cv-250, Final Approval Order at Dkt. 230 (E.D. Va. Oct. 25, 2022) (granting final approval of a class settlement providing $450 million in debt cancellation and a common fund of $39 million); *Blackburn v. A.C. Israel Enterprises*, Case No. 3:22-cv-146, Final Approval Order at Dkt. 228 (E.D. Va.) (granting final approval of a class settlement creating a common fund of $25.5 million); *Fitzgerald v. Wildcat*, Case No. 3:20-cv-00044 (W.D. Va.), Dec. 17, 2024 Final Approval Order, Dkt. 201 (granting final approval of class settlement providing $1.4 billion in debt cancellation and common fund of $37 million).

4.      Like the other tribal lending cases before this Court, this case involves several lending fronts that purport to be sanctioned by a tribal authority and subject to only tribal laws. Like the other tribal lending cases, this case also involves triple-digit interest loans that clearly violate the usury protections of Plaintiffs' respective states of residence.  But this case is unlike the other tribal lending cases in two, important ways.

5.      First, unlike the other tribal lending cases, the "tribe" that Defendants' lending fronts purport to be authorized by in this case is a First Nation in Canada, not a Native American tribe in the United States.

6.      And second, unlike the typical arrangement where there is a kickback and some nominal involvement by the Native American Tribe, the representations made by the lenders regarding Canadian First Nation ownership are utterly false. Indeed, the Mohawk Community of Kahnawà:ke (the "MCK" or "First Nation")—has expressly disclaimed, **under oath**, any association with the very entities that claim to be authorized to act on their behalf.  *See generally* Ex. 1 (Declaration of Tony Perron).

7.      These differences are material in several ways.  For one, unlike the tribal lending cases this Court has addressed to date, this case does not require the Court to parse through issues of tribal sovereignty, as there is no tribe whose sovereignty the lending entities could even claim. Instead, this is a straightforward RICO conspiracy between wholly non-tribal participants that not only sought to collect and collected unlawful debts from Plaintiff and thousands of other consumers but also lied to the consumers and the public about their First Nation association in an attempt to avoid liability for and conceal their brazen conduct.

8.      Faced with Defendants' unlawful attempts to use a First Nation lending model to evade state usury protections, Plaintiffs bring claims against the named Defendants—the lending

entities and the known coconspirators behind them—as well as yet-to-identified John Doe Defendants—the other coconspirators behind the scheme, whose identities Defendants have intentionally concealed—for violations of the Racketeer Influenced Corrupt Organizations Act ("RICO").

9.    Plaintiffs also assert class common law claims for unjust enrichment and civil conspiracy and a claim seeking to void the debts issued in states whose laws provide for such a remedy. In similar cases, this Court has repeatedly found that "any money paid on a void contract" constitutes "a benefit for the purposes of an unjust enrichment" claim. *Williams v. Big Picture Loans, LLC*, 339 F.R.D. 46, 63 (E.D. Va. 2021); *see also Gibbs v. Haynes Invs., LLC*, 368 F. Supp. 3d 901, 934 (E.D. Va. 2019) (finding plaintiffs stated a claim against a non-tribal entity who received 1% of the illegal loans); *Hengle v. Asner*, 433 F. Supp. 3d 825, 896 (E.D. Va. 2020) (same). This Court has also found civil conspiracy can apply to participants, such as the individual defendants, who facilitate the scheme. Accordingly, under these common law theories, Plaintiffs seek to recover all amounts paid on their and other class members' loans, as well as their costs and attorneys' fees.

## **JURISDICTION**

10.    This Court has subject matter jurisdiction pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1332(d)(2). Moreover, the Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

11.    This Court has personal jurisdiction over any U.S.-based Defendants because RICO authorizes nationwide service of process. As a result, personal jurisdiction over a defendant may be exercised anywhere in the United States so long as it does not violate the Fifth Amendment. *ESAB Grp., Inc. v. Centricut, Inc.*, 126 F.3d 617 (4th Cir. 1997). Because the U.S.-based

Defendants are all residents of the United States, the Court has personal jurisdiction over them under the Fifth Amendment.

12.     Likewise, under Fed. R. Civ. P. 4(k)(2), the Court may exercise personal jurisdiction over the foreign Defendants for Plaintiffs' RICO claims because the Defendants are not subject to the jurisdiction of any state courts of general jurisdiction and the exercise of jurisdiction is consistent with the Fifth Amendment, as they have purposeful, direct contacts with the United States—i.e., the advertising, issuing, and funding of triple-digit interest loans to U.S.-based consumers—from which Plaintiffs' claims directly arise.  And the Court has pendent personal jurisdiction with respect to the foreign Defendants for Plaintiffs' state law claims.

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because there is no State of which all defendants are residents, such that 28 U.S.C. § 1391(b)(1) would provide venue in a judicial district of that State; nor is there a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, as the loans at issue were issued from Canada to consumers nationwide, meaning no one district in the United States is the locus of the transactions or occurrences giving rise to this action such that venue would be proper in another district under 28 U.S.C. § 1391(b)(2).  Thus, under 28 U.S.C. § 1391(b)(3), venue is proper in this District because Defendants are subject to personal jurisdiction here with respect to this action and there is no district in which this action otherwise may be brought.

14.     Upon information and belief, venue is also proper in this Court pursuant to 28 U.S.C. § 1965(a) because Defendants transacted their affairs in Virginia through their participation in a conspiracy and a lending enterprise targeting Virginia consumers.

## PARTIES

15.    Plaintiff Whitney Evans is a natural person and resident of Alabama.

16.    Plaintiff Michael Goetting is a natural person and resident of North Carolina.

17.    Plaintiff Dawn Famiglietti is a natural person and resident of New Hampshire.

18.    Plaintiff Lacey Salcido is a natural person and resident of California.

19.    Plaintiff Felicia White is a natural person and resident of Alabama.

20.    Plaintiff Rubin Stone is a natural person and resident of Kentucky.

21.    Defendant Strategic Solution Services, Inc. ("Strategic Solution") is corporation organized under the laws of Canada with its principal place of business in Quebec, with a registered address at CP 2584 Kahnawake Québec J0L1B0 Canada.  It also has a registered agent at the Law Offices of John K. Maloney, 2505 Anthem Village Drive, #E-549, Henderson, Nevada 89052. Upon information and belief, Strategic Solution operates several lending fronts under various tradenames, including Arrow Mountain Funding, Line of Credit Now, and Arrow Valley Loans.

22.    Defendant Green Funds Group ("GFG") is a corporation organized under the laws of Canada with is principal place of business in Quebec, with a registered address at 12 Simon Rd. Kanesatake (Québec) J0N1E0 Canada.  It also has a registered agent at the Law Offices of John K. Maloney, 2505 Anthem Village Drive, #E-549, Henderson, Nevada 89052.  At all times relevant to this Complaint, GFG has conducted business as a lending entity under the tradename Green Funds Go.

23.    Defendant Speedy Servicing is a sole proprietorship organized under the laws of Canada with is principal place of business in Quebec, with a registered address at 1329 RD Arena Kahnawake Québec J0L1B0 Canada.  Speedy Servicing does business under the tradename Uncle

Warbucks, and has also conducted business under the tradenames Money Messiah, Rapital Capital, Dash of Cash, and Speedy Mohawk Financial Servicing.

24.     Together, these lending fronts and the other fronts operated by Defendants, including Green Funds Go, Arrow Mountain Funding, Line of Credit Now, and Arrow Valley Loans, are referred to herein as the "Lending Fronts."

25.     Defendant Kapital Solutions Inc. is a corporation organized under the laws of Canada with its principal place of business in Montreal, Quebec.  Its registered address is 510 boul. Décarie Montréal (Québec) H4L3K9 Canada. Kapital Solutions is an ecommerce software development company that, upon information and belief, knowingly entered into agreements with Strategic Solution, Speedy Servicing, Green Funds Group, Defendants Travis Jacobs, Lazarus Legal, and the John Doe Defendants behind the Lending Fronts to provide the technological, underwriting, payment processing, and electronic funds transfer support necessary for the Lending Fronts to advertise, issue, and collect the unlawful debts at issue in this litigation.   Upon information and belief, Kapital Solutions received a share of the revenue from the loans issued by the Lending Fronts in return for its services. It is therefore personally liable as a conspirator in the lending scheme that harmed Plaintiffs and the class members.

26.     Defendant Waters Law Office, PLLC d/b/a WLO Payments is a Montana professional limited liability company with its principal business address at 11 West Main Street, Suite 217, Belgrade Montana 59714.

