**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

|  |  |  |
|---|---|---|
| WHITNEY EVANS, *et al.*, *on behalf of themselves and all individuals similarly situated,* | : | |
| | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Civil Action No. 3:26-cv-00145-DJN |
| | : | |
| STRATEGIC SOLUTION SERVICES, INC., *et al.* | : | |
| | : | |
| Defendants. | : | |
| _____ | : | |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' *EX PARTE* MOTION FOR LEAVE TO CONDUCT JOHN DOE DISCOVERY

This Court is by now all too familiar with the tribal lending model that has preyed on millions of consumers nationwide.  In cases like *Williams*, *Gibbs*, *Hengle*, and *Blackburn*, the Court found that such schemes unlawfully evade state usury protections, and that the actors behind such schemes, including nontribal investors and operators, can be held accountable under RICO and unjust enrichment theories for their illicit conduct.

Like these prior cases, this case involves a predatory lending scheme in which non-tribal individuals and entities created a tribal façade in an attempt to shield their triple-digit-interest payday loans from state usury protections.  However, this case is even more egregious because— rather than nominal involvement of a tribal government and a kickback for using its name—the scheme's affiliation with a tribal government is a complete and utter fabrication, as confirmed by the declaration from Tonya Perron, who is a "lawyer and Elected Chief of the Mohawk Council of Kahnawà:ke," which is "one of the over 630 First Nations in Canada." *See* ECF No. 1-2 (Decl. of Tonya Perron) at ¶¶ 1-3. Although these lenders claim to be "a Mohawk entity, located on the Kahnawake Reserve and is subject to the laws Kahnawake and those of the First Nations of

Canada," their purported affiliation with a First Nations government is a lie.  As confirmed by Chief Perron, the Mohawk Council of Kahnawà:ke has never "formed, owned, operated, or authorized anyone to make [any such] loans," which would are "criminal in Canada and, thus unenforceable in the Mohawk Territory of Kahnawà:ke as it is contrary to public order and a criminal offence." *Id*. at ¶¶ 11, 31. These internet loans are also unenforceable in the United States, where the borrowers reside and remain protected by state and federal laws prohibiting usury.

Using the façade of a First Nations government entity, Defendants Strategic Solution Services, Inc., Green Funds Group, and Speedy Servicing have operated—and continue to operate—various consumer lending fronts purportedly authorized and operated by a tribal authority.[1]  However, even the members of the Mohawk Council of Kahnawà:ke ("MCK") do not know "who is behind this lending scheme."  *Id*. at ¶ 33.  And while Plaintiffs and their counsel have been able to identify some of the non-tribal individuals and entities involved in the scheme, including Defendants Travis Jacobs, Kapital Solutions, Inc., and Waters Law Office, PLLC, they want to ensure that they have identified all the true funders, operators, and benefactors of this brazen lending scheme.  Using false claims of sovereignty and tribal affiliation, these non-tribal actors have intentionally concealed their roles so they could issue and collect millions in usurious loans with interest rates exceeding 600%, far higher than even the most lenient usury limitations in the United States.

But as the Court found in *Hengle*, the tribal artifice—even if legitimate—is not a basis to take advantage of consumers, as tribal lenders going beyond reservation boundaries are still "subject to nondiscriminatory state regulation."  *Hengle v. Asner*, 433 F. Supp. 3d 825, 876 (E.D.

---

[1] These lending fronts include Green Funds Go, Arrow Mountain Funding, Line of Credit Now, Arrow Valley Loans, Money Messiah, Rapital Capital, Dash of Cash, Speedy Mohawk Financial Servicing, Ahead Lending, and Uncle Warbucks.