27.     Defendant Travis Jacobs is a natural person and resident of Canada.  He can be served at 759 rue du Square-Victoria, Suite 200, Montreal, Quebec H2Y 2J7.  Upon information and belief, he is one of the main participants behind the creation, development, and implementation of the Lending Fronts, including its attempts to use the façade of a First Nation to shield the Fronts

from state usury laws.  Indeed, as set forth below, Mr. Jacobs has personally provided presentations claiming to represent the "First Nations Lenders' Authority" (the "FNLA"), which he represented as a regulator chartered by the MCK to operate the Lending Fronts.  *See* Ex. 2 (FNLA Presentation).  But as set forth in the Affidavit of Ms. Perron—the Chief of the Mohawk Council of Kahnawà:ke—the FNLA is nothing more than a fiction that "neither the [MCK] nor the Council, has ever authorized or in any way recognized . . . ." Ex. 1 ¶¶ 1, 19-24.  Instead, Mr. Jacobs created the FNLA to create the appearance that the usurious loans were regulated by an actual governmental entity in Canada even though, in reality, FNLA is a sham organization with no affiliation to Mohawk Community of Kahnawà:ke.

28.    The John Doe Defendants Nos. 1-40 are the as-yet unknown individuals and business organizations that designed, are operating, and have extracted most of the revenue from the Lending Fronts alleged herein. Their identity, which has been hidden as a key part of the underlying scheme, will be easily established in this litigation.

## FACTUAL BACKGROUND

**A.    State usury and licensing laws protect consumers from usurious loans.**

29.    "From times immemorial," state governments have sought to "protect desperately poor people from the consequences of their own desperation" through usury laws. *Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs.*, 974 F. Supp. 2d 353, 356 (S.D.N.Y. 2013).

30.    Typically, state usury laws involve: (1) an interest rate cap; and/or (2) a licensing requirement for lenders. Almost every state in the country has enacted one or both of these requirements, including North Carolina, California, Alabama, New Hampshire, and Kentucky, *i.e.*, the home states of each of the Plaintiffs where they applied for, received, and repaid their loans.

**i.      North Carolina**

31.      In North Carolina, the legal interest rate chargeable to consumers is 8%.  N.C. Gen. Stat. § 24-1.

32.      Where a written contract exists, for loans with a principal amount of less than $25,000, North Carolina's maximum interest rate permitted is the greater of (1) "the latest published noncompetitive rate for U.S. Treasury bills with a six-month maturity as of the fifteenth day of the month plus 6%" rounded to nearest half percent, or (2) 16%.  N.C. Gen. Stat. § 24-1.1(c).

33.      Charging consumers more than the maximum interest rate—regardless of whether the interest has been paid or not—results in a forfeiture of the entire interest.  N.C. Gen. Stat. § 24-2.  If the interest has been paid, the borrower may recover twice the amount of interest paid.  *Id.*

34.      North Carolina's Consumer Finance Act ("CFA") provides that for loans of $15,000 or less, a consumer lender may not charge interest greater than that permitted by Chapter 24 of the General Statutes without first obtaining a license from the North Carolina Commissioner.  N.C. Gen. Stat. §§ 53-166(a), 53-168.

35.      Unlicensed venders who issue loans exceeding the maximum interest rate are guilty of a Class 1 misdemeanor.  N.C. Gen. Stat. § 53-166(c).  Additionally, the entire loan becomes void, and the party in violation "shall not collect, receive, or retain any principal or charges whatsoever with respect to the loan."  *Id.* § 53-166(d).

36.      Defendants were never licensed to make consumer loans in North Carolina.

**ii.      California**

37.      Recognizing that "[u]sury—the charging of excessive interest rates—is an ancient concept dating back to the earliest commercial civilizations," California, which was founded in

9

1850, has regulated maximum interest rates since 1872. Robert R. Rickett, *California's Model Approach to Usury*, 18 Stan. L. Rev. 1381 (1966).

38. Currently, the law of usury in California is based upon California Constitution article XV, section 1, which limits the interest payable "[f]or any loan or forbearance of any money." *Sw. Concrete Products v. Gosh Constr. Corp.*, 798 P.2d 1247, 1249 (Cal. 1990) (quoting Cal. Const. Art. XV § 1).

39. Under the California Constitution, "unless a lender falls into one of the exemptions approved by the state legislature, it may not charge more than 10% interest per annum on a loan." *Dev. Acquisition Group, LLC v. EA Consulting, Inc.*, 776 F. Supp. 2d 1161, 1164 (E.D. Cal. 2011) (citing Cal. Const. Art. XV § 1).

40. "California state law currently limits the amount collected on a loan to "twelve dollars upon one hundred dollars for one year," or 12 percent. Cal. Civ. Code § 1916-2. "Any agreement or contract of any nature in conflict with [the interest rate cap] shall be null and void as to any agreement or stipulation therein contained to pay interest and no action at law to recover interest in any sum shall be maintained and the debt can not be declared due until the full period of time it was contracted for has elapsed." *Id.*

41. Thus, "[a]n interest rate in excess of [12%] is usurious, and if a lender negotiates a loan at a usurious rate absent a qualified exemption, the agreement shall be void and the lender will have no action at law to recover any interest." *Dev. Acquisition Grp.*, 776 F. Supp. 2d at 1164 (citing Cal. Civ. Code § 1916-2).

42. California law further provides that any person who pays any amount exceeding the interest-rate cap may recover "treble the amount of the money so paid or value delivered in violation of said [cap]." Cal. Civ. Code § 1916-3(a).

43. California has also deemed the willful lending of usurious loans without a license a felony "punishable by imprisonment in the state prison for not more than five years or in the county jail for not more than one year."  Cal. Civ. Code § 1916-3(b).

44. In addition to abiding by California's usury cap, lenders issuing loans to California residents are also required to obtain a license under the California Financing Law.  *See* Cal. Fin. Code §§ 22000*, et seq.*

45. Even if licensed, moreover, a licensee is still limited in the interest rates it can charge based on the unpaid principal balance remaining.  *See* Cal. Fin. Code § 22303 (setting, for example, a "two and one-half percent per month" rate maximum on "that part of the unpaid principal balance . . . up to, including, but not in excess of [$225]," while limiting the rate for the portion between $225 and $900 to 2 percent, and the rate for $900-$1,650 to 1.5 percent).

46. Loans willfully issued by even unlicensed lenders in violation of these requirements are deemed "void" and "no person has any right to collect or receive any principal, charges, or recompense in connection with the transaction."  Cal. Fin. Code § 22750.

47. Those who willfully violate the licensing requirements are also subject to fines and imprisonment.  Cal. Fin. Code §§ 22753, 22780.

48. California's usury laws "are primarily designed to penalize those who take advantage of 'unwary and necessitous borrowers.'"  *Dev. Acquisition Grp.*, 776 F. Supp. 2d at 1166 (quoting *Fox v. Peck Iron & Metal Co.*, 25 B.R. 674, 692-93 (Bankr. S.D. Cal. 1982)).

49. Lending at usurious interest rates also constitutes a violation of California's unfair competition laws, Cal. Bus. & Prof. Code § 17200, *et seq.*, which prohibits unlawful, unfair, or deceptive business practices.  Cal. Bus. & Prof. Code § 17200.

11

### iii.    Alabama

50.    In Alabama, the maximum rate of interest for is 8% for consumer loans issued pursuant to a written contract.  Ala. Code § 8-8-1.

51.    Loans issued with interest rates above the 8-percent cap are deemed usurious "and cannot be enforced except as to the principal."  *Id.* § 8-8-12.

*52.*    Thus, "[t]he borrower of money at a usurious rate of interest shall not in any case be required to pay more than the principal sum borrowed, and if any interest has been paid, the same must be deducted from the principal and judgment entered for the balance only . . . ."  *Id.*

### iv.    New Hampshire

53.    New Hampshire prohibits any lender from issuing "small loans" within the state "without first obtaining a license."  N.H. Rev. Stat. § 399-A:2.

54.    Those licensed to issue small loans, moreover, are limited to charging only 36 percent interest.  N.H. Rev. Stat. § 399-A:11.

55.    Any person who issues a loan without a license or in excess of the interest rate cap "shall be guilty of a misdemeanor if a natural person, or a felony if any other person."  N.H. Rev. Stat. § 399-A:23.

56.    Moreover, an unlicensed lender is prohibited from "recovering any finance charge, delinquency, or collection charge on the contract."  *Id.*  Unlicensed lenders also have no right to "collect, receive, or retain any principal, interest or charges whatsoever . . . and any such [loan] contract shall be null and void."  *Id.*  And "[i]f charges in excess of those permitted by this chapter shall be charged . . . the contract of loan shall be void and the lender shall have no right to collect or receive any charges, interest, or recompense whatsoever."  *Id.*

### v.    Kentucky

57.    Kentucky prohibits interest rates greater than 19% on loans of $15,000 or less.  Ky. Rev. Stat. Ann. § 360.010.

58.    The knowing assessment of interest greater than the legal rate "shall be deemed a forfeiture of the entire interest which the note, bill, or other evidence of debt carries with it, or which has been agreed to be paid thereon."  Ky. Rev. Stat. Ann. § 360.020.