Va. 2020) (Novak, J.) (collecting cases), *aff'd sub nom. Hengle v. Treppa*, 19 F.4th 324 (4th Cir. 2021). Nor can purportedly tribal lenders evade state usury protections through selection of tribal law to govern their loans, as Virginia and other states have a strong public policy against unlicensed usurious lending. *See id.* at 867-868 (finding that choice of tribal law lacking any regulations for usurious lending over Virginia law violated "Virginia's compelling public policy against usurious lending practices"). And both the tribal officials and non-tribal coconspirators, including investors, can be held accountable for their respective roles in facilitating the collection of these unlawful debts. *See id.*; *see also Blackburn v. A.C. Israel Enters.*, 2023 WL 4710884, at *21-25 (E.D. Va. July 24, 2023) (Novak, J.) (finding that even investors in a usurious lending scheme could be held liable under RICO for their separate conduct in facilitating and reinvesting in the enterprise).

Through their fraudulent and deceptive conduct, Defendants have taken the tribal lending scheme to a new level, claiming tribal protection while providing absolutely nothing to the tribes— or, in this case, First Nations—whose sponsorship they have stolen. Instead, the non-tribal Defendants have *falsely claimed* and entirely made up an association with the MCK to conceal their owners' roles and dissuade consumers' from seeking relief from their predatory practices or asserting their rights under U.S. law. The First Nations Lenders' Authority ("FNLA"), which likewise has never been authorized by the MCK, is a key part of this fraudulent artifice and, far from being a legitimate First Nations authority, is instead the brainchild of Defendant Travis Jacobs and his John Doe coconspirators designed to provide any usurious lending front that pays an annual membership fee with a "tribal" shield that has no basis whatsoever in law or fact.

3

Indeed, despite the loan contracts purportedly requiring consumers to first bring disputes to the FNLA (http://fnla.ca/dispute-resolution-policy/), when you try to access the FNLA website, no information is found and the site is "under maintenance."



It is therefore unclear whether the First Nations Lenders Authority, which purports to be the initial arbiter of disputes in these agreements, even exists.

For this reason, Plaintiffs have brought claims against not only the conspirators behind the lending fronts—Jacobs, Kapital Solutions, Waters Law Office, and the John Doe Defendants—but the lending fronts themselves, who are nothing more than private, non-tribal businesses subject to the laws of the states in which they lend, as with any other lender. As is typical, however, the identities of many of the primary drivers and investors behind the lending fronts' activities have been intentionally concealed from public view, hidden behind corporate shells and undisclosed organizational structures. For this reason, Plaintiffs seek leave to conduct early discovery into the identities of the John Doe Defendants who are the principal actors in this unlawful scheme, so that they may be brought to account for their conduct sooner and avoid further harm to Plaintiffs and the putative class members.

Indeed, the lending fronts are actively issuing wage assignment letters to garnish the hard-earned income of Plaintiffs and other low-income individuals. *See, e.g.,* Ex. 1 (Wage Assignments). As recently as March 6, 2026, Plaintiffs' counsel has been contacted by consumers against whom Defendants have issued wage assignments. *See id.* If discovery into the John Doe Defendants' identities is delayed to the normal schedule, these wage assignments will continue

unabated, and the John Doe Defendants will have time to collect the entire balances on these short-term loans and further attempt to hide their respective roles and ill-gotten gains from the scheme. John Doe discovery is especially needed here because the members of the conspiracy have concealed their identities so well that even the members of the Mohawk Council of Kahnawà:ke do not know "who is behind this lending scheme." *Id*. at ¶ 33. Furthermore, most of the named Defendants in this case are Canadian citizens and thus subject to service via the Hague Convention—a process that, although already started, will take several months.  Thus, if Plaintiffs were to wait until all parties were served, all motions to dismiss decided, and a Rule 26(f) conference scheduled, not only would Plaintiffs and the putative class members continue to suffer irreparable harm from their stolen wages, but the John Doe Defendants will have further opportunity to hide their identities, dilute their assets, and claim that the statute of limitations bars this case.

Accordingly, Plaintiffs respectfully request that the Court grant them leave to issue the subpoenas attached to this Memorandum as Exhibits 2 through 11.  As explained below, each subpoena is tailored to obtaining information that is likely to reveal the identities of the individuals behind the lending fronts at issue in this case.  This includes the credentialing files maintained by the consumer reporting agencies for each of the lending fronts that are required by the Fair Credit Reporting Act, as well as information from individuals and businesses with a known association with the lenders in this case.  As the information sought is relevant and narrowly tailored to uncovering the identities of the John Doe Defendants, and because waiting until ordinary discovery commences to determine their identities will cause undue prejudice to Plaintiffs, Plaintiffs respectfully request that their Motion be granted.