59.    Any person who pays greater than the amount of legal rate of interest on a loan is entitled to twice the amount of interest paid, with any payments made considered first applied to interest.  *Id.*

### vi.    Other State Usury Laws

60.    Each state of residence of the putative class members also has an interest rate cap and similar provisions to prevent the enforcement and collection of usurious debts.[2]

---

[2] *See* Ala. Code § 8-8-1; Alaska Stat. § 45.45.010; Ark. Const. Art. XIX § 13; Ariz. Rev. Stat. Ann. §§ 44-1201-1204; Cal. Const. art. XV § 1; Cal. Civ. Code §§ 1916-1, 1916-2, 1916-3; Colo. Rev. Stat. Ann. §§ 5-12-101, 5-12-103, 5-2-201; D.C. Code §§ 28-3301, 28-3302; 6 Del. Code § 2301; Fla. Stat. §§ 687.04, 687.071; O.C.G.A. §§ 7-3-3, 7-3-4, 7-3-11, 7-3-50(a), 16-17-1, 16-17-2, 16-17-3; Haw. Rev. Stat. § 478-2; Idaho Code § 28-22-104; 815 Ill. Comp. Stat. 205/4, 122/4-10; Ind. Code § 24-4.5-201; Kan. Stat. § 16-201; Ky. Rev. Stat. Ann. § 360.010; La. Stat. Ann. § 9:3500, *et seq.*; Me. Rev. Stat. tit. 9-B, § 432; Md. Const. art. III § 57, Md. Code, Com. Law § 12-103; Mich. Comp. Laws §§ 438.31, 438.32, 445.1854; Minn. Stat. § 334.01, et seq.; Miss. Code. § 75-17-1, et seq.; Mont. Code § 31-1-108; Neb. Rev. Stat. §§ 45-101.03, 45-102; N.J. Code §§ 31:1-1, 31:1-3; N.H. Rev. Stat. § 399-A:23; N.M. Stat. §§ 56-8-3, 56-8-13; N.Y. Gen. Oblig. Law §§ 5-501, 5-511; N.Y. Banking Law § 14-a; N.R.S. § 99.040, 99.050; N.D. Cent. Code §§ 47-14-05, 47-14-09; Ohio Rev. Code Ann. §§ 1343.01, 1343.04; Okla. Stat. tit. 15 § 266; Or. Rev. Stat. § 82.010; 41 Penn. Stat. §§ 201-202; 6 R.I. Gen. Laws §§ 6-26-1, 6-26-2; S.D. Code § 54-3-1.1, *et seq.*; Vt. Stat. tit. 9, § 41a; Wash. Rev. Code § 19.52.010; W. Va. Code § 47-6-5; Wis. Stat. § 138.04; Wyo. Stat. § 40-14-106.

**B.      The Emergence of the Tribal Lending Model.**

61.      Many states have enacted usury laws because "[u]sury legislation to cap interest rates on loans predates the founding of our country." *Payday Today*, 903 N.E.2d at 1060 (citing Peterson, *supra*, at 1116 n.13).

62.      Unfortunately, despite the multitude of state and federal protections to prevent usurious lending, predatory financial services "are heavily marketed to financially vulnerable consumers."[3] The collection of unlawful and usurious debt continues to be a major problem, in part because the profits to be realized by small, high interest loans are so high that illegal lenders are willing to take the significant risk of litigation and liability for their violations of state and federal law.

63.      Over the past decade, payday lending has become "one of the fastest growing segments of the consumer credit industry," and as of 2005 "there were more payday-loan stores in the United States than McDonald's, Burger King, Sears, J.C. Penney, and Target stores combined." Martin & Schwartz, *supra* at 759 (quoting Karen E. Francis, Note, *Rollover, Rollover: A Behavioral Law and Economics Analysis of the Payday Loan Industry*, 88 Tex. L. Rev. 611, 611–12 (2010)).

64.      It is no secret that "internet payday lenders have a weak history of complying with state laws." Martin & Schwartz, *supra* at 759.

---

[3] *See* CFPB, *CFPB Finalizes Rule To Stop Payday Debt Traps* (Oct. 5, 2017), https://www.consumerfinance.gov/about-us/newsroom/cfpb-finalizes-rule-stop-payday-debt-traps/. Predatory financial services, including high-cost installment loans and payday debt traps, often involve "high-cost, small dollar loans to low income, low-credit borrowers" and "a repayment system that involves the lender withdrawing funds directly from the borrower's bank account." *Payday, Vehicle Title, and Certain High-Cost Installment Loans*, 131 Harv. L. Rev. 1852, 1852 (2018).

65.    Prior to the rent-a-tribe business model, some payday lenders entered into partnerships with national banks to avoid compliance with state laws.[4] Others, attempted to evade laws through claims that the loans were subject to the laws of a foreign country or state without any usury laws.

66.    In response to the crackdown on these arrangements, several payday lenders reincarnated the lending model through associations with Native American tribes to avoid state laws. Martin & Schwartz, *supra* at 759.

67.    For example, in January 2009, one of the legal pioneers of the tribal lending model, Claudia Callaway, was "recommending that her clients move to a 'tribal model'" and "that under federal Indian law the tribal lender could make these loans, and they could sell the loans to a non-tribal entity, and the loans could be collected upon at the contract rate, and the loans would not be subject to state regulation." *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, 2016 WL 4820635, at *2 (C.D. Cal. Aug. 31, 2016).

68.    Callaway also advised her clients that tribal lending "contemplated two structures," *i.e.*, arm of the tribe lending or tribal member lending. *Id*.

69.    Under either structure, Callaway claimed "the loans would be made under the laws of the tribe and would not have to comply with licensing and usury laws in states where borrowers resided." *Id*.

70.    Often, at the other side of the table, were the attorneys at Rosette, LLP, which holds itself out as "a leading majority Indian owned national law firm representing tribal governments

---

[4] *See, e.g.*, Jean Ann Fox & Edmund Mlerzwinkski, *Consumer Fed'n of Am. & U.S. Pub. Interest Research Grp.*, *Rent-a-Bank Payday Lending: How Banks Help Payday Lenders Evade State Consumer Protection* 17–22 (2001), *available at* http://www.consumerfed.org/pdfs/paydayreport.pdf.

and tribal entities." Rosette, *Our Firm*, https://www.rosettelaw.com/our-firm/ (last visited on March 13, 2022); *see also Hengle v. Asner*, 433 F. Supp. 3d 825, 840 (E.D. Va. 2020) (detailing the role of Rosette in the origin of the tribal lending businesses).

71.    Rosette shared Callaway's erroneous legal opinion that loans made through tribal entities did not need to comply with state licensing and usury laws—even when the tribe received a nominal amount of the proceeds from the loans.

72.    Like the prior schemes, this tribal lending model is highly problematic for several reasons. Most notably, the loans are aggressively marketed, created, and collected in the state where the consumer resides and thus are subject to the consumer's state licensing and usury laws. *Hengle*, 19 F.4th at 348.

73.    Over the past ten years, no less than a dozen courts have considered the enforceability of these loans, each holding that tribal choice-of-law clauses were unenforceable under comparable circumstances and that state law applied. *Id*.[5]

74.    In addition, there have been multiple class actions and government enforcement actions that have cancelled billions of dollars of these usurious loans, as well as returned hundreds of millions of dollars to consumers who were victimized by illegal tribal lending enterprises. *Turner v. ZestFinance, Inc.*, No. 3:19-cv-293, Final Approval Order at Dkt. 114 (E.D. Va. July 9,

---

[5] *See also, e.g.*, *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, 2016 WL 4820635, at *7 (C.D. Cal. Aug. 31, 2016) (holding that "the tribal choice of law provision is unenforceable" because it was "clear that the parties' choice was solely based on CashCall's desire to shield itself against state usury and licensing laws."); *W. Sky Fin., LLC v. State ex rel. Olens*, 793 S.E.2d 357, 366 (Ga. 2016), *reconsideration denied* (Dec. 8, 2016); *Inetianbor v. CashCall, Inc.*, 2015 WL 11438192, at *3 (S.D. Fla. Dec. 8, 2015); *State ex rel. Cooper v. W. Sky Fin.*, LLC, , 2015 WL 5091229, at *10 (N.C. Super. Aug. 27, 2015); *MacDonald v. CashCall, Inc*, No. CV 16-2781, 2017 WL 1536427, at *10 (D.N.J. Apr. 28, 2017), *aff'd*, 883 F.3d 220 (3d Cir. 2018); *Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330, 336 (4th Cir. 2017); *Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 675 (4th Cir. 2016); *Rideout v. CashCall, Inc.*, 2018 WL 1220565, at *8 (D. Nev. Mar. 8, 2018).