## LEGAL STANDARD

"Federal Rule of Civil Procedure 26(b) authorizes courts to alter the frequency and extent of discovery as guided by the subsections in that rule." *LHF Prods., Inc. v. Does*, 2016 WL 7422657, at *5 (E.D. Va. Dec. 22, 2016) (Lauck, J.). Under this rule, "[a] district court has 'wide latitude in controlling discovery and . . . its rulings will not be overturned absent a showing of clear abuse of discretion.'" *Id.* (quoting *Rowland v. Am. Gen. Fin., Inc.*, 340 F.3d 187, 195 (4th Cir. 2003) (internal quotations and citations omitted)).

Pursuant to Rule 26(d)(1), a court may authorize discovery prior to a Rule 26(f) conference. *Id.* This includes discovery into the identities of John Doe Defendants. *See id.* (granting motion for leave to take John Doe discovery from third parties, as it was in the "interest of justice" to do so); *see also Hard Drive Prods., Inc. v. Does 1-30*, 2011 WL 2634166, at *3-4 (E.D. Va. July 1, 2011) (Miller, M.J.) (granting motion for leave to take John Doe discovery prior to Rule 26(f) conference, as delay would cause irreparable harm to the plaintiffs). "Courts have found that immediate discovery 'should be granted when some unusual circumstances or conditions exist that would likely prejudice the party if he were required to wait the normal time.'" *Hard Drive Prods.*, 2011 WL 2634166, at *1 (quoting *Fimab-Finanziaria Maglificio Fratelli Fila, S.p.A. v. Helio Import/Export, Inc.*, 601 F. Supp. 1, 3 (S.D. Fla. 1983) (internal citations omitted)). This includes when a party would suffer from ongoing harm absent the expedited discovery of the identities of the John Doe Defendants. *See id.*

## ARGUMENT

I.    **The Subpoenas Seek Information Likely to Disclose the Identities of the John Doe Defendants Behind Each Lending Front.**

Plaintiffs seek leave to serve ten third-party subpoenas seeking information that will likely reveal the identities of the individuals or entities behind the lending fronts at issue in this case: (1)

6

a document subpoena to DataX, Ltd., a self-described "special finance credit reporting agency"[2] and subsidiary of Equifax that provided credit reports on Plaintiffs and other consumers to the various lending fronts, (*see* Ex. 2); (2) a document subpoena to FactorTrust, a TransUnion subsidiary and second credit reporting agency that provided reports on Plaintiffs and other consumers to the lending fronts, (*see* Ex. 3);[3] (3) subpoenas for documents and a deposition to FinSANA, a Canadian "fintech" company with U.S. offices that provides software support to payday lenders, including the lending fronts in this case, (*see* Ex. 4); (4) a document subpoena to the Online Lenders Alliance, a Virginia-based trade group for payday lenders whom Defendant Travis Jacobs advertised the lending fronts' membership in (*see* ECF No. 1-3 at 14), (*see* Ex. 5); (5) a document subpoena to Universal Service Group, a Nevada company from whom consumers must consent to receiving texts when they apply for their loans, (*see* Ex. 6); (6) subpoenas for deposition testimony from three notaries who signed the wage assignments on behalf of the lending fronts and have a known association with them, (*see* Exs. 7-9); (7) a document subpoena to the United States Postal Service for information on the individual who opened a PO Box address listed for Strategic Solution Services on its wage assignments, (*see* Ex. 10); and (8) a document subpoena to the United Parcel Service for the information on an private mailing box listed for Strategic Solution Services on its wage assignments, (*see* Ex. 11).

As explained below, each of these subpoenas seeks documents and communications targeted at uncovering the individuals and entities behind the lending fronts' operations.

---

[2] *See* https://dataxltd.com/.
[3] *See* https://www.transunion.com/client-support/factortrust-consumer-inquiry.