2020) (granting final approval of a class settlement providing $170 million in debt cancellation and a common fund of $18.5 million); *Gibbs v. Plain Green, LLC*, No. 3:17-cv-495, Final Approval Order at Dkt. 141 (E.D. Va. Dec. 13, 2019) (granting final approval of a class settlement providing $380 million in debt cancellation and a common fund of $53 million); *Galloway v. Williams*, No. 3:19-cv-470, Final Approval Order at Dkt. 115 (E.D. Va. Dec. 18, 2020) (granting final approval of a class settlement providing $100 million in debt cancellation and a common fund of $8.7 million); *Gibbs v. TCV, V, LLP*, No. 3:19-cv-00789, Final Approval Order at Dkt. 95 (E.D. Va. Mar. 29, 2021) (granting final approval of a class settlement providing $383 million in debt cancellation and a common fund of $50 million); *Hengle v. Asner,* No. 3:19-cv-250, Final Approval Order at Dkt. 230 (E.D. Va. Oct. 25, 2022) (granting final approval of a class settlement providing $450 million in debt cancellation and a common fund of $39 million); *Blackburn v. A.C. Israel Enterprises*, Case No. 3:22-cv-146, Final Approval Order at Dkt. 228 (E.D. Va.) (granting final approval of a class settlement creating a common fund of $25.5 million); *Fitzgerald v. Wildcat*, Case No. 3:20-cv-00044 (W.D. Va.), Dec. 17, 2024 Final Approval Order, Dkt. 201 (granting final approval of class settlement providing $1.4 billion in debt cancellation and common fund of $37 million).

75.    Two prominent perpetrators were also convicted and sentenced to prison for their roles in payday lending schemes.[6]

---

[6] *See* The United States Attorney's Office, Southern District of New York, *Scott Tucker Sentenced To More Than 16 Years In Prison For Running $3.5 Billion Unlawful Internet Payday Lending For e* (Jan. 8, 2018), https://www.justice.gov/usao-sdny/pr/scott-tucker-sentenced-more-16-years-prison-running-35-billion-unlawful-internet-payday; The United States Attorney's Office, Eastern District of Pennsylvania, *Two Men Found Guilty of Racketeering Conspiracy in Payday Lending Case*, (Nov. 27, 2017), https://www.justice.gov/usao-edpa/pr/two-men-found-guilty-racketeering-conspiracy-payday-lending-case.

76.    Despite all the litigation and enforcement efforts, Defendants knowingly aided, abetted, facilitated, and profited from the usurious lending scheme as detailed below.

**C.    The Typical Structure of the Tribal Lending Model.**

77.    The typical tribal lending model revolves around a series of agreements through which the tribe contractually relinquishes the right to control its lending entity.

78.    This is accomplished primarily through a document dubiously labeled a "servicing agreement."

79.    By way of one example, the Rosette law firm negotiated the terms of the tribal lending arrangement between Matt Martorello and a tribal company formed by the Lac Vieux Desert Band of Chippewa Indians in Michigan (the "LVD").

80.    Consistent with the tribal lending model, Rosette's client, Red Rock, received 2% of the net revenue from the loans in return for the use of its name. Ex. 3 at § 2.25.

81.    By contrast, Martorello's company received the "revenue remaining" and reimbursement for all advances and expenses. *Id*. §§ 3.5.1.

82.    Additionally, under the servicing agreement, one of Martorello's companies, SourcePoint, was contractually entitled to exercise almost exclusive control over Red Rock's operations.

83.    Among other things, the servicing agreement provided SourcePoint with the exclusive "authority and responsibility over all communications and interaction whatsoever between" Red Rock and "each servicer provider, lender and other agents" involved in the business. *Id*. § 3.1.

18

84.     The non-tribal company also had the contractual right to "sweep [Red Rock's] bank account amounts into [SourcePoint's] bank accounts" to receive its share of the proceeds. *Id.* § 3.5.1.

85.     As explained in a sworn declaration from the Vice Chairwoman of the LVD: "[w]hen Tribal Council initially agreed to the deal with Martorello," they "understood that all aspects of the lending business would be handled by Martorello and that the Tribe would have no risk. It was understood that Martorello's company would handle everything, including underwriting, marketing, servicing, funding, and collection of the loans." Ex. 4 at ¶ 3.

86.     This declaration further that "[a]fter the inception of the business, it was operated completely by Martorello until government regulators and litigation against competitors began. As these cases proceeded, efforts were made to create the appearance of the Tribe's involvement, but the Tribe had no substantive involvement." *Id*. ¶ 4.

87.     By way of another example, the Rosette law firm also used this same structure for a transaction between National Performance Agency ("NPA") and lending entities formed by the Habematolel Pomo of Upper Lake, a federally recognized Native American tribe ("Upper Lake").

88.     Pursuant to a "Services Agreement" between NPA and Silver Cloud one of Upper Lake's lending entities, NPA agreed to provide essentially all services setup and run the lending operations, including: (1) personnel and equipment to receive and respond to incoming telephone calls, faxes, and emails from Silver Cloud's borrowers; (2) delivery of electronic files for all debits and credits to each borrowers' loan; (3) lead generation; (4) receipt and storage of application materials; (5) servicing of the loans, including collection of payments; and (6) delivery of information "to determine whether to fund the loans" and "credit such potential customers' accounts with the appropriate amounts" for debits and credits. Ex. 5 at 2264–65.

89.     Additionally, nearly all of the revenue went to NPA and its partners, primarily through the use of "Participation Agreements."

90.     Rather than being the direct lender, this "participation model" allowed NPA to purchase essentially all of the economic interests in the loan as detailed in NPA's Business Plan and Roadmap dated January 2012. Ex. 6 at 755 (explaining various "structural approaches to tribal deals," including a participation model "in which NPA purchases a 99% participation in the loans the tribe makes.").

91.     The participation model, in other words, entitled NPA and its affiliated companies entitled to nearly all of the income and any profits from the loans while, at the same time, disguising its role and creating the façade that the loans were from a tribal government.

92.     The Rosette law firm also setup the enterprise between Think Finance and Great Plains, which used a similar structure of servicing and participation agreements. *See* Ex. 7.

93.     In addition to the servicing agreement, the tribal lending model involves the use of a loan and security agreement between the tribe and the payday lender.

94.     Typically, in exchange for the millions of dollars in capital to fund the illegal loans, these loan and security agreements require: (1) access to the books and records for each tribal lender; (2) monthly statements regarding the business (especially with respect to its credit and debits on loans); (3) deposit control agreements; (4) prioritized disbursements; (5) granting of a security interest in the loans; (6) restrictions on the use of the proceeds; (7) mandatory interest rates to be imposed on the loans to consumers; (8) servicing requirements for the collection of the loans, including the use of certain third parties; (9) prohibitions on the change of business policies; (10) rights to assume the business in the event of default on the repayment of the capital; and (11) waivers of sovereign immunity for the Tribe and its entities. *See generally* Ex. 8.

**D.      Defendants' Lending Fronts and Attempts to Collect Unlawful Debts Under Falsified Canadian First Nation Authority.**

95.      Like other actors in the tribal lending industry, Defendants created several lending fronts under different tradenames, including Line of Credit Now, Arrow Mountain Lending, Arrow Valley Lending, Green Funds Go, and Uncle Warbucks.  These Lending Fronts then targeted, advertised, and issued—and continue to target, advertise, and issue—high-interest loans to Plaintiffs and thousands of other consumers across the United States, with rates as high as 736%.

96.      In an attempt to shield their blatantly usurious loans from state regulators, upon information and belief, Defendant Travis Jacobs, along with other John Doe Defendants, conspired together to establish the "First Nations Lenders' Authority" as an umbrella organization that claimed to be an established authority of the MCK.

97.      Mr. Jacobs and the John Doe Defendants then established, recruited investors for, funded, and operated various entities under the FNLA umbrella, including Defendants Strategic Solution, Speedy Servicing, and Green Funds Group.  These entities were then funded and capitalized by investors recruited by Mr. Jacobs in return for a share of the profits from the various Lending Fronts.

98.      In the case of Strategic Solution, for example, Mr. Jacobs and others created various fronts funded and operated by Strategic Solution, including Arrow Mountain, Arrow Valley, and Line of Credit Now, all of which were directly managed, funded, and operated by Strategic Solution, Mr. Jacobs, and other John Doe Defendants.

99.      To further this tribal façade, Defendants, including Mr. Jacobs, drafted loan contracts that claimed each Lending Front "IS A MOHAWK OR FIRST NATIONS ENTITY, LOCATED ON THE MOHAWK TERRITORY OF KAHNAWKAE AND IS SUBJECT TO THE LAWS OF KAHNAWAKE AND THOSE OF THE FIRST NATIONS OF CANADA."