A.    **The Subpoenas to DataX and FactorTrust Seek Credentialing Files for each Lending Front that Will Identify the Persons Behind Each Front.**

DataX and FactorTrust are both consumer reporting agencies (CRAs) that serve creditors in the subprime lending market. They are both CRAs from whom the lenders in this case obtained credit reports on Plaintiffs and other putative class members. Because they are CRAs, DataX and FactorTrust are obligated under the Fair Credit Reporting Act to ensure that the customers who purchase their consumer reports have a permissible purpose for using them. *See* 15 U.S.C. § 1681b. As part of this obligation, CRAs conduct so-called "credentialing" of prospective customers to ensure they have a legitimate use for their products.

Indeed, DataX has submitted a sworn affidavit in other litigation attesting to its credentialing of users, stating:

> Because the FCRA requires consumer reporting agencies to provide "consumer reports" only to those users it reasonably believes to have a permitted purpose for using such reports, and to verify the identity of new prospective users, DataX employs and performs a standardized credentialing policy and process to vet prospective customers.

*See* Ex. 12 (Tillman Decl.) at ¶ 6. This "standardized credentialing policy and process" entails: obtaining "an explanation of the prospective customer's permissible purpose for using 'consumer reports'"; collection of "a business license or articles of incorporation from the prospective customer"; verification of the customer's phone number; screening "for Patriot Act compliance"; and, importantly, engaging "a third party vendor to conduct an onsite inspection of the prospective customer's place of business" in order to "verify[] that the company is a bona fide business" and "that the offices and facilities are secure with regards to consumer data." *Id.*

After passing this process, a DataX user must then sign a contract with DataX governing its use of the consumer reports that it purchases, including signing a certification that the user has a permissible purpose for such reports. *Id.* ¶ 7. DataX also "maintains retrievable records from

8

which it can determine to which entities it furnished a report regarding any specific consumer." *Id.* ¶ 8. Plaintiffs' counsel understands that FactorTrust would hold similar records and credentialing information on the lending fronts that purchased its credit reports in order to comply with the FCRA.

As DataX's own affidavit confirms, the information it and FactorTrust obtains and maintains on each user of its credit reports will be directly relevant to identifying not only the physical locations at which each lending front in this case operates, but also the individuals behind the scenes who signed the credentialing forms, responded to credentialing questions, and ultimately executed the contracts with DataX and FactorTrust that governed the parties' relationship. Such information will no doubt reveal the main players behind the lending fronts' operations and, thus, the John Doe Defendants in this case. Plaintiffs therefore seek leave to subpoena both DataX and FactorTrust for their credentialing files on each of the lending fronts in this case, as well as their contracts with each front and related communications with each entity.

Plaintiffs have limited their subpoenas to these two CRAs because these are the two CRAs that Defendants use for their lending operation after a review of all Plaintiffs' consumer reports.

**B.      The Subpoena to FinSANA Seeks Information on the Individuals at each Lending Front with Whom It Interacted.**

As mentioned, FinSANA is a Delaware limited liability company with a principal place of business in Quebec that advertises its technical support for payday lenders like the lending fronts in this case.[4] FinSANA is also associated with Constantine Radiotis and Mark Bettiol, individuals with known associations to the tribal lending industry. *See* FinSANA, Crunchbase (Mar. 17, 2026), https://www.crunchbase.com/organization/finsana (identifying Bettiol and Radiotis as

---

[4] *See* https://www.crunchbase.com/organization/finsana.

"Key People" at the company); Ex. 13 (Radiotis Decl.) (claiming relationship to FinSANA); *Bradby v. Koetting*, No. 3:25-cv-0026-RCY, ECF No. 1 (E.D. Va. Jan. 15, 2025) (naming Bettiol as a defendant and detailing his involvement in similar tribal lending scheme).

As indicated on LinkedIn, FinSANA is "a financial services company that specializes in technology solutions that facilitate the servicing of near prime and non-prime consumers." Ex. 14. FinSANA's focuses on "data science, marketing, collections, payment processing," and claims to be "a leader in an industry where consumers are not well-served by traditional banks and their products." *Id*. "Over the last 15 years," FinSANA has "serviced millions of consumers in" North America "that have urgent credit needs." *Id*.