100.    But this claim—and the existence of the tribal/First Nation façade—was entirely false.

101.    Indeed, as the MCK's elected Chief has confirmed in the attached affidavit, "[t]he MCK has never formed, owned, operated, or authorized anyone to make loans in the name of Strategic Solution Services or any other usurious lender." *See* Ex. 1 ¶ 11.

102.    Nor has the MCK, "receive[d] any benefits, compensation or contributions from any company known as Strategic Solution Services or from any other company involved in lending." *Id.* ¶ 13.

103.    To the contrary, when Mr. Jacobs made the attached presentation to the MCK proposing the FNLA as a body "established . . . within the Mohawk Territory of Kahnawake," the MCK soundly rejected his proposal. *See* Ex. 2.

104.    In fact, the MCK has recently issued a cease-and-desist letter to Strategic Solution Services and the FNLA, demanding that they stop claiming any association with or authorization to act by the MCK. *See* Ex. 1 ¶ 27.

105.    Instead of respecting the MCK's wishes, however, Mr. Jacobs and his coconspirators, including Defendants, doubled down, recruiting other non-tribal/First Nation individuals and entities to provide additional funding, operational support, and employees to operate the various Lending Fronts under the guise of the fraudulent FNLA and the false claim that it was associated with the MCK and the First Nations of Canada—of which there are over 630.

106.    Indeed, according to Mr. Jacob's own presentation to the MCK, he had already brought several additional companies under the FNLA umbrella before even presenting the idea to the MCK for approval. These additional entities include First Nations Media, Trois-Rivieres

Solutions, and Blue A.S. Marketing, each of which, upon information and belief, is an entity organized by Mr. Jacobs and the John Doe Defendants under the laws of Canada and based in Quebec. *See* Ex. 2 at 6.

107.    Once the FNLA was established, Defendant Jacobs and his John Doe co-conspirators used it as a vehicle for investors and operators in the U.S. payday lending industry to issue their predatory loans while claiming First Nation affiliation.

108.    Indeed, the U.S.-focused objective of the FNLA is confirmed by the fact that prior to its website being taken down for "maintenance," it advertised membership in the organization in U.S. (not Canadian) dollars, charging $20,000 per year for general membership, $7,500 for "affiliated" membership, and $5,000 per year for "approved vendors."

109.    It is also notable that of the purported FNLA members known to Plaintiffs' counsel, all of them are lenders targeting U.S.—not Canadian—consumers, despite their supposedly Canadian roots. Indeed, the Lending Fronts do not permit applicants to proceed with loan applications unless they enter a U.S. address—making U.S. residency a prerequisite for consumers seeking their loans.

110.    And prior to its decision to take down its own website, the FNLA's application had no requirement to have a relationship to any recognized First Nation, including the MCK. Instead, any entity willing to pay the membership fee could claim membership and the supposed sovereignty that came with it.

111.    Put simply, the FNLA masquerade established by Defendant Jacobs and his co-conspirators was nothing more than a pay-to-play scheme that allowed any nefarious actor to deceptively claim First Nation affiliation and ownership without having any relationship or financial obligation to a Native American tribe or First Nation.

112.    Participants in the FNLA Enterprise thus obtained a First Nation façade without even having to offer at least some of their revenue to a real tribe, which the tribe could at least use for their members' benefit.  The First Nations, including the MCK, received nothing whatsoever.

113.    To support the participants in the FNLA scheme, Defendants also recruited and executed agreements with various "Approved Vendor[s]," whom Mr. Jacobs described as "entit[ies] that provide[] business solutions, consulting, accounting and marketing services to Certified Members" of the FNLA.  Ex. 2 at 8.  These Approved Vendors included Lazurus Legal and Defendant Kapital Solutions, who advertises, sells, and provides software platforms and support "to optimize and grow your online payment traffic."[7]

114.    Upon information and belief, Defendant Kapital Solutions entered into an agreement with Mr. Jacobs, the FNLA, and Strategic Solution, Speedy Servicing, and Green Funds Group to provide the necessary software programming and technical support for the Lending Fronts to be able to process applications for, issue, and collection payments on Plaintiffs' and the class members' loans.  Without Kapital Solutions' knowing and active participation in the scheme, the Lending Fronts would not have been able to issue the loans to Plaintiffs and the class members or collect any payments from them.

115.    Upon information and belief and based on its status as an "Approved Vendor," Kapital Solutions knowingly entered into the agreements with Defendants with the objective of supporting their issuing and collection of triple-digit interest loans under the façade of a First Nations authority for the purposes of evading U.S. state laws and usury protections.  Indeed, Kapital Solutions could not have become an "Approved Vendor" within the FNLA umbrella without knowledge of the scheme concocted by Mr. Jacobs and the John Doe Defendants.

---

[7] *See* https://www.kapital.solutions/ (last visited Feb. 6, 2026).

116.    To further hide their operations, the FNLA coconspirators also partnered with Waters Law Office d/b/a WLO Payments, which could much more easily obtain access to the Automated Clearing House (ACH) network, as it is a legitimate law firm, and thus process payments for the FNLA lending fronts more easily and without arousing suspicion from regulators.

117.    Indeed, as part of a crackdown on abuses of the ACH system by the federal government, many larger banks such as Capital One and Fifth Third stopped processing ACH payments for payday lenders.  Still today, no large banks—and only a few smaller ones—will knowingly process payday lender transactions.  It therefore was and still is vital to the Lending Fronts to use WLO Payments as a cover for their illicit scheme and obtain payments from Plaintiffs and the class members.

118.    Using its law firm as cover, WLO Payments surreptitiously processes payments for the FNLA Lending Fronts, substantially marking up the price of each ACH transaction assessed to the Lending Fronts and thus profiting off of the FNLA lending scheme.

119.    Upon information and belief, Defendant WLO Payments entered into an agreement with Mr. Jacobs, the FNLA, and Strategic Solution, Speedy Servicing, and Green Funds Group to provide the ACH access to process payments and loan transactions.  Without WLO Payments' knowing and active participation in the scheme, the Lending Fronts would not have been able to issue the loans to Plaintiffs and the class members or collect any payments from them.

120.    Upon information and belief and based on its status as an "Approved Vendor," WLO Payments knowingly entered into the agreements with Defendants with the objective of supporting their issuing and collection of triple-digit interest loans under the façade of a First Nations authority for the purposes of evading U.S. state laws and usury protections.  Indeed, WLO

Payments could not have become an "Approved Vendor" within the FNLA umbrella without knowledge of the scheme concocted by Mr. Jacobs and the John Doe Defendants.

121.    Defendants were each aware at the time they joined the association-in-fact enterprise to issue usurious loans under the guise of the Lending Fronts and their fake First Nation association (the "FNLA Enterprise") that they were doing so for the purpose of collecting debts that were otherwise unlawful under the applicable state laws in the United States.

122.    Indeed, Mr. Jacobs's presentation to the Tribe regarding the FNLA proposal explicitly cited "case studies" involving tribal lending operations and the supposed benefits of those operations to the respective tribes.  *See* Ex. 2 at 9-10 (providing "case studies" on the Otoe-Missouria and Chippewa Cree tribes).

123.    Mr. Jacobs and his coconspirators, including the other Defendants, were thus aware at the time they conspired to establish, join, and carry out the activities of the FNLA Enterprise that its First Nation façade was a necessary aspect of the Enterprise's ability to avoid state usury protections, and Defendants purposefully modeled their Enterprise off of the traditional tribal lending model described above for that reason.

124.    By way of example, following the traditional tribal lending model (and ignoring the Tribe's explicit rejection of the FNLA proposal), Defendants claimed in the Lending Fronts' form loan agreements that the MCK's laws governed each loan, representing to Plaintiffs and the class members in each loan contract that the loans are subject to Kahnawà:ke law and "the First Nations of Canada" more generally.

125.    But this representation was never true, as the MCK never authorized the Lending Fronts or even enacted laws related to tribal or First Nation lending.

126.    Moreover, contrary to the loan agreements' claims, "[i]n Canada, there are no universal 'First Nations laws' and the laws of the Kahnawà:ke only apply to [the Tribe's] Territory." Ex. 1 ¶ 14.

127.    Moreover, even if Kahnawà:ke law did apply to the loans, under Canadian law, the law of a First Nation does not preempt the Canadian Criminal Code which renders the charging of interest rates over 35% a crime. *See id.* ¶¶ 15-17.  And the MCK itself has no laws authorizing the issuing of usurious loans. *See id.* ¶¶ 30-31.

128.    The notions of tribal sovereignty applicable to Native American tribes recognized by the U.S. Congress likewise do not apply in the same manner to Canadian First Nations peoples, whose sovereignty is decided based on principles of Canadian law and history. *See id.* ¶ 18.

129.    In other words, Defendants' attempt to shield their lending activities behind the laws of a real First Nation—like the traditional tribal lending model—amounted to nothing more than a farce designed to thwart regulatory oversight and dissuade consumers from asserting their rights under U.S. federal and state laws.  But unlike the typical model, Defendants here went a step further and completely made up their tribal association.