Considering its associations with online lending and that, like the lending fronts here, it is also headquartered in Quebec, Plaintiffs believe FinSANA has business relationships with the lending fronts, FNLA, Travis Jacobs, and other coconspirators in this case. And even if they do not have a direct relationship with the lending fronts, FinSANA may still have relevant information given its presence in the industry and the location of its headquarters. For this reason, Plaintiffs seek documents and communications from FinSANA related to each lending front in this case, including any agreements with each entity, as it would tend to identify the primary individuals with whom FinSANA, Radiotis, and Bettiol interact at each lending front. Plaintiffs also seek to subpoena FinSANA for a deposition to inquire into its knowledge of the lending fronts' activities.

**C.    The Subpoena to the Online Lenders Alliance Seeks Information on the Individuals at each Lending Front with Whom it Interacted.**

Like the FinSANA subpoena, Plaintiffs' proposed subpoena to the Online Lenders Alliance also seeks documents, contracts, and communications involving each lending front, which would tend to show the individuals at each front who had responsibility for the fronts' participation in

OLA's activities.  Indeed, Defendant Travis Jacob has already openly admitted that the FNLA and the fronts under its umbrella are members of the OLA.  *See* ECF No. 1-3 at 14.

Each lender's website also had the seal of the OLA indicating an affiliation with the organization. *See* www.onlinelendersalliance.org/look-for-the-ola-seal/ ("When you see the OLA seal, you can trust you're working with a company committed to the highest standards of conduct, dedicated to ensuring the best possible experience for their customers, fully compliant with federal law, and working hard to protect consumers from fraud. When you click on the OLA seal on an OLA member's website, it will direct you to this video. If it does not, the site may be fraudulent.") Because each of the lending fronts displays the OLA seal, Plaintiffs suspect that the OLA, which is based in Virginia, will have relevant information on the persons at each front and the FNLA who were the primary contacts for the Alliance. *See, e.g.*,    www.unclewarbuks.com; www.rapitalcapital.com; www.moneymessiah.com.   Plaintiffs' limited subpoena seeks this information and the communications between the fronts and the OLA that would further establish the fronts' principal operators.

**D.    The Subpoena to Universal Service Group Seeks Information on the Individuals at each Lending Front with Whom It Interacted.**

Universal Service Group, Inc. also has known ties to the lending fronts in this case and the John Doe Defendants behind them.  For example, the website of www.lineofcreditnow.com has USG listed at the bottom as the holder of the copyright for the content.  USG is also the entity that sends consumers text messages regarding their loans on behalf of many of the lending fronts, as indicated by the consent each applicant must provide during the application process:

11

*See* Ahead Lending, https://app.aheadlending.com/register (last visited Mar. 17, 2026).  The

President of USG listed on its Nevada business registration, Kirby Delisle, is also listed as the sole

proprietor of several of the lending fronts in this case, including Arrow Valley and Arrow

Mountain.  *Compare* Ex. 15 (USG Registration), *with* Ex. 16 (Bennett Compl.) at ¶¶ 22-23.

Considering Mr. Delisle's close ties to the lending fronts in this case and USG's admitted

relationship to the same, Plaintiffs seek leave to serve a subpoena on USG—a Nevada company—

for documents and communications with each lending front, including contracts, which would tend

to reveal the names of the John Doe Defendants behind each front.

> **E.** **Plaintiffs Seek to Depose the Three Notaries who Signed the Wage Assignments and Who Have Listed Strategic Solution Services as an Employer.**

As mentioned, Strategic Solution Services has issued—and still is issuing—wage

assignments demanding wages from Plaintiffs' employers to pay their usurious loans.  *See, e.g.*,

Ex. 1 (Wage Assignments).[5]  These assignments are signed by at least three notaries commissioned

in Illinois: Lisa Bruno, David Mendoza and Mary Alice Lackey.  *See id.*  The Illinois registration

---

[5] Personal identifying information such as Social Security Numbers have been redacted from this exhibit pursuant to the Local Rules.

for Ms. Lackey and Ms. Bruno also identifies each of them as an employee of Strategic Solution

Services (Mr. Mendoza lists no employer but is believed to also be in Strategics' employ). *See*

https://apps.ilsos.gov/notarysearch/notarysearch (last visited Mar. 17, 2026).