130.    Defendants were aware that they had no First Nations approval or any right to act under any First Nations law.  Indeed, in the same paragraph claiming to be subject to Kahnawà:ke law, Defendants' form loan contracts also claim that any dispute under the contracts is subject to "THE COURTS OF THE PROVINCE OF QUEBEC," an entirely separate sovereign from the MCK that would not have jurisdiction to enforce Kahnawà:ke law in any event. *See* Ex. 1 ¶ 32 (stating that the MCK "do[es] not recognize the courts of the province of Quebec as having any jurisdiction over our laws and would never elect that forum in any contract").

27

131.     If the Lending Fronts were in fact authorized to act on behalf of the MCK, disputes would be handled in a forum that had the authority to enforce Kahnawà:ke law (such as a First Nation court).  They instead chose a forum beyond the reach of U.S. consumers that they knew would not have jurisdiction to even interpret and enforce the First Nation laws that purportedly applied to the loans.

132.     The form loan agreements designed, approved, and published by Defendants also state that "NEITHER THIS AGREEMENT NOR THE LENDER IS SUBJECT TO THE LAWS OF ANY STATE OF THE UNITED STATES" before stating that in any dispute "THE LAWS OF THE KAHNAWAKE AND THOSE OF THE FIRST NATIONS OF CANADA AND APPLICABLE FEDERAL LAW *SHALL EXCLUSIVELY APPLY*."  (emphasis added).

133.     In other words, Defendants designed their loans to preemptively waive consumers' rights and remedies under state law, while at the same time giving them no forum to meaningfully challenge their loans.

134.     Making matters worse, the form loan agreements require that the disputes first be referred to the fictitious First Nations Lenders' Association for resolution "according to its dispute resolution process."

135.     Only then may a consumer bring "a complaint with the Courts of the Province of Quebec having jurisdiction in this matter," but because Quebec courts do not have jurisdiction to enforce Kahnawà:ke law, then there really is no court with jurisdiction to hear the dispute.  In other words, the fictitious FNLA that Defendants themselves created and control is the final arbiter of any dispute according to the loan agreements.

136.     Even then, the FNLA has no authority to enforce Kahnawà:ke law, and its website currently states that it is "under maintenance," with absolutely no information on its "dispute resolution process."[8]

137.     Based on this, and the fact that the MCK has not authorized the FNLA or any similar body, Plaintiffs allege that the FNLA is, like the tribal façade claimed by Defendants, yet another farce designed to thwart consumers' attempts to enforce their rights, requiring consumers to go to a nonexistence forum before even asserting their rights in a foreign court.

138.     The objective of Defendants' loan agreements is clear: the agreements both prospectively strip consumers of the rights under their own states of residence while at the same time providing no real forum for the adjudication of legitimate claims.

**E.     Plaintiffs' Experience and Loan Histories.**

139.     Using the guise of the FNLA and Kahnawà:ke law, Defendants purposefully issued and collected from Plaintiffs and the class members loans with the interest rates that are many multiples of the amount permitted by state usury and licensing laws.

140.     For example, Plaintiff Whitney Evans applied for and obtained a loan from Arrow Mountain in November 2023 from her home in Alabama for a principal amount of $450, which had an interest rate of 682.87%, far exceeding Alabama's 8-percent interest rate cap on consumer loans.  Ms. Evans paid back more than the borrowed amount on this loan from her bank account maintained in Alabama.

141.     From his home in North Carolina, Plaintiff Michael Goetting applied for and obtained a loan from Green Funds Go in February 2024 for $300, which had an interest rate of

---

[8] https://fnla.ca/ (last visited Feb. 5, 2026).

29

708.93%, far exceeding North Carolina's 16-percent usurious interest cap. Using his bank account maintained in North Carolina, Mr. Goetting made payments on this loan.

142.    From her home in California, Plaintiff Lacey Salcido applied for and obtained a loan from Strategic Solution d/b/a Line of Credit Now in July 2024 for $400, which had an interest rate of 736.18%, far exceeding California's 12-percent rate cap. Using her bank account maintained in California, Ms. Salcido made payments on this loan.

143.    From her home in New Hampshire, Plaintiff Dawn Famiglietti applied for and obtained a loan from Uncle Warbucks in February 2023 for $1,200, which had an interest rate of 409%, far exceeding New Hampshire's 36-percent rate cap.  Upon information and belief, neither Uncle Warbucks nor any other Defendant has ever obtained a license to lend to consumers in New Hampshire, rendering this loan and all other loans issued to New Hampshire residents void and uncollectible.  Using her bank account maintained in New Hampshire, Ms. Famiglietti paid back more than she borrowed on this loan.

144.    From her home in Alabama, Plaintiff Felicia White applied for and obtained a loan from Green Funds Go in March 2024 for $800, which had an interest rate of 605%, far exceeding Alabama's 8-percent rate cap. Using her bank account maintained in Alabama, Ms. White made payments on this loan.

145.    From his home in Kentucky, Plaintiff Rubin Stone applied for and obtained a loan from Uncle Warbucks in June 2025 for $1,000, which had an interest rate of 450%, far exceeding Kentucky's 19% cap on loans of $15,000 or less. Using his bank account maintained in Kentucky, Mr. Stone paid back more than he borrowed on each of this loan.

146.    Upon information and belief, none of the Defendants, nor the MCK, the FNLA, MCK Officials, or the Lending Fronts has ever obtained a license to issue loans to consumers in

any state, including Plaintiffs' states of residence, let alone a license to issue the triple-digit interest

loans to Plaintiffs and the putative class members.

147.    Plaintiffs all applied for their loans on the internet while located in their respective

states of residence. None of the Plaintiffs traveled to the MCK's reservation or Canada to obtain

their loans.

148.    Plaintiffs all used their home addresses when applying for the loans, and they used

bank accounts maintained in their home states to receive the loans and for the subsequent ACH

debits used to pay down the loans.

149.    As outlined above, the loans issued to Plaintiffs violated the respective usury

statutes of each of their home states and entitle Plaintiffs to the remedies provided under those

states' laws, including avoidance of the loans, repayment, at a minimum, of interest paid above

the usury caps, if not principal and interest entirely, as well as exemplary damages.

150.    Similarly, almost all other state jurisdictions treat as illegal unlicensed small loans

like those involved here.[9]

---

[9] Most states recognize a similar public policy against usury and have adopted similar laws addressing high-interest loans. *See* Ala. Code § 5-18-4 (loans made without a license "shall be void"); Alaska Stat. § 06.20.310; Ariz. Rev. Stat. § 6-613(B) (loans that charge illegal finance charges are "voidable"); Ark. Code §§ 4-57-104, 105; Cal. Fin. Code §§ 22303, 22750; Colo. Rev. Stat. Ann. § 5-2-201; Conn. Gen. Stat. § 36a-558 (c)(1) (loans made without a license are "void" and uncollectable); Conn. Gen. Stat. § 36a-558 (c)(1) (loans made without a license are "void" and uncollectable); D.C. Code §§ 26-905, 28-3303; Fla. Stat. § 516.02 (loans made with excessive interest rates are "not enforceable"); Ga. Code § 16-17-3 (loans made without a license "shall be void ab initio"); Haw. Rev. Stat. § 478-4; Idaho Code § 28-46-402 (payday loans made without a license are "void, uncollectable and unenforceable"); 815 Ill. Comp. 122/4-10 (payday loans made without a license "shall be null and void"); Kan. Stat. § 16a-5-201; Ky. Rev. Stat. Ann. § 286.4-991 (loans made without a license are void); La. Stat. Ann. § 9:3552; Me. Rev. Stat. tit. 9-A, § 2-401; Mass. Gen. Laws Ann. ch. 140, § 110 (small loans made without a license are void); Md. Code, Com. Law § 12-314 (small loans made without a license that charge excessive interest rates are "unenforceable"); Mich. Comp. Laws §§ 438.32, 445.1854; Minn. Stat. §§ 47.60, 47.601 (provisions in loan contracts charging excessive interest rates are void and unenforceable); Minn. Stat. § 56.19 (authorizing debtor to recover all amounts paid on loans made in violation of licensing

151.     Despite the nearly universal prohibition against unlicensed, high-rate, small-loan lending, Defendants knowingly participated in a widespread scheme to make and collect the loans at issue in this case, which have victimized hundreds of thousands of consumers on terms similar to Plaintiffs.

## COUNT ONE:
## VIOLATIONS OF RICO, 18 U.S.C. § 1962(d)
## (CLASS CLAIM AGAINST ALL DEFENDANTS)

152.     Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

153.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class—the "RICO Class"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with any of the Lending Fronts; (2) from Virginia, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, West Virginia, or Wyoming; and (3) made payments on the loan.