Because notaries must submit with their applications information on their employer,

location, and identity, Plaintiffs have filed a Freedom of Information Act requests for the

application materials for each of these notaries.  Once they have determined the notaries' locations

based on their application materials, Plaintiffs seek leave to subpoena their depositions so that they

can provide insights into their knowledge of Strategic's operations, including its managers and

supervisors, as well as the other lending fronts under the Strategic umbrella.

**F.      The Subpoenas to USPS and UPS Seek Information on PO Boxes associated with Strategic and Speedy Servicing.**

Finally, Plaintiffs request leave to serve subpoenas on the United States Postal Service and

United Postal Service for information on the persons behind addressees listed for Strategic

Solution Services on its wage assignments.  Specifically, Strategic lists its address as PO Box 189,

Lombard, Illinois 60148.  *See* Ex. 1 (Wage Assignments).  A related entity, Trois-Rivieres

Solutions, also lists an address at PO Box 147, Beloit, Wisconsin 53512.  *See id.*  These are both

USPS Post Office Boxes and, as such, must be opened by an individual with a verified identity.

For this reason, Plaintiffs have submitted a form to USPS requesting the boxholder information

for the PO Boxes, but in case these requests are delayed or denied, they further request leave from

this Court to issue a subpoena for the same information.

Likewise, using the Wayback machine, Plaintiffs have determined that Defendant Speedy

Servicing d/b/a Dash of Cash listed the address for payments to be sent as 40 E. Main Street, Ste.

508D, Newark, Delaware 19711.  This address is a UPS store, and the number, 508D, is a private

box within the store.  To open a business mailbox, UPS requires "two valid forms of identification,

one of which must include a photograph." *See* Business Mailboxes, The UPS Store, https://www.theupsstore.com/mailboxes/business-mailboxes (last visited Mar. 18, 2026). Plaintiffs therefore seek leave to subpoena UPS for information related to the owner of the business mailbox opened at the above address, as it would show the identity of the individual who opened the box on behalf of Speedy Servicing, who presumably has a key role in its operations.

## II.    John Doe Discovery is Appropriate Prior to a Rule 26(f) Conference to Avoid Continued Prejudice to the Plaintiffs and Other Consumers.

As mentioned, courts generally grant leave to conduct pre-26(f) discovery, including into the identities of John Doe Defendants, "'when some unusual circumstances or conditions exist that would likely prejudice the party if he were required to wait the normal time.'" *Hard Drive Prods.*, 2011 WL 2634166, at *1.

In *Hard Drive Productions*, for example, Judge Miller found expedited discovery necessary, as information on the IP addresses behind alleged infringers of copyrighted material were only stored for a short period, meaning "Plaintiff will not be able to serve the Complaint on Defendants and, in turn, not receive remedies for the copyright infringement." *Id.* at *2.

Likewise, in *LHF Productions*, Judge Lauck found that it was "in the interest of justice" to allow discovery into the identities of John Doe Defendants, including because "LHF requires discovery to advance its asserted claims." 2016 WL 7422657, at *2, 5. Other courts have also found the need for identifying information to advance the plaintiffs' claims sufficient to order John Doe discovery. *See, e.g.*, *McMann v. Doe*, 460 F. Supp. 2d 259, 265–66 (D. Mass. 2006) (holding a court should allow expedited discovery if the plaintiff will otherwise be denied the proper remedy); *Sony Music Entm't Inc. v. Does 1–40*, 326 F. Supp. 2d 556, 565–66 (S.D.N.Y. 2004) (allowing expedited discovery when there was a need for the subpoenaed information to advance the claims).