---

requirements); Miss. Code. § 75-67-119; Mont. Code § 31-1-712 (Any deferred deposit loan made by an unlicensed lender "is void, and the unlicensed person may not directly or indirectly collect, receive, or retain any loan principal, interest, fees, or other charges related to the loan"); Neb. Rev. Stat. § 45-1024; N.H. Rev. Stat. § 399-A:23 (any contract for small loan by unlicensed lender is "null and void"); N.M. Stat. § 58-15-3 (small loans made without a license are void); N.Y. Gen. Oblig. Law § 5-511 (usurious loans are "void"); N.Y. Banking Law § 355; N.C. Gen. Stat. § 53-166 (small loans made without a license are void); N.D. Cent. Code § 13-04.1-09.3 (West); Ohio Rev. Code Ann. § 1321.02 (small loans made without a license are void); Okla. Stat. tit. 14A, § 3-201; Or. Rev. Stat. § 725.045 (consumer finance loans made without a license are "void"); 41 P.S. §§ 501-502; 6 R.I. Gen. Laws § 6-26-4 (loans charging excessive interest "shall be usurious and void"); S.C. Code § 34-29-140; S.D. Codified Laws § 54-4-44 (loans charging excessive interest or made without a license are "void and uncollectible"); Tenn. Code §§ 47-14-110, 117; Tx. Fin. §§ 302.001-004; Vt. Stat. tit. 9, § 50; Va. Code § 6.2-1541(any loan made in violation of Virginia's usury and licensing laws "shall be void" and "any principal or interest paid on the loan shall be recoverable by the person by or for whom payment was made"); Wash. Rev. Code § 19.52.020; W. Va. Code § 46A-5-101; Wis. Stat. § 138.14; Wyo. Stat. § 40-14-521.

Plaintiffs are members of this class.

154. **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical.  In other tribal lending litigations, there have been hundreds of thousands and even more than 1 million class members, and, upon information and belief, there are thousands of potential class members in this case.  The names and addresses of the class members are identifiable through the internal business records maintained by the Lending Fronts and Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

155. **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions include: (1) whether the interest rates used on loans violate each state's usury laws; (2) whether the choice-of-law provision used in their loan agreements and selecting Kahnawà:ke law are enforceable; (3) whether the relationship between the various participants constitutes an enterprise as defined under RICO; (4) whether Defendants knew of and facilitated the conspiracy to collect the loans; and (5)  whether the amounts paid by each consumer are recoverable against Defendants. These questions predominate over the questions affecting only individual class members.

156. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member.  In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

157. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute

the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them to not vigorously pursue this action.

158.    As alleged above, Defendants are an association-in-fact enterprise who are associated together for the common purpose of making, collecting, and profiting off the illegal loans, referred to herein as the "FNLA Enterprise."

159.    Specifically, each of the Defendants engaged in a lending enterprise with a single, unifying purpose—the issuance of usurious payday loans to consumers that attempted to evade state usury laws using the guise of tribal sovereignty and, more specifically, the fictitious "First Nations Lenders' Authority" concocted by Defendant Jacobs and other John Doe Defendants.

160.    Defendants, along with other yet-to-identified coconspirators, formed the FNLA Enterprise under a common scheme to establish multiple Lending Fronts that would allow them to generate millions in revenue while attempting to evade state usury laws.

161.    Defendants participated in and coordinated their efforts behind this common scheme, including, upon information and belief, through the sharing of resources among the Lending Fronts, including technical, underwriting, and operational support; the use of the same "Approved Vendors"; the sharing of funding; and the sharing of marketing efforts, including through the joint and/or shared purchase of borrower "leads" from credit reporting agencies and subsequent targeting of mailing and other advertising to those individuals.

162.    Defendants also jointly benefitted from each other's involvement in the enterprise by sharing the risks of such an obviously illegal enterprise among multiple entities and individuals, who could jointly front the costs of such risks, including any legal judgment.

163.    All of the loans made to Virginia, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, West Virginia, or Wyoming included an interest rate far in excess of twice the enforceable rate under each consumer's respective state law.

164.    Defendants violated § 1962(d) of RICO by agreeing to undertake and advance the FNLA Enterprise, including by aiding, abetting, and facilitating the scheme through their funding of the loans, as well as through their ownership and oversight of the entities that funded and operated the loans issued to Plaintiffs.  Defendants further violated § 1962(d) by aiding, abetting, and facilitating the scheme through their role in the creation of the original agreements related to the origination, funding, and servicing of the loans, as well as the agreements designed to shield the non-tribal outsiders from liability and facilitate the continued illegal lending activities.

165.    Accordingly, Defendants are jointly and severally liable to Plaintiffs and the putative class members for their actual damages, treble damages, costs, and attorney's fees pursuant to 18 U.S.C. § 1964(c).

**COUNT TWO:**
**VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)**
**(CLASS CLAIM AGAINST ALL DEFENDANTS)**

166.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

167.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of the classes defined in Count One.

168.   **Numerosity**. **Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical.  In other tribal lending litigations, there have been hundreds of thousands and even more than 1 million class members, and, upon information and belief, there are thousands of potential class members in this case.  The names and addresses of the class members are identifiable through the internal business records maintained by the Lending Fronts and Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

169.   **Predominance of Common Questions of Law and Fact**. **Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions include: (1) whether the interest rates used on loans violate each state's usury laws; (2) whether the choice-of-law provision used in their loan agreements and selecting Kahnawà:ke law are enforceable; (3) whether the relationship between the various participants constitutes an enterprise as defined under RICO; (4) whether Defendants knew of and facilitated the conspiracy to collect the loans; and (5) whether the amounts paid by each consumer are recoverable against Defendants. These questions predominate over the questions affecting only individual class members.

170.   **Typicality**. **Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member.  In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

171.   **Adequacy of Representation**. **Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute

the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them to not vigorously pursue this action.

172.    As alleged above, Defendants are an association-in-fact enterprise (the FNLA Enterprise) who are associated together for the common purpose of making, collecting, and profiting off the illegal loans.

173.    All of the loans made to Virginia, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Washington, West Virginia, or Wyoming included an interest rate far in excess of twice the enforceable rate under each consumer's respective state law.

174.    As alleged above, Defendants participated in the operation of the enterprise, which existed for the purpose of collection of unlawful debt. Among other things and as detailed above, Defendants helped design, implement and fund the tribal lending scheme through their ownership and control of the entities behind the lending operation, which developed the tribal lending scheme at the heart of this case.

175.    Plaintiffs and the class members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(c) because the loans would not have been made but for Defendants' participation in the enterprise.

176.    As a result of Defendants' violations, Defendants are jointly and severally liable to Plaintiffs and the putative class members for their actual damages, treble damages, costs, and attorney's fees pursuant to 18 U.S.C. § 1964(c).

**COUNT THREE:**
**UNJUST ENRICHMENT**
**(CLASS CLAIM AGAINST ALL DEFENDANTS)**

177.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

178.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class—the "Unjust Enrichment Class"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with any of the Lending Fronts; (2) from Virginia, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, West Virginia, or Wyoming; and (3) repaid more than the principal balance of the loans.

Plaintiffs Evans, Famiglietti, and Stone are members of the Unjust Enrichment Class.

179.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Evans brings this action for herself and the following subclass—the "Alabama Unjust Enrichment Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with any of the Lending Fronts; (2) from Alabama, and (3) repaid more than the principal balance of the loans.

Plaintiff Evans is a member of this subclass.

180.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Famiglietti brings this action for herself and the following subclass—the "New Hampshire Unjust Enrichment Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with any of the Lending Fronts; (2) from New Hampshire, and (3) repaid more than the principal balance of the loans.

Plaintiff Famiglietti is a member of this subclass.

181.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Stone brings this action for himself and the following subclass—the "Kentucky Unjust Enrichment Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with any of the Lending Fronts; (2) from Kentucky, and (3) repaid more than the principal balance of the loans.

Plaintiff Stone is a member of this subclass.

182.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical.  In other tribal lending litigations, there have been hundreds of thousands and even more than 1 million class members, and, upon information and belief, there are thousands of potential class members in this case.  The names and addresses of the class members are identifiable through the internal business records maintained by the Lending Fronts and Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

183.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions include: (1) whether the interest rates used on loans violate each state's usury laws; (2) whether the choice-of-law provision used in their loan agreements and selecting Kahnawà:ke law are enforceable;

(3) whether Plaintiffs and the class members conferred a benefit on Defendants; (4) whether Defendants knew or should have known of the benefit; (5) whether Defendants retained an unjust benefit because the loan was void; and (6) what is the proper recovery for Plaintiffs and the class members against each of Defendants.

184. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

185. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them to not vigorously pursue this action.

186. As detailed above, all loans to Virginia, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, West Virginia, or Wyoming were unenforceable.