The same reasoning applies here.  Plaintiffs need to identify the John Doe Defendants to hold them responsible for their role in advancing the usurious lending conspiracy at the heart of this case.  Indeed, as join tortfeasors, the John Doe Defendants are separately liable for their own role in causing harm to Plaintiffs and the putative class members.  *See Blackburn v. A.C. Israel Enters.*, 2023 WL 4710884, at *21-25 (E.D. Va. July 24, 2023) (Novak, J.) (finding that even investors in a usurious lending scheme could be held liable under RICO for their separate conduct in facilitating and reinvesting in the enterprise).  Without identifying who these John Doe Defendants are, therefore, Plaintiffs cannot properly advance their separate claims against them and obtain relief, including appropriate injunctive relief.

Immediate discovery of the John Doe Defendants' identities is particularly necessary in this case, as nearly all of the named Defendants are Canadian residents and as such require service under the Hague Convention, which has a six-month waiting period after service is first delivered to the Central Authority in Canada before this Court can assume service to be completed.  *See* Ex. 17 (Text of Convention on the Service Abroad of Judicial and Extrajudicial Documents) at art. 15 (requiring a minimum of six months after delivery to the central authority in a foreign jurisdiction before a domestic judge can assume service and render judgment).  Although Plaintiffs have started this process, it will be some time before service can be effectuated or presumed, which will in turn delay the course of ordinary discovery. The filing of motions to dismiss by the Canadian defendants once they have been served will only then further delay discovery.  During these delays, the John Doe Defendants will be able to further conceal their identities and involvement in the lending scheme, as they will no doubt learn of the lawsuit before they can be properly served.

As Defendants have also demonstrated, without holding them to account, they will continue to issue wage assignments to collect on their usurious loans, reaping additional benefits

from their unlawful scheme and causing additional harm to low- and middle-income Americans nationwide.  If allowed extra time for ordinary discovery to begin, these ill-gotten gains could be spent, disbursed, and reinvested in other ventures, allowing those funds to escape the reach of Plaintiffs if and when a judgment is obtained.[6]  In addition to the ongoing garnishment of consumers wages, this constitutes irreparable harm.

Further, Plaintiff anticipates bringing the John Does before the Court once they and their role in the enterprise are identified. Doing this now, before motions to dismiss have been filed, will prevent delays and multiple rounds of motions practice, promoting judicial efficiency and the interests of justice.

Accordingly, Plaintiffs respectfully request leave to serve the above subpoenas in advance of the ordinary discovery schedule, as each subpoena seeks information tailored to discovering the identities of the John Doe Defendants, who are separately liable to Plaintiffs and whose continued concealment will only further prejudice Plaintiffs' ability to hold them to account for their conduct.

### CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request leave to conduct John Doe Discovery.

Respectfully submitted,
**PLAINTIFFS,** *individually and on behalf of all others similarly situated*

By: */s/ Kristi C. Kelly*
Kristi Cahoon Kelly, VSB #72791
Andrew J. Guzzo, VSB #82170
Casey S. Nash, VSB #84261
Patrick McNichol, VSB No. 92699

---

[6] Indeed, in a similar tribal lending case, *Williams v. Martorello*, the defendant, Matt Martorello, used overseas trusts to hide his assets and avoid collection, even after Judge Payne issued a judgment against him.

Matthew G. Rosendahl, VSB No. 93738
**KELLY GUZZO PLC**
3925 Chain Bridge Road, Suite 202
Fairfax, Virginia 22030
Telephone: (703) 424-7572
Facsimile: (703) 591-0167
Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com
Email: casey@kellyguzzo.com
Email: pat@kellyguzzo.com
Email: matt@kellyguzzo.com


**SERAPH LEGAL, P.A.**

Bryan J. Geiger (*pro hac vice* to be filed)
Florida Bar No. 119168
bgeiger@seraphlegal.com
Thomas M. Bonan (*pro hac vice* to be filed)
Florida Bar No. 118103
tbonan@seraphlegal.com
3505 East Frontage Road, Suite 145
Tampa, FL 33607

*Counsel for Plaintiffs*

17