187. Plaintiffs and the class members conferred a benefit on Defendants when they repaid the void loans; Defendants knew or should have known of the benefits; and Defendants

have been unjustly enriched through their receipt of any amounts in connection with the unlawful loans.

188.     Accordingly, on behalf of themselves and the class defined above, Plaintiffs seek to recover from Defendants, jointly and severally, all amounts repaid on any loans with the LDF Lending Entities.

**COUNT FOUR:**
**COMMON LAW CONSPIRACY**
**(CLASS CLAIM AGAINST ALL DEFENDANTS)**

189.     Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

190.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and the classes and subclasses defined in Count Three.

191.     **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical.  In other tribal lending litigations, there have been hundreds of thousands and even more than 1 million class members, and, upon information and belief, there are thousands of potential class members in this case.  The names and addresses of the class members are identifiable through the internal business records maintained by the Lending Fronts and Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

192.     **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions include: (1) whether the interest rates used on loans violate each state's usury laws; (2) whether the choice-of-law provision used in their loan agreements and selecting Kahnawà:ke law are enforceable;

(3) whether Defendants combined together or with others to accomplish an unlawful purpose; (4) whether at least one member of the conspiracy committed an unlawful act; (5) whether collection of a usurious and unenforceable loan caused injuries to Plaintiffs and the class members; and (6) what is the proper recovery for Plaintiffs and the class members against each of Defendants.

193.    **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member.  In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

194.    **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them to not vigorously pursue this action.

195.    As detailed above, all loans to Virginia, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, West Virginia, or Wyoming were unenforceable.

196.    As alleged above, Defendants violated state common law conspiracy prohibitions by joining together through a series of agreements to accomplish the making, collection, and

profiting from the blatantly illegal usurious loans. Among others, these agreements include the original agreements related to the origination, funding, and servicing of the loans, as well as the merger agreements designed to shield the non-tribal outsiders from liability and facilitate the continued illegal lending activities through the promissory notes and related documents.

197.    Plaintiffs and the class members were injured as a result of Defendants' violations because they repaid amounts arising from the unlawful conspiracy.

198.    As a result of Defendants' violations, Defendants are jointly and severally liable to Plaintiffs and the putative class members for their actual damages, treble damages, costs, and attorney's fees.

## COUNT FIVE:
## DECLARATORY JUDGMENT UNDER 28 U.S.C. § 2201
## (CLASS CLAIM AGAINST STRATEGIC SOLUTION, GREEN FUNDS GROUP AND SPEEDY SERVICING)

199.    Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs.

200.    Pursuant to Rule 8(d)(2), Plaintiffs allege that, in the alternative to the prospective relief available under state law, a declaratory judgment is available under 28 U.S.C. § 2201.

201.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs Evans, Salcido, Famiglietti, Goetting, and White bring this claim for themselves and on behalf of the "Void Debt Class" initially defined as follows:

> All natural persons who: (1) entered into a loan agreement with any Lending Front;
> (2) from Virginia, Georgia, Maryland, Florida, Alabama, Arizona, Arkansas,
> California, Connecticut, Idaho, Illinois, Kansas, Minnesota, New York, New
> Hampshire, North Carolina, Oregon, Rhode Island, South Dakota, Texas, West
> Virginia, or Wisconsin; and (3) have an outstanding balance on their loan.

Plaintiffs Evans, Salcido, Famiglietti, Goetting, and White are each a member of this class.

202.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Evans and White also bring this claim for themselves and the following subclass—the "Alabama Void Debt Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with any Lending Front;
> (2) from Alabama, and (3) have an outstanding balance on their loan.

Plaintiffs Evans and White are each a member of this subclass.

203.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Salcido also brings this claim for herself and the following subclass—the "California Void Debt Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with any Lending Front;
> (2) from California, and (3) have an outstanding balance on their loan.

Plaintiff Salcido is a member of this subclass.

204.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Famiglietti also brings this claim for herself and the following subclass—the "New Hampshire Void Debt Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with any Lending Front;
> (2) from New Hampshire, and (3) have an outstanding balance on their loan.

Plaintiff Famiglietti is a member of this subclass.

205.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Goetting also brings this claim for herself and the following subclass—the "North Carolina Void Debt Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with any Lending Front;
> (2) from North Carolina, and (3) have an outstanding balance on their loan.

Plaintiff Goetting is a member of this subclass.

206.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical.  In other tribal

lending litigations, there have been hundreds of thousands and even more than 1 million class members, and, upon information and belief, there are thousands of potential class members in this case.  The names and addresses of the class members are identifiable through the internal business records maintained by the Lending Fronts and Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

207.    **Predominance of Common Questions of Law and Fact**. **Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions include: (1) whether the interest rates used on loans violate each state's usury laws; (2) whether the choice-of-law provision used in their loan agreements and selecting Kahnawà:ke law are enforceable; (3) whether the loans are usurious and/or made without a license under the respective state laws governing the loans; (4) whether the loans are void under the respective state laws governing the loans; and (5) whether Plaintiffs are entitled to declaratory relief.

208.    **Typicality**. **Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member.  In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

209.    **Adequacy of Representation**. **Fed. R. Civ. P. 23(a)(4).** Plaintiffs are each an adequate representative of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them to not vigorously pursue this action.

210.    Virginia, Georgia, Maryland, Florida, Alabama, Arizona, Arkansas, California, Connecticut, Idaho, Illinois, Kansas, Minnesota, New Hampshire, New York, North Carolina, Oregon, Rhode Island, South Dakota, Texas, West Virginia, and Wisconsin have licensing or usury laws that require a lender to be licensed and/or cap interest rates.

211.    None of the Defendants, nor the Lending Fronts, were licensed to make loans in Virginia, Georgia, Maryland, Florida, Alabama, Arizona, Arkansas, California, Connecticut, Idaho, Illinois, Kansas, Minnesota, New Hampshire, New York, North Carolina, Oregon, Rhode Island, South Dakota, Texas, West Virginia, or Wisconsin.

212.    Because the loans were made without the required license and/or charged excessive interest rates, the loans are null and void.

213.    Plaintiffs and members of the classes are subject to ongoing harm absent a declaration that the loans were void, including the accumulation of additional debt, adverse credit reporting of the invalid loans, and abusive collection practices.

214.    The dispute and controversy is a justiciable matter that is not speculative, and a resolution by this court will determine the rights and interests of the parties to the loan contracts as well as the validity, if any, of the choice of law and forum-selection provisions.

215.    Pursuant to 28 U.S.C. § 2201, there is an actual justiciable controversy, and a declaratory judgment is the appropriate mechanism for resolving the validity and enforceability of the loan agreements.

216.    Accordingly, Plaintiffs seek a declaratory judgment that the loan agreements are void and invalid and the loans of the Void Debt Class and subclass members are uncollectable. Plaintiffs also seek to enjoin Defendants from allowing collection on the loans.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment against Defendants as follows:

A.      An Order certifying the proposed Classes under Fed. R. Civ. P. 23 (b)(3) and appointing Plaintiffs as class representatives and their counsel as class counsel, as soon as practicable;

B.      An Order declaring that Defendants are financially responsible for notifying class members of the pendency of this suit;

C.      An Order declaring that Defendants committed the violations of law alleged herein;

D.      An Order providing for any and all injunctive relief the Court deems appropriate;

E.      An Order awarding monetary damages, including but not limited to any compensatory, incidental, or consequential damages in an amount to be determined by the Court or jury;

F.      An Order awarding treble damages in accordance with proof and in an amount consistent with applicable precedent;

G.      An Order awarding interest at the maximum allowable legal rate on the foregoing sums;

H.      An Order awarding Plaintiffs their reasonable costs and expenses of suit, including attorneys' fees; and

I.      Such further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury.

Respectfully submitted,
**PLAINTIFFS,** *individually and on behalf of all others similarly situated*

By: */s/ Kristi C. Kelly*
Kristi Cahoon Kelly, VSB #72791
Andrew J. Guzzo, VSB #82170
Casey S. Nash, VSB #84261
Patrick McNichol, VSB No. 92699
Matthew G. Rosendahl, VSB No. 93738
**KELLY GUZZO PLC**
3925 Chain Bridge Road, Suite 202
Fairfax, Virginia 22030
Telephone: (703) 424-7572
Facsimile: (703) 591-0167
Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com
Email: casey@kellyguzzo.com
Email: pat@kellyguzzo.com
Email: matt@kellyguzzo.com


**SERAPH LEGAL, P.A.**

Bryan J. Geiger (*pro hac vice* to be filed)
Florida Bar No. 119168
bgeiger@seraphlegal.com
Thomas M. Bonan (*pro hac vice* to be filed)
Florida Bar No. 118103
tbonan@seraphlegal.com
3505 East Frontage Road, Suite 145
Tampa, FL 33607

*Counsel for Plaintiffs*