# Exhibit 16

**UNITED STATED DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

| | |
|---|---|
| MALCOLM BENNETT and DONNA D'ELIA, *individually and on behalf of others similarly situated,* | |
| Plaintiffs, | |
| v. | |
| ASHLEY ANN AIREY*, doing business as* GREEN FUNDS GROUP and GREEN FUNDS EXPRESS, ATTENTIVE MOBILE, INC., DAVE BERNARD, *doing business as* RIVER FUNDS, MIDDAY GREEN, EAGLE WING CREDIT, and FAST GREEN DIRECT, FINSANA, LLC, KIRBY DELISLE, *doing business as* ARROW VALLEY LOANS, ARROW MOUNTAIN FUNDING, RAPID ARROW LOANS, and SWIFT DEER LENDING, NCR FINANCIAL SERVICES, INC., THE FIRST NATIONS LENDERS' AUTHORITY, and WATERS LAW OFFICE, PLLC d/b/a WLO PAYMENTS, | Case No.: 8:25-cv-1534  JURY TRIAL DEMANDED |
| Defendants. | |

**CLASS ACTION COMPLAINT**

COME NOW, the Plaintiffs, Malcolm Bennett ("Mr. Bennett") and Donna

D'Elia ("Ms. D'Elia"), on behalf of themselves and all similarly-situated individuals,

by and through their attorneys, Seraph Legal, P.A., and complain of the Defendants,

Ashley Ann Airey ("Airey"),  *doing business as* Green Funds Group and Green Funds

Page **1** of **52**

Express, Attentive Mobile, Inc. ("Attentive"), Dave Bernard ("Bernard"), *doing business as* River Funds, Midday Green, Eagle Wing Credit, and Fast Green Direct, Finsana, LLC ("Finsana"), Kirby DeLisle ("DeLisle"), *doing business as* Arrow Valley Loans, Arrow Mountain Funding, Rapid Arrow Loans, and Swift Deer Lending, NCR Financial Services, Inc. ("NCR"), The First Nations Lenders' Authority ("The FNLA"), and Waters Law Office, PLLC *doing business as* WLO Payments ("WLO Payments") (collectively, the "Defendants"), stating as follows:

## DESCRIPTION OF THE CASE

1.      This is an action against all Defendants for violations of the *Racketeer Influenced and Corrupt Organizations Act*, 18 U.S.C. § 1961, *et seq.* ("RICO"), Florida's *Civil Remedies for Criminal Practices Act*, § 772.102, Fla. Stat., *et seq.* ("CRCPA"), and for unjust enrichment, and against Airey, Bernard, DeLisle, Finsana, and NCR for violations of the *Florida Consumer Collection Practices Act*, § 559.55, Fla. Stat., *et seq.* ("FCCPA").

2.      The Defendants operate or provide various services essential to the operation of the following lending websites:

    a.      https://www.greenfundsexpress.com ("Green Funds Express");

    b.      https://www.arrowvalleyloans ("Arrow Valley");

    c.      https://www.greenfundsgo.com/ ("Green Funds Go");

    d.      https://www.arrowmountainfunding.com/ ("Arrow Mountain");

    e.      https://www.swiftdeerlending.com/ ("Swift Deer Lending");

    f.      https://www.rapidarrowloans.com/ ("Rapid Arrow");

g.     https://www.middaygreen.com/ ("Midday Green");

h.     https://www.fastgreendirect.com/ ("Fast Green");

i.     https://www.riverfundsgroup.com ("River Funds"); and,

j.     https://www.eaglewingfunds.com/ ("Eagle Wing") (collectively, the "FNLA Lending Websites.")

3.     Loans made through the FNLA Lending Websites charge interest rates exceeding **600%** annually – rates significantly above the maximum legal rate in most states, including Florida. Indeed, Florida law prohibits usury and caps interest rates at 18% annually. Interest rates of 45% and higher are deemed a felony. *See* Section 687.071(3), Florida Statutes. Loans made at usurious rates are void *ab initio* under Florida law.

4.     Until recently, the FNLA Lending Websites represented that the lender responsible for making the loans was a "a subsidiary agency of The First Nations Lenders' Authority" and that The FNLA "is an independent body with the mandate to oversee short-term lending service businesses within and from the Mohawk Territory of Kahnawake."[1]

5.     By asserting First Nation governance, and through the use of choice-of-law provisions and assertions American borrowers must file legal action in Quebec, Defendants have attempted to strip consumers of any remedies they may have under state law, and attempted to circumvent state usury laws, such as Florida's. However,

---

[1] Kahnawake is also written as "Kahnawá:ke."

the notion that Arrow Mountain is operated primarily by, and/or for the benefit of the Mohawk Territory of Kahnawake is a farce.

6. The Mohawk Council of Kahnawake has expressly disavowed any relationship with the FNLA, and by extension, the FNLA Lending Websites. On or about March 17, 2025, the Mohawk Council of Kahnawake served a cease-and-desist order (the "Cease-and-Desist Order") to a number of the Defendants, including DeLisle, Finsana, and NCR. This Cease-and-Desist Order indicated that the FNLA does not operate from within the Mohawk Territory of Kahnawake and that the Mohawk Council of Kahnawake has never granted the FNLA any authority to oversee lending operations within its territory. A copy of the Cease-and-Desist Order is attached hereto as Exhibit A.

7. Plaintiffs both obtained loans from Green Funds Express while located in Florida. These loans assessed interest in excess of 680% annual percentage rate ("APR"), more than 22 times the rate permitted by Florida law, even with a consumer lending license.

8. To facilitate collection of the usurious loans, Green Funds Express and its sister websites utilize text-messaging services owned and operated by Attentive, which was aware its services were being utilized in connection with the collection of unlawful debts.

## JURISDICTION AND VENUE

9. Subject matter jurisdiction for Plaintiffs' federal claims arises under RICO, 18 U.S.C. § 1965, and 28 U.S.C. § 1331.

10. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

11. This Court may also exercise jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1332, as the matter in controversy exceeds $5,000,000 and Plaintiffs are all residents of a different state from any Defendant.

12. Venue is proper in the Middle District of Florida, pursuant to 28 U.S.C. § 1391(b), because the events giving rise to this cause of action occurred within the Middle District Florida, including in this Division.

## PARTIES

### Plaintiffs

13. Ms. D'Elia is a natural person who at all times relevant has resided in Lutz, Hillsborough County, Florida, where she maintains her permanent residence.

14. Mr. Bennett is a natural person who at all times relevant has resided in Lakeland, Polk County, Florida, where he maintains his permanent residence.

15. Mr. Bennett and Ms. D'Elia are *Consumers* as defined by the FCCPA, § 559.55(8), Fla. Stat.

### Defendants

16. Airey is registered as a sole proprietor in Quebec, conducting business under the names Green Funds Group and Green Funds Express.

17. Airey's address is listed in the Quebec *Registraire des Entreprises* as CP 2009 Kahnawake (Quebec) J0L1B0 Canada.

18. Attentive is a New Jersey corporation with a primary business address of 221 River Street, Suite 9047, Hoboken, NJ 07030.

19. Attentive's Florida registered agent is Cogency Global, Inc., 115 N Calhoun St., Suite 4, Tallahassee, FL 32301.

20. Bernard is registered as a sole proprietor in Quebec, conducting business under the names River Funds, Fast Green, Midday Green, and Eagle Wing.

21. Bernard's address is listed in the Quebec *Registraire des Entreprises* as 117 rue Nolka Wôlinak (Quebec) G0X1B0 Canada.

22. DeLisle is registered as a sole proprietor for more than a dozen business names in Quebec, including Arrow Valley, Arrow Mountain, Rapid Arrow, and Swift Deer Lending.

23. DeLisle's address is listed in the Quebec *Registraire des Entreprises* as CP PO Box 2503 Kahnawake (Quebec) J0L1B0 Canada.

24. Finsana is a Delaware limited liability company with a principal business address of 4480 Chem. de la Côte-de-Liesse, Suite 355 Mount Royal, Quebec, Canada H4N2R1.

25. Finsana's Delaware Registered Agent is Corpomax, Inc., 2915 Ogletown Rd., Newark, DE 19713.

26. NCR is registered in Quebec, Canada as a corporation under Quebec's Business Corporations Act (RLRQ, C. S-31.1).

27. NCR's address is 4480 ch. de la Côte-de-Liesse, Mont-Royal, Quebec, Canada H4N2R1.

28. NCR's majority shareholder is Constantinos Radiotis, who is listed as the President, Secretary, and Treasurer of NCR in filings with the Quebecois government.

29. The FNLA states it operates from 1 Patton Road, P.O. Box 2012, Mohawk Territory of Kahnawake (Quebec), J0L 1B0, Canada.

30. WLO Payments is a Montana professional limited liability company with a principal business address of 11 W Main St., Suite 217, Belgrade, MT 59714.

31. WLO Payments' Montana registered agent is Dustin Gahagan, 11 W Main St., Suite 217, Belgrade, MT 59714

## FACTUAL ALLEGATIONS

### Green Funds Express Makes Usurious Loans to Plaintiffs

32. On or about June 6, 2024, Mr. Bennett obtained a loan from Green Funds Express in the principal amount of $300. A copy of the Loan Agreement is attached hereto as Exhibit B.

33. Mr. Bennett took the loan out from his home in Florida, had the proceeds wired to his checking account which he maintains in Florida, signed all relevant documents in Florida, received loan communications in Florida, and had payment debited from his checking account at a Florida bank.

34. Green Funds Express charged an interest rate of 740.13% annually on the Loan, requiring Mr. Bennett to repay a total of $958.26 for the $300 loan.

35. On or about October 6, 2022, Green Funds Express made a $1,000 loan to Ms. D'Elia.

36. The stated interest rate of the Loan exceeded 600% annually.

37. Ms. D'Elia repaid the loan early, paying $1,391.85 by October 27, 2022.

38. Ms. D'Elia thus paid $391.85 of interest on the October 2022 loan, which equates to an interest rate of 752.63% annually.

39. On or about October 2, 2023, Ms. D'Elia obtained a second loan from Green Funds Express in the principal amount of $1,000. A copy of the Loan Agreement is attached hereto as Exhibit C.

40. Ms. D'Elia took both loans out from her home in Florida, had the proceeds wired to her checking account which she maintains in Florida, signed all relevant documents in Florida, received loan communications in Florida, and had payments debited from her checking account at a Florida bank.

41. Green Funds Express charged an interest rate of 686.60% annually on the 2023 loan, requiring Ms. D'Elia to repay a total of $3,104.15 for the short-term, $1,000 loan.

42. Plaintiffs utilized the proceeds from the Loans for personal and household expenses, and thus, the Loans meet the definition of *Debt* under the FCCPA, § 559.55(6), Fla. Stat.

43. The IP address for the server hosting GreenFundsExpress.com is 169.55.151.1, which corresponds to a physical location in the United States and inside a data center operated by SoftLayer Technologies, Inc.

44. Mr. Bennett and Ms. D'Elia each made payments to Green Funds Express.

45. Green Funds Express later claimed Ms. D'Elia owed substantially more than $1,000, despite significant payments against the loan.

46. Green Funds Express later claimed Mr. Bennett owed substantially more than $300, despite significant payments against the loan exceeding the principal amount borrowed.

### The Loans Are Void Under Florida Law

47. Section 687.02(1), Fla. Stat., renders any extension of credit made at annual interest rates greater than 18% per year usurious.

48. Section 687.071(3), Fla. Stat., renders the making of a loan charging interest above 45% per year a third-degree felony.

49. Section 687.071(7), Fla. Stat., renders any criminally usurious loan void and unenforceable.

50. Any person who willfully makes a criminally usurious loan, in addition to subjecting themselves to criminal sanctions, forfeits the right to collect payment for the loan. *Richter Jewelry Co. v. Schweinert*, 169 So. 750, 758-59 (Fla. 1935).

51. Florida has taken usury one step further in the consumer loan context through the passing of the Consumer Finance Act, § 516, Fla. Stat. (the "Act").

52. The Act requires licensure and state oversight for lenders issuing loans to Florida consumers in the amount of $25,000 or less. § 516.02(1), Fla. Stat.

53. The Act further restricts the interest and fees which may be charged by a licensed consumer finance company.

54.    Section 516.02(c), Fla. Stat., indicates that any loan which fails to comply with the Act is unenforceable in Florida *even if valid wherever made.*

55.    None of the Defendants are licensed as a Consumer Finance Company in Florida.

56.    Plaintiffs' Loans do not come close to complying with the Consumer Finance Act, as they assess interest at more than 20x the maximum proscribed rate.

57.    Thus, Plaintiffs' Loans are unenforceable against Plaintiffs, even assuming, *arguendo*, they were somehow valid under the law of a Canadian First Nation, or wherever else they may have been made.

58.    Plaintiffs' loan agreements contain a choice-of-law provision indicating the laws of the Mohawk govern; however, the Mohawk Council of Kahnawake have expressly disavowed authorizing or regulating these loans and have further made clear that no Mohawk law authorizes such loans. *See* Exhibit A.

59.    Canada criminalizes usury if a loan assesses interest rates greater than 60% annually, with no exception for loans made by persons claiming affiliation with a First Nation. *See* Section 347 of the Criminal Code of Canada.

60.    Thus, Plaintiffs' Loans are void regardless of whether Florida law, Mohawk law, or Canadian law applies to the loans.

## THE LENDING ENTERPRISE

### Airey, Bernard, and DeLisle

61.    The FNLA Lending Websites make loans to borrowers over the internet.

62.     When a borrower is approved for a loan, the borrower is presented with a loan agreement for electronic execution, such as the loan agreements signed by Ms. D'Elia and Mr. Bennett. *See* Exhibits B and C.

63.     These loan agreements state a generic business name as the lender. For example, Green Funds Express' loan agreement states, "Lender Information: Green Funds Group DBA GFX." *Id.* Arrow Mountain's loan agreements state, "Lender Information: Arrow Mountain Funding."

64.     These "lenders" are tradenames registered to Airey, Bernard, or DeLisle, who conduct business under the various lender names as sole proprietors.

65.     On information and belief, Airey, Bernard, and DeLisle each claim *some* affiliation with the Mohawks of Kahnawake, albeit not in any official or governmental capacity.

66.     By utilizing First Nation members as the sole proprietors for the trade names conducting business through The FNLA Lending Websites, the Defendants claim some level of First Nation legitimacy, even when the Mohawk Council denies such affiliation.

67.     However, Airey, Bernard and DeLisle are not the primary beneficiaries of their respective Lending Websites.

### NCR & Finsana

68.     The FNLA Lending Websites are all bankrolled and managed, at least in part, through NCR and Finsana.

69.     NCR and Finsana are run by Constantine "Costa" Radiotis ("Radiotis"), a Montreal-based businessman with significant experience in online payday lending.

70.     Radiotis' empire includes dozens of lenders purportedly affiliated with American Indian tribes, several lenders operating with legitimate state licenses from Utah or Missouri, and some outside of the United States, including in Panama, as well as the more than a half-dozen named herein, which claim affiliation with First Nations in Quebec.[2]

71.     While these NCR-affiliated lenders have many different affiliations – American Indian, First Nation, Utah- and Missouri-based, etc. – each and every lender, including Green Funds Express, is answered by the same automated phone system, using the same computer-generated voice, and containing the exact same error: "Thank you for calling (lender name). To ensure proper *experience* (SIC) all calls will be recorded for quality and compliance purposes."

72.     Further, every Radiotis-related lender appears to share the exact same ACH Processor, WLO Payments.[3]

73.     In October 2023, the $1,000 loan proceeds from Ms. D'Elia's loan were transferred by ACH credit to her checking account in Florida.

---

[2] In addition to The Lending Websites named herein, lenders ostensibly "tribally" owned but controlled by Radiotis, NCR, Finsana, *et al.*, include: Condor Credit (Big Valley Band of the Pomo Indians), First Day Loan, and Rain of Cash (WLCC/Oglala Sioux). Radiotis' non-tribal lending platforms include: NCRU Financial Services (Utah lending license); NCRM Financial Services (Missouri lending license); and Prestamos 911 (Panama-based lender).

[3] "ACH" stands for Automated Clearing House, an electronic payment network allowing quick and cost-effective payment processing from checking and savings accounts.

74. On October 12, 2023, her first payment of $259.53 was debited via ACH debt from her account; the ACH memo line for the transaction stated: "Gfe_Wlo 866-978-3607."

75. 866-978-3607 is a phone number operated by NCR or WLO Payments and answered, generically, as "customer service."

76. The nomenclature for ACH credits and debits for *all* "tribally" affiliated lending platforms operated by NCR and Finsana go as such: Initials of the lender, underscore, WLO, 877-286-5954.

77. Thus, Gfe_Wlo 866-978-3607 indicates an ACH transaction for a loan from Green Funds Express, as Gfe indicates "Green Funds Express."[4]

78. Likewise, Mr. Bennett's $300 loan proceeds were wired to him via ACH by WLO Payments; the ACH credit indicated the payment came from "GFE_WLO," phone number 866-978-3607.

79. The metadata supplied by each "tribal" website for search engines like Google is the same — (lender name) + "Short Term Loans Provider."

80. A Google search for "Arrow Mountain Funding," another lending platform operated by NCR and Finsana and which, prior to the March 17, 2025 Cease & Desist order, claimed to operate under the authority of the Mohawks and the FNLA, results in the following:

---

[4] Other examples of NCR-affiliated lenders include "CDC_WLO 877-286-5954," which indicates a loan from Condor Credit, and FDL_WLO 877-286-5954, which indicates Fast Day Loans.



Arrow Mountain Funding
https://www.arrowmountainfunding.com

Arrow Mountain Funding | Short Term Consumer Loan Provider.

81.     Likewise, a Google search for "Condor Credit," another lending platform operated by NCR and Finsana which operates under the purported authority of the Oglala Sioux in South Dakota, results in the following:



Condor Credit
https://www.condorcredit.com

Condor Credit | Short Term Consumer Loan Provider.

82.     In a similar fashion, a Google search for "Green Funds Go" results in the same template utilized:

Green Funds Go
https://www.greenfundsgo.com

Green Funds Go | Short Term Consumer Loan Provider.

83.     The same is true for a search for "Green Funds Express":



Green Funds Express
https://www.greenfundsexpress.com

Green Funds Express | Short Term Consumer Loan Provider.

84.     The hours of operation for every Radiotis-related lending enterprise are standardized and are listed as Monday-Friday from 8:00 AM to 11:00 PM EST, Saturday and Sunday from 8:00 AM to 9:00 PM EST – even for tribal lenders in PST or MST time zones.

85. The three-dozen lending websites, despite supposedly being operated by geographically-diverse persons, Tribes, and First Nations, are all essentially copy-and-paste jobs of one another.

86. While minor details are changed, the font and text color, as well as the utilization of different stock photos, and the text of the websites are almost verbatim duplicates of one another.

87. For example, FastDayLoans.com – purportedly operated by the Wakpamni Lake Community Corporation and Oglala Sioux in South Dakota – contains the phrase, "Get up to $1000 direct to your bank account in as little as 24 hours," appearing in the upper-right corner of the webpage, as such:

Get up to $1000 direct to your
bank account in as little
as 24 hours.

*See* https://www.fastdayloans.com, accessed December 13, 2024.

88. Likewise, CondorCredit.com, purportedly owned and operated by the Big Valley Band of Pomo Indians in California, contains the same phrase, in the same location, with the same line spacing, as the phrase appears as follows:

Get up to $1000 direct to your
bank account in as little
as 24 hours.

*See* https://www.condorcredit.com, accessed December 13, 2024.

89. Green Funds Go's website contains the identical phrasing, in the same location on the upper-right corner of the website, appearing as follows:

> Get up to $1000 direct to your bank account in as little as 24 hours.

*See* https://www.greenfundsgo, accessed June 5, 2025.

90. Green Funds Express contains the identical phrasing as well:

> Get up to $1000 direct to your bank account in as little as 24 hours.

91. Each of the Radiotis-related lending websites, including Green Funds Go, contains the phrase "How much do you want to borrow?" followed by a slider that lets the user select an amount, with the slider set to $500 by default.

92. The website for every Radiotis-related lending entity contains a series of four testimonials, with a circular picture of the consumer supposedly giving the testimonial.

93. Many of the Radiotis-related lending entities recycle consumer testimonials. For example, "Kimberly W." in Baltimore, MD provided a testimonial

to Cash Lending Group, a non-tribal lender; the identical picture is utilized for a testimonial concerning Fast Day Loans, ostensibly by a "Tricia W."

94.　　The conformity between nearly three-dozen lending websites, including shared call centers, ACH processor and websites, make clear that Radiotis, NCR and Finsana – and not a First Nation or a sovereign tribe – operate each online lender.

### The FNLA

95.　　Prior to April 2025, the FNLA Lending Websites purportedly operated as "subsidiary agencies" of The FNLA.

96.　　The FNLA claimed to operate pursuant to a Charter of The First Nation Lenders' Authority (the "Charter") granted by the Mohawks of Kahnawake, which Charter supposedly granted the authority to regulate "short-term lending service businesses within First Nations Territories." The Charter is attached hereto as Exhibit D.[5]

97.　　The FNLA then granted licenses to each of the FNLA Lending Websites which licenses were available via a link on each website so that any consumer accessing the website would believe the lender to be legitimately licensed by the Mohawks of Kahnawake. For example, Green Funds Express contained the following statement and link:

---

[5] However, as noted in the Mohawk Council's cease-and-desist, no such charter was ever recognized by the Council, or any other legitimate governing authority. *See* Exhibit A at 4, stating "The FNLA's so-called "Charter" does not create any regulatory authority over lending operations and is not recognized by the [Mohawk Council of Kahnawake] or any legitimate governing body."

**About Green Funds Express**

Green Funds Express is a subsidiary agency of The First Nations Lenders' Authority ('FNLA') is an independent body with the mandate to oversee short-term lending service businesses within and from the Mohawk Territory of Kahnawake as a means of promoting and supporting economic development, self-sufficiency and peace, order and good governance within the Territory. The FNLA ensures that short-term lending service businesses operating within and from the Territory are operated honestly, equitably and in the best interests of consumers and the Mohawks of Kahnawake. Please visit the FNLA website here.

 Click here to view our lending license.

An example of a license issued by The FNLA is attached hereto as Exhibit E.

98.     However, as the Mohawk Council never authorized any Charter, the licenses provide no real authority or legitimacy to lend pursuant to Kahnawake law.

99.     The FNLA allowed anyone to apply for certification, charging a mere US$20,000 per year for a lender to become a "General Member," US$7,500 per year to become an "Affiliate Member" (*e.g.*, companies which "assist" licensed lenders), and US$5,000 for "approved vendors." See attached Exhibit F.

100.    Thus, a non-Kahnawake lender interested in acquiring the guise of First Nation legitimacy need only pay roughly US$32,500 for approval.

101.    The Charter mostly purports to regulate "short-term lending service businesses within First Nations Territories," including, ostensibly, maximum interest rates, even though the ability of the FNLA to do this is expressly prohibited by Canadian federal law – a fact the Mohawk Counsel itself does not dispute.

102. While the Charter purports to regulate lending *within* First Nation Territories, online loan applications submitted to Green Funds Express and other lending websites do not so much as permit you to enter a non-US address.

103. Of note, there are 630 recognized First Nations governments or bands in Canada, with territories ranging from Ontario on the east to British Columbia in the west, speaking more than 50 distinct languages.[6]

104. No other First Nation is associated with any online lending business targeting consumers in the United States.

105. No First Nation ratified, condoned, or approved of the Charter, including the Mohawks.

106. Despite supposedly representing the interests of First Nations, The FNLA's "application for certification" did not require the applicant to be a member of a First Nation, or even Canadian.

107. The "application for certification" did not require the applicant to lend solely within the Mohawk Territory of Kahnawake or any other First Nation.

108. To the contrary, all indications point to a requirement that lending occur *only* in the United States.

109. Thus, The FNLA was clearly geared to serve American business interests. The Mohawk Territory of Kahnawake, like all other parts of Quebec and Canada, uses the Canadian dollar as legal tender; yet, despite purportedly being run

---

[6] https://www.thecanadianencyclopedia.ca/en/article/first-nations

by a *Canadian First Nation* authority, every price quoted in the "application for certification" is in United States dollars.

110. Simply put, The FNLA was nothing more than a paper-thin scheme between NCR, Finsana, and their owners and investors, as well as others, such as FNLA officer Travis Jacobs, to convince the public The FNLA is a "real" governing body and, somehow, has authority to regulate lending and interest rates between lenders in Mohawk territory and consumers in the United States.

111. Within a few days of being served the Cease-and-Desist Order, The FNLA Lending Websites, including Green Funds Express, removed all references of the Mohawks of Kahnawake and The FNLA from their website.

112. At present, The FNLA Lending Websites, including Green Funds Express, continue to operate but no longer claim to be operating under the laws of the Mohawk or any other First Nation, nor The FNLA.

113. Thus, The FNLA Lending Websites currently make loans to residents of Florida at interest rates exceeding 600% annually, without any veneer of these rates being authorized by some authority. The websites no longer provide any plausible reason the loans are legal.

**Attentive Knowingly Provided Collection Services to the Enterprise**

114. On numerous occasions, including on December 4, 2024, Ms. D'Elia received collection communications about a loan balance purportedly due to Green Funds Express via text message, which came from SMS short code 43783.

115. The SMS short code 43783 is registered to and operated by Attentive.

116. Attentive advertises that it provides AI-powered services via SMS, which sends out personalized texts.

117. If a consumer responds, Attentive's AI can respond, mimicking that of an actual human's speech, but at a significantly lower cost.

118. Ostensibly, Attentive prohibits certain types of businesses from using its services, including payday lending, debt collection, and short-term high interest loans. *See* https://www.attentive.com/legal/content-policy, accessed December 20, 2024.

119. Thus, on its face, Green Funds Express, which uses the SMS short code 43783 to collect debt on short-term high interest loans, would be excluded from obtaining services.

120. Despite Attentive publishing such prohibitions on its website, in reality, Attentive does little to nothing to police who uses its services and for what purposes.

121. While Attentive claims to vet new customers for content, reputational risk, and so forth, it prioritizes maximizing subscriber revenue over ensuring its content guidelines (which ostensibly prohibit use by high interest short-term lenders like Green Funds Express) over the harm its advanced AI-powered software could do to vulnerable consumers.

122. NCR and Finsana have used Attentive's AI for years to collect debt and send likely what total millions of text messages since at least 2020, or earlier.

123. As one example, on September 23, 2020, the lender First Day Loan, which like Green Funds Express is operated by NCR and Finsana, used Attentive's software and 43783 short code to send a message to a consumer concerning a balance

owed to First Day Loan, a lending platform supposedly operated on the reservation of the Oglala Sioux in South Dakota: "First Day Loan: Please call 888-680-3868 or reply to discuss your arrangement. We can help you get back on track. For info reply HELP" (SIC).

124. In comparison, the December 4, 2024 message to Ms. D'Elia was virtually identical, other than the substitution of the lender's name, phone number, and final sentence: "Green Funds Express: Please call 833-975-4529 or reply to discuss your arrangement. We can help you get back on track. To optout (SIC) reply STOP" (SIC).

125. Both messages are missing punctuation at the end of the last sentence and the non-standard English phase "discuss your arrangement," which further reinforces the nexus between the "American Indian" First Day Loan and the Canadian "First Nation" Green Funds Express.

126. Attentive also has allowed other dubious lenders to use its services, despite its *purported* prohibition against using its services in connection with "short term high interest" loans and for debt collection, including FastLending.com, which uses the 43783 short code to collect debt related to its high-interest loans.

127. Attentive thus participated in the affairs of the Green Funds Express, Green Funds Go, Arrow Valley Loans, Swift Deer Lending, Rapid Arrow Loans, Midday Green, River Funds Group, and Eagle Wing Funds lending enterprises as it knowingly allowed its advanced services to be used by these lending platforms operated by NCR and Finsana over a course of years.

128. Attentive knew its platform was being used for the collection of ultra-high-rate interest debt, and continued to accept payment from NCR, Finsana, and/or related entities to for its use.

### WLO Payments' Participation in the Enterprise

129. As aforementioned, WLO Payments provide ACH processing for loans obtained through The FNLA Lending Websites.

130. WLO Payments specializes in processing ACH, debit card, and credit card payments for entities operating in dubious industries, including online payday lending.

131. WLO Payments also processes credit card and debit card payments for websites with explicit adult content, including ManyVids.com, a Canadian pornography website.

132. The ACH network is administered by the National Automated Clearing House Association ("NACHA"), which implements numerous requirements which participating payment processors must meet.

133. One such requirement is that Originating Depository Financial Institutions ("ODFIs") must gather detailed information about the business operations of their customers to whom they grant access to the ACH network.

134. The ODFIs "are the gatekeepers of the ACH Network." 2013 NACHA Operating Rules, Section 2.1 General Rule – ODFI is Responsible for Entries and Rules Compliance (2013 NACHA Operating Rules & Guidelines, Page OR4).

135. In 2013, the United States Department of Justice ("DOJ") initiated Operation Choke Point and investigated a large number of banks that processed ACH transactions for payday lenders, as well as other companies believed to be at a high risk for fraud and money laundering.

136. As a result, many larger banks, including Capital One Bank and Fifth Third Bank, terminated ACH processing for payday lenders.

137. In March 2015, the DOJ announced a civil and criminal settlement with CommerceWest Bank due, in large part, to the bank's processing of payday loan fees.

138. Although Operation Choke Point wound down in August 2017, its effects are still felt today by the online payday lending industry, as no large banks – and only a handful of smaller banks – will knowingly process ACH transactions for even the legal, licensed payday lenders.

139. Both Visa and Mastercard, the two largest credit card and debit card payment networks in the world, heavily restrict the use of their payment networks by adult entertainment businesses. As a result, few, if any, banks accept merchant account applications from entities they know to be involved in adult entertainment.

140. Thus, an entire cottage industry exists of ACH payment brokers and middlemen servicing the "tribal" payday lending industry.

141. These brokers and middlemen gain the ability to process ACH transactions through small banks, then resell access to the ACH network, at considerable mark-ups.

142. These brokers and middlemen often obfuscate – or outright lie – to their OFDI about the end-user's actual business.

143. Small, everyday, low-risk businesses typically pay 20 to 30 cents per ACH transaction; larger businesses with processing volumes pay only a few cents.

144. In contrast, it is not unusual for ACH transaction brokers like WLO Payments to charge 5% to 15% of the total dollar amount processed, meaning they can profit $50,000 to $150,000 per $1 million processed by their customers.

145. These outsized profits provide strong motivation for transaction brokers to hide their customers' actual business when processors would otherwise refuse service.

146. Upon information and belief, WLO Payments' ODFI allows WLO Payments – a "billing service" – to vet the customers and perform the requisite "due diligence" on WLO Payments' clients itself.

147. In many instances WLO Payments processes ACH payments using an account linked to WLO Payments itself.

148. WLO Payments – a trade name or "doing business as" name of Waters Law Office, PLLC, a law firm – could much more easily attain access to the ACH network than The FNLA Lending Websites could, given that Waters Law Office is a legitimate law firm, and not itself a payday lender.

149. Using the fact it is a law firm as cover, WLO Payments surreptitiously processes payments for The FNLA Lending Websites, substantially marking up the

price of each ACH transaction and thus profiting off The FNLA Lending Websites' illegal loans.

150.    Because WLO Payments is, ostensibly, the one to whom payment is going to (or coming from), its name must appear in the ACH memo line in some capacity, as noted above.

151.    WLO Payments charges a markup to its clients for access to ACH specifically because it is aware that the business they are involved in would otherwise not be granted access.

152.    WLO Payments' participation in the enterprise is thus willful, and essential to the lending enterprise's overall ability to operate.

## FIRST CAUSE OF ACTION
### Violation of RICO, 18 U.S.C. § 1962(c)

### CLASS CLAIM AGAINST ALL DEFENDANTS

153.    Plaintiffs adopt and incorporate paragraphs 1 – 152 as if fully restated herein.

154.    Pursuant to Fed. R. Civ. P. 23(b)(2), (b)(3) and/or (b)(4), Plaintiffs bring this action for themselves and on behalf of the following class of which they are both members, initially defined as:

> **All persons: (1) located in Alabama, Arizona, Arkansas, California, Connecticut, Florida, Georgia, Idaho, Illinois, Kansas, Maryland, Minnesota, New York, Oregon, Rhode Island, South Dakota, Texas, Virginia, Washington, West Virginia, and Wisconsin;[7] (2) who**

---

[7] While Plaintiff is located in Florida, it should be noted Alabama, Arizona, Arkansas, California, Connecticut, Idaho, Illinois, Kansas, Minnesota, New York, Oregon, Rhode Island, South Dakota, Texas, West Virginia, and Wisconsin have similar laws that render the

**obtained a loan from any of The FNLA Lending Websites, and (3) who made at least one payment towards the loan within the last four years (the "National Class").**

155. Excluded from the National Class are the Defendants and any of their officers, directors, and employees.

156. Plaintiffs reserves the right to modify or amend the National Class definition before the Court determines whether certification is appropriate.

157. **Numerosity. Fed R. Civ. P. 23(a)(1).** The Class members are so numerous that joinder of all of them is impractical. The FNLA Lending Websites are heavily marketed online and accessible to consumers throughout each state in the

---

loans void as detailed with respect to Florida. *See* Ala. Code § 5-18-4 (loans made without a license "shall be void"); Ariz. Rev. Stat. § 6-613(B) ("Any consumer lender loan that is made by a person who is required to be licensed pursuant to this chapter but who is not licensed is void, and the person making that consumer loan has no right to collect, receive or retain any principal, finance charges or other fees in connection with that consumer lender loan."); Ark. Const. amend. LXXXIX, § 6 (loans that charge excessive interest rates are "void"); Cal. Fin. Code § 22750 (loans made without license are "void," including the "right to collect or receive any principal, charges, or recompense in connection with the transaction"); Conn. Gen. Stat. § 36a-558 (c)(1) (loans made without a license are "void" and uncollectable); Idaho Code § 28-46-402 (payday loans made without a license are "void, uncollectable and unenforceable"); 815 Ill. Comp. Stat. 122/4-10 (payday loans made without a license "shall be null and void"); Kan. Stat. § 16a-5-201 (loans that charge excessive interest and made without a license are "void"); Minn. Stat. §§ 47.60, 47.601 (provisions in loan contracts charging excessive interest rates are void and unenforceable); N.Y. Gen. Oblig. Law § 5-511 (usurious loans are "void"); Or. Rev. Stat. § 725.045 (consumer finance loans made without a license are "void"); Or. Rev. Stat. § 725.045 (consumer finance loans made without a license are "void"); 6 R.I. Gen. Laws § 6-26-4 (loans charging excessive interest "shall be usurious and void"); S.D. Codified Laws § 54-4-44 (loans charging excessive interest or made without a license are "void and uncollectible"); Tex. Fin. Code Ann. § 305.002 (allowing for recovery of the "principal amount on which interest is charged and received"); Va. Code § 6.2-1541(A) (declaring such loans "void" and principal uncollectible); W. Va. Code § 46A-5-101 (loans made in violation of Consumer Credit and Protection Act are "void and the consumer is not obligated to pay either the principal or the loan finance charge"); Wis. Stat. § 425.305 (declaring usurious transactions "void").

National Class. Although the precise number of Class members is unknown, based on the class sizes in similar cases, Plaintiffs anticipate that there are likely thousands of members, the names and addresses of whom are identifiable through documents and business records maintained by the Defendants. Thus, the class is so numerous that joinder of all members is impracticable.

158. **Existence and Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** There are questions of law and fact that are common to the National Class which predominate over questions affecting any individual class member. Specifically, these common questions include, without limitation: (a) whether the Defendants and associated persons participated in an *Enterprise* as defined by 18 U.S.C. § 1961(4); (b) whether the activities of the Defendants or the enterprise affected interstate commerce; (c) whether loans obtained by members of the class from The FNLA Lending Websites amount to unlawful debts as defined by 18 U.S.C. § 1961(6); (d) whether the Defendants participated in the enterprise through the collection of unlawful debt; and, (e) whether Plaintiffs and the class members were harmed by the Defendants.

159. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each Class member, which all arise from similar operative facts and are based upon the same legal theories. The FNLA Lending Websites charged each putative class member interest in excess of their respective state's interest rate cap and without any state lending licenses. Plaintiffs have no interest adverse or antagonistic to the

interests of other members of the Class and have the same claims for actual and treble damages that they seek for members of the Class.

160. **Adequacy of Class Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the National Class and will fairly and properly protect the interests of the Class. Plaintiffs have retained experienced counsel who have litigated well over two thousand consumer cases under consumer protection statutes, including RICO. Plaintiffs' counsel are competent in the prosecution of class action litigation and intend to prosecute this action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of members of the Class.

161. **Predominance and Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the Class members predominate over questions affecting only individual Class members. Under the totality of the circumstances, a Class Action is superior to other available methods for the fair and efficient adjudication of the controversy. The Defendants' conduct described in this Complaint stems from common and uniform practices, resulting in systematic violations of RICO. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents potential for inconsistent or contradictory judgments and increases the delay and expense to all

parties and to the court system presented by the legal and factual issues raised by the Defendants' conduct.

162. **Injunctive Relief Appropriate for the Defendants, Class. Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendants have and continue to act on grounds generally applicable to the class, making appropriate injunctive relief with respect to Ms. D'Elia, Mr. Bennett and the class members. Ms. D'Elia, Mr. Bennett and the putative class seek an injunction prohibiting the Defendants from continued collection of these illegal loans and ordering the dissolution of each corporate Defendant that has engaged in any enterprise pled herein.

163. As alleged above, Airey, Bernard, DeLisle, Finsana, NCR, and The FNLA, together with services provided by entities like WLO Payments and Attentive, have established one or more association-in-fact enterprises to evade state usury laws.

164. The loans obtained through The FNLA Lending Websites by Ms. D'Elia, Mr. Bennett, and the Class carried an interest rate more than double that of applicable state law and, thus, the loans are unenforceable and constitute *Unlawful Debts* under RICO, 18 U.S.C. § 1961(6).

165. The Defendants each associated with the enterprise and participated in the affairs of the enterprise as described in detail herein, which existed for the purpose of collecting unlawful debt.

166. The Defendants' participation in the enterprise violated § 1962(c) of RICO and caused Plaintiffs and the Class to repay amounts on unlawful loans.

167. Accordingly, the Defendants are jointly and severally liable to Plaintiffs and the putative class members for treble damages, costs, and attorney's fees pursuant to 18 U.S.C. § 1964(c).

**SECOND CAUSE OF ACTION**
**Violation of RICO, 18 U.S.C. § 1962(d)**

**CLASS CLAIM AGAINST ALL DEFENDANTS**

168. Plaintiffs adopt and incorporate paragraphs 1 – 152 and 154 – 156 as if fully restated herein.

169. Pursuant to Fed. R. Civ. P. 23(b)(2), (b)(3) and/or (b)(4), Plaintiffs bring this action for themselves and on behalf of the National Class, defined above.

170. **Numerosity. Fed R. Civ. P. 23(a)(1).** The Class members are so numerous that joinder of all of them is impractical. The FNLA Lending Websites are heavily marketed online and accessible to consumers throughout each state in the National Class. Although the precise number of Class members is unknown, based on the class sizes in similar cases, Plaintiffs anticipate that there are likely thousands of members, the names and addresses of whom are identifiable through documents and business records maintained by the Defendants. Thus, the class is so numerous that joinder of all members is impracticable.

171. **Existence and Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** There are questions of law and fact that are common to the National Class which predominate over questions affecting any individual class member. Specifically, these common questions include, without limitation: (a)

Page **31** of **52**

whether the Defendants and associated persons participated in an *Enterprise* as defined by 18 U.S.C. § 1961(4); (b) whether Defendants had knowledge of and facilitated the conspiracy to collect unlawful debt from Plaintiffs and members of the putative Class; (c) whether loans made to members of the class by Green Funds Go amount to unlawful debts as defined by 18 U.S.C. § 1961(6); and, (d) whether Plaintiffs and the class members were harmed by the Defendants.

172. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each Class member, which all arise from similar operative facts and are based upon the same legal theories. The FNLA Lending Websites charged each putative class member interest in excess of their respective state's interest rate cap and without any state lending licenses. Plaintiffs have no interest adverse or antagonistic to the interests of other members of the Class and have the same claims for actual and treble damages that they seek for members of the Class.

173. **Adequacy of Class Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the National Class and will fairly and properly protect the interests of the Class. Plaintiffs have retained experienced counsel who have litigated well over two thousand consumer cases under consumer protection statutes, including RICO. Plaintiffs' counsel are competent in the prosecution of class action litigation and intend to prosecute this action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of members of the Class.

174. **Predominance and Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the Class members predominate over questions affecting only

individual Class members. Under the totality of the circumstances, a Class Action is superior to other available methods for the fair and efficient adjudication of the controversy. The Defendants' conduct described in this Complaint stems from common and uniform practices, resulting in systematic violations of RICO. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by the Defendants' conduct.

175.   **Injunctive Relief Appropriate for the Defendants, Class. Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendants have and continue to act on grounds generally applicable to the class, making appropriate injunctive relief with respect to Ms. D'Elia, Mr. Bennett, and the class members. Ms. D'Elia, Mr. Bennett, and the putative class seek an injunction prohibiting the Defendants from continued collection of these illegal loans and ordering the dissolution of each corporate Defendant that has engaged in any enterprise pled herein.

176.   As alleged above, Airey, Bernard, DeLisle, Finsana, NCR, and The FNLA, together with services provided by entities like WLO Payments and Attentive, have established one or more association-in-fact enterprises to evade state usury laws.

177. The loans obtained through The FNLA Lending Websites by Ms. D'Elia, Mr. Bennett, and the Class carried an interest rate more than double that of applicable state law and, thus, the loans are unenforceable and constitute *Unlawful Debts* under RICO, 18 U.S.C. § 1961(6).

178. The Defendants violated § 1962(d) of RICO by conspiring with each other, and other persons, such as Travis Jacobs and Constantine Radiotis, to issue and collect unlawful debts obtained by borrowers from The FNLA Lending Websites.

179. The Defendants agreed to participate in the RICO conspiracy and agreed to the overall objective of the conspiracy – to collect unlawful loans.

180. The Defendants were each aware of the goals of the enterprise and each took actions in furtherance of this conspiracy. For example, at various times:

    a. The *faux*-Mohawk lenders, beneficially operated by NCR and Finsana, including Green Funds Express and its sister websites, made loans to Plaintiffs and the putative Class;

    b. Airey, Bernard, and DeLisle registered the sole proprietorships through which each FNLA Lending Website made loans;

    c. The FNLA accepted payments from NCR, Finsana and others in exchange for "lending licenses" and the apparent authority and governance of the Mohawk of Kahnawake to make such loans, even though no such authority was granted to The FNLA by the Mohawk of Kahnawake;

d. WLO used its status as a law firm to obtain ACH access and sold that access to Finsana and NCR at a considerable profit, all the while knowing exactly what kind of lending business Green Funds Express and its sister websites conducted;

e. Attentive knowingly supplied its technology to NCR and Finsana to facilitate the collection of clearly unlawful debt, and was paid for this; and,

f. Finsana and NCR oversaw the day-to-day operations of Green Funds Express and its sister websites, including the design of the websites through which all loans are obtained and the provision of customer service through a call center.

181. Accordingly, the Defendants are jointly and severally liable to Plaintiffs and the putative class members for treble damages, costs, and attorney's fees pursuant to 18 U.S.C. § 1964(c).

### THIRD CAUSE OF ACTION
**Violation of the CRCPA, § 772.103(3), Fla. Stat.**

**CLASS CLAIM AGAINST ALL DEFENDANTS**

182. Plaintiffs adopt and incorporate paragraphs 1 – 152 as if fully restated herein.

183. Pursuant to Fed. R. Civ. P. 23(b)(2), (b)(3) and/or (b)(4), Plaintiffs bring this action for themselves and on behalf of the following class of which they are both members, initially defined as:

**All persons: (1) located in Florida, (2) who obtained a loan from any of The FNLA Lending Websites, and (3) who made at least one payment towards the loan within the last five years (the "Florida Sub-Class").**

184.     Excluded from the Florida Sub-Class are the Defendants and any of their officers, directors, and employees.

185.     Plaintiffs reserve the right to modify or amend the Florida Sub-Class definition before the Court determines whether certification is appropriate.

186.     **Numerosity. Fed R. Civ. P. 23(a)(1).** The Class members are so numerous that joinder of all of them is impractical. The FNLA Lending Websites are heavily marketed online and accessible to consumers throughout Florida. Although the precise number of Class members is unknown, based on the class sizes in similar cases, Plaintiffs anticipate that there are likely hundreds of members, the names and addresses of whom are identifiable through documents and business records maintained by the Defendants.  Thus, the class is so numerous that joinder of all members is impracticable.

187.     **Existence and Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** There are questions of law and fact that are common to the Florida Sub-Class which predominate over questions affecting any individual class member. Specifically, these common questions include, without limitation: (a) whether the Defendants and associated persons participated in an *Enterprise* as defined by § 772.102(3), Fla. Stat.; (b) whether loans obtained by members of the class The FNLA Lending Websites amount to unlawful debts as defined by § 772.102(2), Fla.

Stat.; (c) whether the Defendants participated in the enterprise through the collection of unlawful debt; and, (d) whether Plaintiffs and the class members were harmed by the Defendants.

188. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each Class member, which all arise from similar operative facts and are based upon the same legal theories. The loans obtained from the FNLA Lending Websites charged each putative class member interest in excess of Florida's interest rate cap and were made without any state lending licenses. Plaintiffs have no interest adverse or antagonistic to the interests of other members of the Class and has the same claims for actual, treble and statutory damages that they seek for members of the Class.

189. **Adequacy of Class Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the Florida Sub-Class and will fairly and properly protect the interests of the Class. Plaintiffs have retained experienced counsel who have litigated well over two thousand consumer cases under consumer protection statutes, including RICO and the CRCPA. Plaintiffs' counsel are competent in the prosecution of class action litigation and intend to prosecute this action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of members of the Class.

190. **Predominance and Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the Class members predominate over questions affecting only individual Class members. Under the totality of the circumstances, a Class Action is superior to other available methods for the fair and efficient adjudication of the

controversy. The Defendants' conduct described in this Complaint stems from common and uniform practices, resulting in systematic violations of the CRCPA. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by the Defendants' conduct.

191. As alleged above, Airey, Bernard, DeLisle, Finsana, NCR, and The FNLA, together with services provided by entities like WLO Payments and Attentive, have established one or more association-in-fact enterprises to evade state usury laws.

192. The loans obtained through The FNLA Lending Websites by Ms. D'Elia, Mr. Bennett, and the Class carried an interest rate far in excess of the permissible rate under Florida law and, thus, the loans are unenforceable and constitute *Unlawful Debts* under the CRCPA, § 772.102(2), Fla. Stat.

193. The Defendants each associated with the enterprise and participated in the affairs of the enterprise as described in detail herein, which existed for the purpose of collecting unlawful debt.

194. The Defendants' participation in the enterprise violated § 772.103(3), Fla. Stat. and caused Plaintiffs and the Florida Sub-Class to repay amounts on unlawful loans.

195. Accordingly, the Defendants are jointly and severally liable to Plaintiffs and the putative class members for treble damages, costs, and attorney's fees pursuant to § 772.104, Fla. Stat.

**FOURTH CAUSE OF ACTION**
**Violation of the CRCPA, § 772.103(4), Fla. Stat.**

**CLASS CLAIM AGAINST ALL DEFENDANTS**

196. Plaintiffs adopt and incorporate paragraphs 1 – 152 and 183 – 185 as if fully restated herein.

197. Pursuant to Fed. R. Civ. P. 23(b)(2), (b)(3) and/or (b)(4), Plaintiffs bring this action for themselves and on behalf of the Florida Sub-Class defined above.

198. **Numerosity. Fed R. Civ. P. 23(a)(1).** The Class members are so numerous that joinder of all of them is impractical. The FNLA Lending Websites are heavily marketed online and accessible to consumers throughout Florida. Although the precise number of Class members is unknown, based on the class sizes in similar cases, Plaintiffs anticipate that there are likely hundreds of members, the names and addresses of whom are identifiable through documents and business records maintained by the Defendants. Thus, the class is so numerous that joinder of all members is impracticable.

199. **Existence and Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** There are questions of law and fact that are common to the Florida Sub-Class which predominate over questions affecting any individual class member. Specifically, these common questions include, without limitation: (a) whether the Defendants and associated persons participated in an *Enterprise* as defined by § 772.102(3), Fla. Stat.; (b) whether loans obtained by members of the class The FNLA Lending Websites amount to unlawful debts as defined by § 772.102(2), Fla. Stat.; (c) whether Defendants had knowledge of and facilitated the conspiracy to collect unlawful debt from Plaintiffs and members of the putative Class; and, (d) whether Plaintiffs and the class members were harmed by the Defendants.

200. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each Class member, which all arise from similar operative facts and are based upon the same legal theories. The loans obtained from the FNLA Lending Websites charged each putative class member interest in excess of Florida's interest rate cap and were made without any state lending licenses. Plaintiffs have no interest adverse or antagonistic to the interests of other members of the Class and has the same claims for actual, treble and statutory damages that they seek for members of the Class.

201. **Adequacy of Class Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the Florida Sub-Class and will fairly and properly protect the interests of the Class. Plaintiffs have retained experienced counsel who have litigated well over two thousand consumer cases under consumer protection

statutes, including RICO and the CRCPA. Plaintiffs' counsel are competent in the prosecution of class action litigation and intend to prosecute this action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of members of the Class.

202. **Predominance and Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the Class members predominate over questions affecting only individual Class members. Under the totality of the circumstances, a Class Action is superior to other available methods for the fair and efficient adjudication of the controversy. The Defendants' conduct described in this Complaint stems from common and uniform practices, resulting in systematic violations of the CRCPA. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by the Defendants' conduct.

203. As alleged above, Finsana, NCR, the FNLA, DataX, Attentive, and Green Funds Express and its sister websites have established one or more association-in-fact enterprises to evade state usury laws.

204. The loans issued by Green Funds Express and its sister websites to Plaintiffs and the Class carried an interest rate far in excess of the permissible rate under Florida law and, thus, the loans are unenforceable and constitute *Unlawful Debts* under the CRCPA, § 772.102(2), Fla. Stat.

205. The Defendants violated § 772.103(4), Fla. Stat. by conspiring with each other, and other persons, to issue and collect unlawful debts obtained through The FNLA Lending Websites.

206. The Defendants agreed to participate in the conspiracy and agreed to the overall objective of the conspiracy – to collect unlawful loans.

207. The Defendants were each aware of the goals of the enterprise and each took actions in furtherance of this conspiracy. For example, at various times:

   a. The *faux*-Mohawk lenders, beneficially operated by NCR and Finsana, including Green Funds Express and its sister websites, made loans to Plaintiffs and the putative Class;

   b. Airey, Bernard, and DeLisle registered the sole proprietorships through which each FNLA Lending Website made loans;

   c. The FNLA accepted payments from NCR, Finsana and others in exchange for "lending licenses" and the apparent authority and governance of the Mohawk of Kahnawake to make such loans, even though no such authority was granted to The FNLA by the Mohawk of Kahnawake;

d. WLO used its status as a law firm to obtain ACH access and sold that access to Finsana and NCR at a considerable profit, all the while knowing exactly what kind of lending business Green Funds Express and its sister websites conducted;

e. Attentive knowingly supplied its technology to NCR and Finsana to facilitate the collection of clearly unlawful debt, and was paid for this; and,

f. Finsana and NCR oversaw the day-to-day operations of Green Funds Express and its sister websites, including the design of the websites through which all loans are obtained and the provision of customer service through a call center.

208. Accordingly, the Defendants are jointly and severally liable to Plaintiffs and the putative class members for treble damages, costs, and attorney's fees pursuant to § 772.104, Fla. Stat.

## FIFTH CAUSE OF ACTION
**Violation of the FCCPA, § 559.72(9), FLA. STAT.**

**CLASS CLAIM AGAINST AIREY, BERNARD, DELISLE, FINSANA AND NCR**

209. Plaintiffs adopt and incorporate paragraphs 1 – 152 and 183 – 185 as if fully restated herein.

210. Pursuant to Fed. R. Civ. P. 23(b)(2), (b)(3) and/or (b)(4), Plaintiffs bring this action for themselves and on behalf of the Florida Sub-Class defined above.

211. **Numerosity. Fed R. Civ. P. 23(a)(1). Numerosity. Fed R. Civ. P. 23(a)(1).** The Class members are so numerous that joinder of all of them is impractical. The FNLA Lending Websites are heavily marketed online and accessible to consumers throughout Florida. Although the precise number of Class members is unknown, based on the class sizes in similar cases, Plaintiffs anticipate that there are likely hundreds of members, the names and addresses of whom are identifiable through documents and business records maintained by the Defendants. Thus, the class is so numerous that joinder of all members is impracticable.

212. **Existence and Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** There are questions of law and fact that are common to the Florida Sub-Class which predominate over questions affecting any individual class member. Specifically, these common questions include, without limitation: (a) whether the Defendants attempted to collect loans obtained through The FNLA Lending Websites from Florida residents; (b) whether any entity involved in the making of the loans was properly licensed under Chapter 516, Florida Statutes; (c) whether loans made to members of the class are unenforceable under Florida law; (d) whether Defendants had knowledge that the loans violated Florida law; and, (e) whether Plaintiffs and the class members were harmed by the Defendants.

213. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each Class member, which all arise from similar operative facts and are based upon the same legal theories. Defendants attempted to collect loans from Plaintiffs and

the putative members of the Florida Sub-Class, when such loans were made by unlicensed entities and charged interest well in excess of Florida's maximum statutory rate. Plaintiffs have no interest adverse or antagonistic to the interests of other members of the Class and has the same claims for statutory damages that they seek for members of the Class.

214. **Adequacy of Class Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the Florida Sub-Class and will fairly and properly protect the interests of the Class. Plaintiffs have retained experienced counsel who have litigated well over two thousand consumer cases under consumer protection statutes, including the FCCPA. Plaintiffs' counsel are competent in the prosecution of class action litigation and intend to prosecute this action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of members of the Class.

215. **Predominance and Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the Class members predominate over questions affecting only individual Class members. Under the totality of the circumstances, a Class Action is superior to other available methods for the fair and efficient adjudication of the controversy. Defendants' conduct described in this Complaint stems from common and uniform practices, resulting in systematic violations of the FCCPA. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden

on the Courts. Furthermore, individualized litigation presents potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by the Defendants' conduct.

216. **Injunctive Relief Appropriate for the Defendants pursuant to § 559.77(2), Fla. Stat., Class. Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendants have and continue to act on grounds generally applicable to the class, making appropriate injunctive relief with respect to Plaintiffs and the class members. Plaintiffs and the putative class seek an injunction prohibiting the Defendants from continued collection of these illegal loans and ordering the dissolution of each corporate Defendant that has participated in such collection.

217. The loans obtained by Mr. Bennett, Ms. D'Elia, and the putative class members were void, as the loans carried an interest rate more than double that of Florida's maximum statutory rate and were made without the required licensure under Florida's Consumer Finance Act, Chapter 516, Florida Statutes.

218. Defendants Airey, Bernard, Delisle, Finsana and NCR violated § 559.72(9), Fla. Stat., when they attempted collection of these loans via emails, text message, and ACH transactions from Plaintiffs and the Florida Sub-Class, thereby asserting the loans were legitimate, and that a legal right to collect the loans existed, when no such right exists, as the loans are unenforceable and illegitimate.

219. The Defendants have been involved in *dozens* of similar online lending schemes and are well aware that loans made by Green Funds Express and its sister websites violate Florida law.

220. The Defendants' knowledge is evident through their attempt to avoid Florida law through a guise of First Nation affiliation and licensure.

221. Accordingly, Defendants Airey, Bernard, Delisle, Finsana and NCR are jointly and severally liable to Plaintiffs and each putative Class member for their actual damages in the form of all amounts paid towards the void loans, statutory damages of up to $1,000.00 per Class member, costs, and attorney's fees pursuant to § 559.77(2), Fla. Stat.

222. Plaintiffs further seek an injunction prohibiting the Defendants from continued collection of these illegal loans and ordering the dissolution of each corporate Defendant that has participated in such collection.

## SIXTH CAUSE OF ACTION
### Unjust Enrichment

### CLASS CLAIM AGAINST ALL DEFENDANTS

223. Plaintiffs adopt and incorporate paragraphs 1 – 152 and 154 – 156 as if fully restated herein.

224. Pursuant to Fed. R. Civ. P. 23(b)(2), (b)(3) and/or (b)(4), Plaintiffs bring this action for themselves and the National Class, defined above.

225. **Numerosity. Fed R. Civ. P. 23(a)(1). Numerosity. Fed R. Civ. P. 23(a)(1).** The Class members are so numerous that joinder of all of them is impractical.

The FNLA Lending Websites are heavily marketed online and accessible to consumers throughout Florida. Although the precise number of Class members is unknown, based on the class sizes in similar cases, Plaintiffs anticipate that there are likely hundreds of members, the names and addresses of whom are identifiable through documents and business records maintained by the Defendants. Thus, the class is so numerous that joinder of all members is impracticable.

226. **Existence and Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** There are questions of law and fact that are common to the Class which predominate over questions affecting any individual class member. Specifically, these common questions include, without limitation: (a) whether the Defendants attempted to collect illegal loans from Plaintiffs and the Class; (b) whether any entity involved in the making of the loans was properly licensed under Chapter 516, Florida Statutes, or other states' regulations; (c) whether loans made to members of the class are unenforceable under applicable state law; (d) whether Defendants had knowledge that the loans violated state law; and, (e) whether Plaintiffs and the class members were harmed by the Defendants.

227. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each Class member, which all arise from similar operative facts and are based upon the same legal theories. The FNLA Lending Websites charged each putative class member interest in excess of their respective state's interest rate cap and without any state lending licenses. Plaintiffs have no interest adverse or antagonistic to the

interests of other members of the Class and have the same claims for actual and treble damages that they seek for members of the Class.

228.   **Adequacy of Class Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the National Class and will fairly and properly protect the interests of the Class. Plaintiffs have retained experienced counsel who have litigated well over two thousand consumer cases under consumer protection statutes, including RICO. Plaintiffs' counsel are competent in the prosecution of class action litigation and intend to prosecute this action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of members of the Class.

229.   **Predominance and Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the Class members predominate over questions affecting only individual Class members. Under the totality of the circumstances, a Class Action is superior to other available methods for the fair and efficient adjudication of the controversy. Defendants' conduct described in this Complaint stems from common and uniform practices, resulting in systematic violations of state usury laws. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents potential for inconsistent or contradictory judgments and increases the delay and expense to all

parties and to the court system presented by the legal and factual issues raised by the Defendants' conduct.

230. **Injunctive Relief Appropriate for the Defendants pursuant to § 559.77(2), Fla. Stat., Class. Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendants have and continue to act on grounds generally applicable to the class, making appropriate injunctive relief with respect to Plaintiffs and the class members. Plaintiffs and the putative class seek an injunction prohibiting the Defendants from continued collection of these illegal loans and ordering the dissolution of each corporate Defendant that has participated in such collection.

231. Plaintiffs and the Class conferred a benefit on Defendants when they made payments on their loans, as they had no obligation to do so and, therefore, Defendants were owed nothing.

232. Defendants knew or should have known of the benefit, as evidenced by their attempt to avoid state usury laws through a guise of tribal affiliation and licensure, and by charging an increased rate to access the ACH network, in the case of WLO Payments.

233. Accordingly, on behalf of themselves and all other consumers similarly situated, Plaintiffs seeks to recover from Defendants, jointly and severally, all amounts paid on The FNLA Lending Website loans by Plaintiffs and each class member.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs request that the Court enter judgment on behalf of themselves and the classes they seek to represent against Defendants for:

a. An Order certifying the proposed Classes under Fed. R. Civ. P. 23 (b)(3) and appointing Plaintiffs as class representatives and their counsel as class counsel, as soon as practicable;

b. An Order declaring that Defendants are financially responsible for notifying class members of the pendency of this suit;

c. An Order declaring that Defendants committed the violations of law alleged herein;

d. An Order providing for any and all injunctive relief the Court deems appropriate;

e. An Order awarding monetary damages, including but not limited to any compensatory, incidental, or consequential damages in an amount to be determined by the Court or jury;

f. An Order awarding treble damages in accordance with proof and in an amount consistent with applicable precedent;

g. An Order awarding interest at the maximum allowable legal rate on the foregoing sums;

h. An Order awarding Plaintiffs their reasonable costs and expenses of suit, including attorneys' fees; and

i. Such further relief as this Court may deem just and proper.

<u>**DEMAND FOR JURY TRIAL**</u>

Plaintiffs hereby demand a jury trial on all issues so triable.

Respectfully submitted on June 13, 2025, by:

**SERAPH LEGAL, P. A.**

*/s/ Bryan J. Geiger*
Bryan J. Geiger, Esq.
Florida Bar Number: 119168
BGeiger@seraphlegal.com
2124 W. Kennedy Blvd., Suite A.
Tampa, FL 33606
Tel: 813-567-1230 (Ext: 303)
Fax: 855-500-0705
*Counsel for Plaintiffs*

<u>**Exhibit List**</u>

A.    Cease-and-Desist Order from the Mohawk Council of Kahnawake

B.    Malcom Bennett's Green Funds Express Loan Agreement

C.    Donna D'Elia's 2023 Green Funds Express Loan Agreement

D.    Charter of The First Nation Lenders' Authority

E.    License Issued by The FNLA to Strategic Solutions Services d/b/a Arrow Mountain Funding

F.    The FNLA Member Application

# COMPLAINT EXHIBIT A

**Cease-and-Desist Order from the Mohawk Council of Kahnawake**

STRENGTH

PEACE

UNITY

# Mohawk Council of Kahnawake



P.O. Box 720
Kahnawake Mohawk Territory   J0L 1B0

**LEGAL SERVICES**

*Tel.: (450) 632-7500*
*Fax: (450) 638-3663*
*Website: www.kahnawake.com*

**DELIVERED BY BAILIFF**

Kahnawà:ke, 17 Enniskó :wa/March, 2025

**FIRST NATIONS LENDERS AUTHORITY**
1 Patton Road, P.O. Box 2012
Mohawk Territory of Kahnawà:ke (Quebec)
J0L 1B0

**ARROW MOUNTAIN FUNDING**
**c/o Kirby Delisle**
P.O. Box 2503
Mohawk Territory of Kahnawà:ke (Quebec)
J0L 1B0

**UNCLE WARBUCKS**
**c/o Carolyn Stalk**
1329-D Arena Road, Lot 110
Mohawk Territory of Kahnawà:ke (Quebec)
J0L 1B0

**DASH OF CASH**
**c/o Carolyn Stalk**
1329-A Arena Road, Lot 110
Mohawk Territory of Kahnawà:ke (Quebec)
J0L 1B0

**SAFE LOAN**
**c/o Blue Alida Sky**
P.O. Box 56
Mohawk Territory of Kahnawà:ke (Quebec)
J0L 1B0

**RAPITAL CAPITAL**
**c/o Carolyn Stalk**
1329-C Arena Road, Lot 110
Mohawk Territory of Kahnawà:ke (Quebec)
J0L 1B0

**MONEY MESSIAH**
**c/o Carolyn Stalk**
1329-B Arena Road, Lot 110
Mohawk Territory of Kahnawà:ke (Quebec)
J0L 1B0

**ARROW VALLEY LOANS**
**c/o Kirby Delisle**
P.O. Box 2503
Mohawk Territory of Kahnawà:ke (Quebec)
J0L 1B0

**SWIFT DEER LENDING**
**c/o Kirby Delisle**
P.O. Box 2503
Mohawk Territory of Kahnawà:ke (Quebec)
J0L 1B0

**RAPID ARROW LOANS**
**c/o Kirby Delisle**
P.O. Box 2503
Kahnawake, Quebec
J0L 1B0

**LOONIE FINANCIAL**
**c/o Carolyn Stalk**
1329-B Arena Road, Lot 110
Kahnawake, Quebec
J0L 1B0

**PAYDAY KING 500**
1329 Arena Road
Kahnawake, Quebec
J0L 1B0

**PAYDAY KING 500**
313-1350 rue Mazurette
Montréal, Québec
H4N 1H2

**STRATEGIC SOLUTION SERVICES**
**c/o Kirby Delisle**
P.O. Box 2503
Kahnawake, Quebec
J0L 1B0

**SPEEDY SERVICING**
**c/o Carolyn Stalk**

1329 Arena Road
Kahnawake, Québec
J0L 1B0

**SPEEDY MOHAWK FINANCIAL SERVICING**
**c/o Carolyn Stalk**
1329 Arena Road
Kahnawake, Québec
J0L 1B0

**GREEN FUNDS GO**
12 Simon Road
Kanesatake, Quebec
J0N 1E0

**THREE RIVERS SOLUTIONS DBA EAGLE WING FUNDS**
117 rue Nolka
Wolinak, Quebec
G0X 1B0

**NCR**
4480 De la Côte-de-Liesse Rd Suite 355
Mount Royal, Quebec
H4N 2R1

**FINSANA**
4480 De la Côte-de-Liesse Rd Suite 355
Mount Royal, Quebec
H4N 2P7

**RE:    CEASE AND DESIST**

To Whom It May Concern,

We were recently erroneously served with legal proceedings regarding a class action against the First Nations Lenders Authority ("FNLA") and Arrow Mountain Funding, among other defendants. After reviewing the legal proceeding, as well as the information available on fnla.ca and the following associated websites:

- www.arrowmountainfunding.com
- www.unclewarbucks.com
- www.dashofcash.com
- www.safeloan.com
- www.rapitalcapital.com
- www.moneymessiah.com
- www.greenfundsgo.com

- www.eaglewingfunds.com
- www.arrowvalleyloans.com
- www.swiftdeerlending.com
- www.rapidarrowloans.com
- www.looniefinancial.com
- www.paydayking500.com

we have identified numerous misleading and unauthorized references to the Mohawk Territory of Kahnawà:ke, its jurisdiction, and its legal framework.

Specifically, both the legal proceedings and the websites in question falsely assert that the FNLA operates from within the Mohawk Territory of Kahnawà:ke. Even more concerning, these materials invoke the "laws of Kahnawà:ke and those of the First Nations of Canada" while simultaneously stating that the Courts of the Province of Quebec have sole and exclusive jurisdiction over any court-related proceedings. References are also made to a so-called "lending industry in the Mohawk Territory of Kahnawà:ke."

For example, the Arrow Mountain Funding website states:

*"Arrow Mount Funding is a subsidiary of the First Nations Lenders' Authority ('FNLA') is* [sic] *an independent body with the mandate to oversee short-term lending service businesses within and from the Mohawk Territory of Kahnawà:ke as a means of promoting and supporting economic development, self-sufficiency and peace, order and good governance within the Territory. The FNLA ensures that short-term lending service businesses operating within and from the Territory are operated honestly, equitably and in the best interests of consumers and the Mohawks of Kahnawà:ke. Please visit the FNLA."*

These statements are categorically false. The Mohawk Council of Kahnawà:ke ("MCK") has never granted the FNLA any authority to oversee lending operations within its territory, nor does any valid legislation exist in Kahnawà:ke governing loans or lending practices.

Additionally:

- The FNLA's so-called "Charter" does not create any regulatory authority over lending operations and is not recognized by the MCK or any legitimate governing body.

- The claim that short-term lending services constitute an Aboriginal right is legally unfounded and unrecognized by either Canada or the MCK.

- The assertion that breaches of the FNLA's purported regulations are punishable by fines, imprisonment, or enforcement by the Kahnawà:ke Peacekeepers is entirely without basis. The Peacekeepers have no role in enforcing lending-related matters beyond applicable provisions of the **Criminal Code of Canada** and any other laws of general application.

- The reference to Quebec courts having jurisdiction over Kahnawà:ke's legal matters is incorrect. Kahnawà:ke's jurisdiction is separate and distinct from that of the province of Quebec, and the claims made to the public are misleading and false.

Furthermore, we are aware that Mr. Travis Jacobs of Lazarus Charboneau has approached the MCK on multiple occasions to solicit participation in payday lending operations, each of which was unequivocally declined.

Given that the FNLA Charter purports to regulate short-term lending services through non-existent laws and that multiple legal actions are ongoing concerning what are alleged to be **predatory and illegal lending practices**, we demand that you:

1. **Immediately remove all references to Kahnawà:ke, the Mohawk people, and the Kahnawà:ke Peacekeepers** from all websites, documents, and materials.

2. **Cease and desist from any representations implying that the FNLA operates under the jurisdiction or authority of Kahnawà:ke or its governing bodies.**

3. **Cease any and all business operations falsely held out as being authorized or regulated under Kahnawà:ke's jurisdiction.**

4. **Cease to operate any and all business operations within the Mohawk Territory of Kahnawà:ke.**

5. **Cease to regulate the FNLA from within the Mohawk Territory of Kahnawà:ke.**

If you chose to ignore this demand letter, we have been instructed to immediately contact the proper authorities and institute all necessary legal proceedings against you.

**DO GOVERN YOURSELF ACCORDINGLY.**

**MOHAWK COUNCIL OF KAHNAWÁ:KE**

Suzanne Jackson, Legal Counsel

Cc

**Travis Jacobs**, by bailiff in the Mohawk Territory of Kahnawà:ke
**Lazarus Charbonneau**, by bailiff
759 rue du Square-Victoria, Suite 200
Montreal, Quebec
H2Y 2J7

**Constantinos Radiotis**, by bailiff
4480 Chem. de la Côte-de-Liesse Suite 355
Mount Royal Quebec

**Council of Chief**, chiefsonly@mck.ca
**Chief Zacharie**, Mohawk Peacekeepers of Kahnawà:ke, dwayne.zacharie@kmpk.ca
**Omar Sulaiman**, Lawyer, osulaiman@sulaimanlaw.com
**Bryan J Geiger**, Lawyer, bgeiger@seraphlegal.com
**Noah M. Bean**, Lawyer, noah.bean@dfpi.ca.gov

# COMPLAINT EXHIBIT B

# Malcom Bennett's Green Funds Express Loan Agreement

## INSTALLMENT LOAN AGREEMENT

ENSURE YOU SCROLL THROUGH, READ, AND UNDERSTAND ALL PARTS OF THIS UNSECURED INSTALLMENT LOAN AGREEMENT

| LENDER INFORMATION | BORROWER INFORMATION |
|---|---|
| Green Funds Group DBA GFX<br>12 Simon Road, Kanesatake, QC, J0N-1E0<br>Customer Service: 1-833-381-1202<br>Email: clientservices@greenfundsexpress.com<br>Website: www.GreenFundsExpress.com | Malcolm Bennett<br>Borrower ID: 290915<br>Redacted<br>Borrower Phone: Redacted<br>Borrower Email: Redacted |
| **LOAN INFORMATION** | **LOAN DETAILS** |
| Loan No: 334181<br>Application Date: 06/05/2024<br>Fund Disbursement Date: 06/07/2024<br>First Repayment Date: 06/14/2024 | Amount Financed: $300.00 |

## TRUTH-IN-LENDING DISCLOSURES

ALL AMOUNT ARE IN UNITED STATES DOLLARS

Please Review all the terms of this Installment Loan Agreement for any additional information about nonpayment, default, and repayment in full before the scheduled date and any prepayment penalties

| ANNUAL PERCENTAGE RATE<br>The cost of your credit as a yearly rate. | FINANCE CHARGE<br>The dollar amount the credit will cost you. | AMOUNT FINANCED<br>The amount of credit provided to you or on your behalf. | TOTAL OF PAYMENTS<br>The amount you will have paid after you have made all payments as scheduled |
|---|---|---|---|
| 740.13% | $658.26 | 300.00 | $958.26 |

**Prepayment:** If you pay off early, you will not have to pay a penalty. Review this entire Agreement for additional information
**Security:** This Loan is unsecured.

**Your payment schedule will be:**

| Number | Date | Amount Due |
|---|---|---|
| 1 | 06/14/2024 | $79.90 |
| 2 | 06/28/2024 | $79.90 |
| 3 | 07/12/2024 | $79.90 |
| 4 | 07/26/2024 | $79.90 |
| 5 | 08/09/2024 | $79.90 |
| 6 | 08/23/2024 | $79.90 |
| 7 | 09/06/2024 | $79.90 |
| 8 | 09/20/2024 | $79.90 |
| 9 | 10/04/2024 | $79.90 |
| 10 | 10/18/2024 | $79.90 |
| 11 | 11/01/2024 | $79.90 |

| 12 | 11/15/2024 | $79.36 |

**Total Payments: $958.26**

If you have any questions about this statement, your Loan or the related terms and conditions, you can call us toll-free at 1-833-381-1202, or write to us at the address noted above.

**Disbursement Authorization:** You authorize us to disburse the proceeds of you Loan, totaling $300.00, subject to the terms and conditions of this Agreement, as follows:

- $0.00 to pay off outstanding amounts owing on prior loan(s), loan number(s) N/A, including any outstanding principal, accrued interest and other fees and charges, if any, as of (date of loan).
- $300.00 deposited to your checking account identified in the ACH Authorization herein

## INSTALLMENT LOAN AGREEMENT TERMS

The following terms and conditions are between you the Borrower (sometimes referred to as "Borrower" "you" or "your") and Green Funds Group DBA GFX as the Lender (sometimes referred to as "Lender" "us" "we" or "our") and forms part of your loan agreement with us, and sets out a summary of the key terms of your Installment Loan (hereinafter "Loan").

You agree to accept a copy of this disclosure statement and the related terms and conditions together with the Loan (hereinafter the "Agreement") in electronic form and agree that any electronic disclosures have the same meaning and effect as if provided to you in writing, in paper form. You also agree to carefully review this Agreement and all related documents in full, before agreeing to the Loan; and to retain a copy of this Disclosure Statement and related terms and conditions for your records and future reference.

**IMPORTANT – GOVERNING LAW:** YOU UNDERSTAND THAT THE LENDER IS A MOHAWK OR FIRST NATIONS ENTITY, LOCATED ON THE MOHAWK TERRITORY OF KAHNAWAKE AND IS SUBJECT TO THE LAWS OF KAHNAWAKE AND THOSE OF THE FIRST NATIONS OF CANADA. YOU AGREE TO BE BOUND BY SUCH LAWS IN ALL ACTIONS RELATING TO THIS LOAN, THE REPAYMENT OF THE LOAN, OR THIS AGREEMENT. THIS MEANS THAT YOUR LOAN IS GOVERNED BY THE LAWS OF A SOVEREIGN GOVERNMENT. BORROWER AGREES TO BE BOUND BY THE COURTS OF THE PROVINCE OF QUEBEC AS THE SOLE AND EXCLUSIVE JURISDICTION TO FILE COURT-RELATED PROCEEDINGS BEFORE A COURT OF JUSTICE TO DECIDE THE FINAL OUTCOME OF ANY DISPUTE AND/OR CONFLICT, AND ONLY AFTER ALL ELSE PROVIDED WITHIN THE "DISPUTE RESOLUTION" PROVISION HAS FAILED. WE DO NOT HAVE A PRESENCE IN ANY STATE OF THE UNITED STATES OF AMERICA. NEITHER THIS AGREEMENT NOR THE LENDER IS SUBJECT TO THE LAWS OF ANY STATE OF THE UNITED STATES. THE LAW OF KAHNAWAKE RELATING TO LENDING DOES NOT LIMIT THE RATE OF INTEREST OR FEES THAT MAY BE CHARGED; YOU MAY LIVE IN A STATE THAT RESTRICTS THE RATE OF INTEREST OR FEES THAT MAY BE CHARGED ON A CONSUMER LOAN; YOU MAY WISH TO FIND A DIFFERENT LENDER THAT COMPLIES WITH THOSE RESTRICTIONS. IN THE EVENT OF A BONA FIDE DISPUTE BETWEEN YOU AND US, THE LAWS OF KAHNAWAKE AND THOSE OF THE FIRST NATIONS OF CANADA AND APPLICABLE FEDERAL LAW SHALL EXCLUSIVELY APPLY TO SUCH DISPUTE.

You must electronically sign this Agreement and submit it with your application. Upon signing this Agreement, pursuant to these terms and conditions, we agree to lend to you the amount set out in the above disclosures at the annual interest rate set out therein. This agreement become effective immediately upon signing (hereinafter the Effective Date").

## SPECIAL NOTICES

- THIS LOAN IS GOVERNED BY THE LAWS OF KAHNAWAKE AND THOSE OF THE FIRST NATIONS OF CANADA
- THIS IS AN EXPENSIVE FORM OF BORROWING.
- YOUR LOAN IS DESIGNED TO ASSIST YOU IN MEETING YOUR SHORT-TERM CASH NEEDS. IT IS NOT A SOLUTION FOR LONGER TERM FINANCIAL PROBLEMS.
- ADDITIONAL FEES MAY INCUR IF A LOAN IS ROLLED OVER OR REFINANCED
- CREDIT COUNSELING SERVICES MAY BE AVAILABLE IN YOUR AREA IF YOU ARE EXPERIENCING FINANCIAL DIFFICULTIES

**TRUTH-IN-LENDING DISCLOSURES**The disclosures above are provided to you so that you may compare the cost of this loan to other loan products you might obtain. All numerical disclosures are estimates and are calculated based on the date the loan funds are deposited into your bank account. The loan funds are assumed to be deposited into your bank account one business day after this Agreement is signed. The inclusion of these disclosures does not mean that we or any subsequent holder of this Agreement agree to the application of state or federal law.

**PROMISE TO PAY:** You promise to pay us the amount financed and finance charges, fees, or costs according to the payment schedule in the Truth in Lending Disclosures plus all other amounts owed to us under this Agreement. You agree that your finance charges will be calculated at the annual percentage rate in the Truth in Lending Disclosures. You agree to make your payments using the method in the Disbursement and Payment Choice.

**CANCELLATION:** You may cancel your payment obligations under this Agreement, without cost or finance charges, no later than 3 days immediately following the Effective Date ("Cancellation Deadline"). To cancel your payment obligations on this loan, you must inform us in writing, by or before the Cancellation Deadline by email to clientservices@greenfundsexpress.com that you want to cancel the future payment obligations on this loan. If we timely receive your written notice of cancellation before the loan proceeds have been deposited into your bank account, then we will not debit your bank account and both your and our obligations under this Agreement will be rescinded.

If we receive your notice of cancellation on or before the Cancellation Deadline but after the loan proceeds have been deposited into your bank account, then you authorize us to effect a debit to your bank account or your debit card for the principal amount of this Agreement. If we receive payment of the principal amount via the debit, then all obligations under this Agreement are immediately rescinded. If we do not receive payment of the principal amount by the debit, then this Agreement remains in full force and effect.

**INTEREST:** There are no interest free grace periods. Interest shall accrue on the outstanding principal balance of the Loan and all other amounts due to Lender under the Loan Documents commencing on the date that the proceeds of the Loan are deposited into your bank account. Interest shall be computed on the actual number of days elapsed, based on a 360-day year. In calculating your payments, we have assumed you will make each payment on the due date and in the amount due. This continues until all amounts payable under this Agreement, including interest, are paid back in full. Late payments made after the due date will result in additional interest charges.

**DISBURSEMENT:** If your loan is approved, we will disburse your loan proceeds within two business days. You authorize us to use commercially reasonable efforts to initiate a credit entry by depositing the proceeds of your loan into the bank account that you first authorized in your Disbursement and Payment Choice Authorization. Delays caused by bank holidays, the processing schedule of your individual bank, inadvertent processing errors, natural disasters, or acts of terror may extend the time for the deposit.

**PAYMENT TERMS:** You must repay this Loan according to the Payment Schedule set forth above in the Truth-in-Lending Disclosure. including any additional fees accrued based on late or nonpayment. The Truth-in-Lending Disclosures are calculated based on the assumption that you will make each payment on the date it is due. To the extent that any payment due to us under this Agreement would exceed the maximum rate permitted by law, the payment shall be amended and replaced with the maximum lawful amount.

*REPAYMENT:* You agree to make payments in the manner selected in your Disbursement and Payment Choice Authorization until your loan, including principal, finance charges and other charges.
*ESTIMATES:* All numerical disclosures in the Truth-in-Lending Disclosures are estimates and assume the Disbursement Date is the business day after your loan is approved. The actual amount of your required payment of interest and principal may vary from the amount shown.
*APPLICATION OF PAYMENTS:* We will apply all payments we receive in the following order: (1) finance charges and fees; (2) accrued and unpaid interest; and (3) principal.
*PREPAYMENT:* You may prepay all or part of the amount that you owe under this Agreement at any time without penalty. Finance charges are not precomputed so you will not be entitled to a refund of any finance charge if you make a prepayment. Regular Payments in the amounts and on the dates set out above will continue to be drawn from your designated bank account until your Loan is repaid in full.
*DUE DATE:* While every effort will be given to take the payment on the due date, due dates are just an estimate and the actual withdrawal may occur within 2 business days before or after the due date. In the event your due date is on a day your bank is not open we will process your payment on the next business day after your due date, and we will credit any payment received on that business day as if it were received on the due date. In the event a payment is not received for any reason, you authorize us to attempt to obtain the payment or resubmit a rejected payment as soon as reasonably possible after the due date at any time, and as many times as lawfully allowed, during the next ten business day.
*RETURNED ITEM AND LATE FEES:*If your payment method is stopped, denied or dishonored for any reason, including due to insufficient funds in your bank Account, you agree to pay us a fee of $30.00 . You authorize us and our agents to make a one-time withdrawal from your bank account to collect this fee. Your financial institution may also impose a fee. If your payment needs to be moved or is 1 day or more days late, may charge you a Late Fee
*BORROWER'S BANK CHARGES:* You will not hold us or our agents responsible for any fees imposed by your banking institution in connection with this Loan or Agreement.
*ALL SUMS DUE:* If you fail to make your payments when due we can require you to pay your unpaid balance in full. We can also require you to pay your unpaid balance in full if you break any promise you made in this Agreement, default in this Agreement, or if any statement made in your application is untrue or becomes untrue and you do not tell us, or in the event we discover fraud of any sort.

**DEFAULT:** It is a default under this Agreement if you: (1) fail to make a payment when such payment is due; (2) become bankrupt or insolvent or make an assignment in favor of your creditors; (3) have in connection with this Agreement, made a statement or representation or provided us with any information that was false, misleading or inaccurate; (4) violate, fail to or are unwilling to comply with any provision of this Agreement; or (5) die. In the event of a default under this Agreement, upon demand by us in accordance with applicable laws, all amounts owing under this Agreement will become immediately due and payable at our option following any required notice period.

*CONSEQUENCES OF DEFAULT:* Should you default on any of your obligations under this Agreement, we may, at our option, do any one or more of the following: (1) we can choose to declare all principal, earned finance charges and other amounts that you owe us to be immediately due and payable in full; (2) you agree that, without further notice, we can debit your bank account or debit card, as applicable, for the full amount that you owe us; (3) submit your name to a collection agency; (4) report the incident to a consumer reporting agency database, which may negatively impact your ability to write checks or to receive loans or advances from other companies, and (5) pursue all legally available means to collect what you owe us. By choosing any one or more of the above options, we do not waive our rights to use any other alternative methods available to us to collect the money you owe us.

**CONSUMER REPORTS & VERIFICATION:** You authorize us to obtain consumer reports about you from one or more consumer reporting agencies now or in the future as long as you owe us money under this Agreement. We may use the consumer report for any purpose authorized by applicable law in connection with a credit transaction involving you and involving the extension of credit to you or review or collection of your account, including by not limited (i) for authentication purposes; to verify your identity; (ii) to make credit decisions; and (iii) to determine your debt-to-income ratio. We reserve the right to withhold funding of this Loan, at any time prior to disbursement, to allow us to verify the information you have provided to us.

**CREDIT REPORTING:** We may submit negative credit information about you to a credit reporting agency if you fail to satisfy the terms of this Agreement. We may report information about your account to any credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

**CREDIT DISPUTES; IDENTITY THEFT:** If you believe that any information, we have furnished to a consumer reporting agency about your loan

is inaccurate, or if you believe that you have been the victim of identity theft in connection with any loan made by us, contact us immediately at 1-833-381-1202 or write us at clientservices@greenfundsexpress.com.

**MILITARY LENDING:** By signing this Agreement, you certify that you are not, nor are you the spouse or dependent of a regular reserve member of the Army, Navy, Marine Corps, Air Force or Coast Guard, serving on active due under a call or order that does not specify a period of 30 days or fewer, or servicing on Active Guard or Reserve Duty. (Dependents include the member's spouse, children under the age of 18 years old, or an individual for whom the member provided more than one half of their financial support for 180 days preceding the date of this Agreement).

**BANKRUPTCY:** You represent and warrant that you are not currently a debtor in any bankruptcy proceeding, you are not contemplating bankruptcy, have no intention to file a petition for relief under any chapter of the U.S. Bankruptcy Code, and you have not consulted with an attorney regarding a potential bankruptcy filing in the past six months. You must provide any notice(s) of any future bankruptcy petition and all subsequent filings, motions, orders or correspondence to us at 12 Simon Road, Kanesatake, QC, J0N-1E0.

**SOVEREIGNTY:** It is the express intent of the Lender that this Agreement and all related documents be governed by the jurisdiction of the Lender, and Lender in no way is submitting itself to the laws of any United States jurisdiction. Lender is not a U.S. based business, you will be limited as to what claims, if any, you may be able to assert against us. To encourage resolution of consumer complaints, any complaint may be submitted by you or on your behalf to us for review as described under the Dispute Resolution provision below.

**DISPUTE RESOLUTION PROCESS:** Prior to Borrower being able to seek legal action, Borrower agrees to take the following steps to attempt resolution of any conflict and/or dispute relating to the Loan, this Agreement, or anything related to the business between you and us: (1) Borrower shall contact the Lender directly in the event of a dispute in each instance in an attempt to seek resolution thereof. Upon receipt thereof, the Lender will do everything within its power to resolve the dispute or conflict in an expedited manner; (2) In the event that the foregoing dispute or conflict cannot be resolved on an expedited basis, the Borrower shall then be referred to the "First Nations Lenders' Authority" ("FNLA") to have the dispute decided according to its dispute resolution process adopted specifically for complaints filed by individual Borrowers. The dispute resolution process can be found here: http://fnla.ca/dipute-resolution-policy/; (3) In the event that Steps 1 and 2 herein have not resulted in a resolution of any dispute or conflict involving the Borrower and the Lender, to the satisfaction of each of the parties to the Agreement, within sixty (60) days dating from the receipt of the complaint by the FNLA, the Borrower shall then have the option, as part of the present due process, to file a complaint with the Courts of the Province of Quebec having jurisdiction in this matter. **YOU AGREE TO FOLLOW THIS DISPUTE RESOLUTION PROCESS FULLY**.

> _CLASS ACTIONS:_ As forming part of the "Dispute Resolution Process", the parties hereto further waive any rights to participate in an arbitration process and any right to join and/or participate in an alleged class-action lawsuit.
> _RIGHT TO OPT OUT:_ If you do not agree to the Dispute Resolution process, as defined above herein, in accordance with the terms and conditions of this Agreement, you may advise us in writing either by providing us with written notice by either mailing a letter to Green Funds Group DBA GFX, 12 Simon Road, Kanesatake, QC, J0N-1E0, or email a letter to clientservices@greenfundsexpress.com no later than ten days following the date of this Agreement. Your opt-out correspondence must clearly print or type your name, Account ID and Loan Number and state that you reject dispute resolution. Your rejection of dispute resolution will not be effective if it is not in writing or is dated later than ten days following the date of this Agreement. It is not sufficient to telephone us. In the event you opt out of the Agreement to Dispute Resolution, any Disputes shall nonetheless be governed under the laws of the of Kahnawake and those of the First Nations of Canada.
> _SURVIVAL OF DISPUTE RESOLUTION:_ This agreement for Dispute Resolution will survive: (1) the cancellation, payment, charge-off, or assignment of this Agreement; (2) the bankruptcy of any party; and (3) any transfer, sale, or assignment of this Agreement, or any amounts owed under this Agreement, to any other person or entity

**COMMITMENT TO CUSTOMER SERVICE:** Please direct any questions, issues or disputes in the first instance to us at www.GreenFundsExpress.com or 1-833-381-1202 and we will do our best to help you quickly to efficiently address and resolve the matter. If you have already contacted Customer Service in an attempt to resolve an issue or concern and still need additional assistance, please contact FNLA here: http://fnla.ca/dipute-resolution-policy/.

**CONSENT TO ELECTRONIC COMMUNICATIONS** The following terms and conditions govern electronic communications in connection with this Agreement and the transaction evidenced hereby (hereinafter "Consent"). By electronically signing this Agreement and entering your name below, you are confirming that you have agreed to the terms and conditions of this Consent and that you have the ability to download or print a copy of this Consent for your records. You agree that:

- Any disclosure, notice, record or other type of information that is provided to you in connection with your transaction with us, including but not limited to, the Agreement, this Consent, the Truth in Lending Disclosures, Privacy Policy, Privacy Notice, notices of adverse action, and other applicable brochures and disclosures (collectively, "Communications"), may be sent to you electronically by posting the information at our website, www.GreenFundsExpress.com or by sending it to you by email at the address provided in your application, from us or any vendor contracted through us at any time. You understand and agree that we have no obligation to notify you of the communications posted on our website.
- We will not be obligated to provide any Communication to you in paper form unless you specifically request us to do so.
- You are free to withdraw your Consent at any time and at no charge. If at any time you wish to withdraw your Consent, you can send us your written request with the details of such request. If you decide to withdraw your Consent, the legal effectiveness, validity, and enforceability of prior electronic disclosures and Communications will not be affected.
- You agree to provide us with your current email address for Communications. We will use the email address you gave us to contact you unless you timely notify us of a change. If your email address, telephone number(s), or residence address changes, you must notify us of your new address/telephone number(s), email address by sending us an email, before the change, or as soon as reasonably possible to ensure that you continue to receive timely Communications about your loan.

In order to receive electronic communications in connection with this transaction, you will need a working connection to the Internet. Your browser must support the Secure Sockets Layer (SSL) protocol. You must have your own Internet service provider. We may amend (add to, delete or change) the terms of this Consent to electronic communication.

*CONSENT TO RECEIVE TEXT MESSAGES* As used in this text consent, "Text Message" means any text messaging, SMS, or similar communication from us to you pertaining to your Loan. All Text Messages from us in electronic format to you will be considered "in writing." In order to access, view, and retain Text Messages that we make available to you, you must have: (1) a Text Message-capable mobile phone, (2) an active mobile phone account with a communication service provider; and (3) sufficient storage capacity on your mobile phone. There is no service fee for Text Messages, but you are responsible for all charges imposed by your communications service provider. Consult your mobile service carrier's pricing plan to determine the charges for sending and receiving Text Messages. Message frequency is not determined. You agree that we may send any Text Messages related to your loan through your communication service provider. You agree to indemnify, defend and hold us harmless from and against all claims, losses, liability, cost and expenses (including reasonable attorneys' fees) arising from your provision of a mobile phone number that is not your own or your violation of applicable law, regulation or ordinance relating to Text Messages. Your obligation under this paragraph shall survive termination of this Agreement. You agree that Text Messages are provided for your convenience only. We will not be liable for losses or damages arising from any disclosure of account information to third parties, non-delivery, delayed delivery, misdirected delivery or mishandling of, or inaccurate content in, the Text Messages sent by us. We may modify or terminate our Text Messaging services from time to time, for any reason, with or without notice, and without liability to you, any other user or third party.

## PROMOTIONAL PHONE CALLS AND TEXT MESSAGES.

To help speed up the funding process and to keep me up to date on my loan status and future promotions, I am providings express consent to be contacted by GreenFundsExpress.com on my provided telephone number, 8632268835, via email, SMS-Text Message, and auto dialed / pre-recorded phone calls. This consent is optional and not a condition of obtaining lending.

**ADDITIONAL INFORMATION ON MARKETING AND PROMOTIONAL MESSAGE.** Once you opt-in, we will send a text to your number confirming your agreement to receive texts and calls described in this Agreement. To receive texts, you will need: (1) a text capable phone; (2) an account with a communication service provider that offers text services; and (3) sufficient storage capacity on your cell phone. Standard carrier charges may apply.

**OPT-OUT or STOP.** You do not have to agree to receive calls or texts in order to obtain credit or any other services. Your consent is voluntary. You may withdraw your consent at any time by: (1) replying "STOP" to any text message we send you, (2) calling us at 1-833-381-1202, or (3) emailing us at clientservices@greenfundsexpress.com .

You can stop receiving all texts, including messages about payment due dates or missed payments, by typing and sending "STOP ALL" in a reply text. Your request to stop text messages will be effective in one Business Day. We may modify or terminate text messaging at any time, for any reason, without notice, and without liability to you or anyone else.

## DISBURSEMENT AND PAYMENT CHOICE AUTHORIZATION

By electronically signing this Disbursement and Payment Choice Authorization below, you voluntarily authorize us to initiate disbursement credits and payment debits. Unless you notify us in writing otherwise, payments will be made through automatic payment from your bank account. You authorize us to process payment debit entries out of your bank account by using any commercially available methods we choose, such as (but not limited to) ACH entries, wire transfers, remotely created checks, or transactions through your debit card accessing your bank account according to the Payment Schedule above, plus any late charges, returned payment fees and, if you are in default, all principal, finance charges and other amounts due to us as provided in the Agreement. You authorize us to re-process debit entries for the same amounts if any attempted payment transaction is dishonored for any time within the following ten (10) business day. You understand that any re-processing will not change or alter future scheduled payments and that they will continue as scheduled.

*Disbursements to Your Bank Account*: You authorize us to process your loan proceeds with a credit deposit to your following bank account:

**IMPORTANT:** Payments by Cashier's Check or Money Order. If you opt to make your payments by cashier's check, money order or bill pay services through your bank, you must notify us in writing and revoke your ACH. All payments must be received no later than your payment due date to: clientservices@greenfundsexpress.com.

*NOTICE OF VARYING AMOUNTS:* Please note that you have the right to receive notice of all withdrawals from Your Bank Account by an ACH Debit that vary in amount. However, by agreeing to let us withdraw the money from Your Bank Account, you agree we only have to tell you the range of withdrawals that we can make. The range of withdrawals will be either an amount equal to your payment or an amount equal to the outstanding balance under the Loan (which may be greater than or less than an installment payment based upon your payment history). Therefore, by signing this Agreement below, you acknowledge that you will only receive notice when a withdrawal exceeds the amount in the specified range. You authorize us to vary the amount of any withdrawal as needed to repay installments due on the Loan as modified by any partial prepayments you make.

You agree that this Payment Choice Authorization will remain in effect until your loan, including principal, finance charges and other charges, is paid in full. You may only revoke the above authorizations by contacting the financial institution that holds Your Bank Account as well as us directly. If you revoke your authorization, you agree to provide us with another form of payment acceptable to us such as a cashier's check or money order. Any payments already processing at the time or a revocation will continue to process.

**NON-WAIVER, ASSIGNMENT, OTHER RIGHTS:** Lender expressly reserves the right to enforce any of these terms at any time. Failure to enforce any term does not constitute a waiver of the term and Lender may choose to enforce the term at any time. Should a court of competent jurisdiction and authority over Lender find any term in this agreement unenforceable, the offending term shall be struck from the agreement and recrafted to the term most closely relating to the term of the Agreement that is enforceable, if possible. Should this not be possible the term shall be struck, and the remaining terms will remain in full force and effect. We can enforce this Agreement against your heirs and legal representatives. We may assign this Agreement and our rights under it without notice and without your consent.

**ENTIRE AGREEMENT:** This Agreement together with the application and notices herein, contains the entire agreement between you and us

relating to your Loan. Any change to this Agreement must be in writing and signed by us or posted on our website.

**ATTORNEY FEES AND COLLECTION COSTS:** If the Loan is in default for any of the reasons described above, and we pursue collection efforts against you, subject to applicable law. You agree to pay all reasonable collection agency fees, court costs and other collection costs actually incurred by us and our agents, successors and assigns. If we refer you Loan to an attorney who is not our salaried employee for collection or enforcement of this Agreement, you agree we may charge you reasonable attorney fees that we incur.

**PRIVACY POLICY**

**Reviewed 09/2020**

| FACTS | WHAT DOES Green Funds Group DBA GFX DO WITH YOUR PERSONAL INFORMATION? |
|---|---|
| Why? | Financial companies choose how they share your personal information. Consumers have the right to limit some but not all sharing. This notice tells you how we collect, share, and protect your personal information. Please read this notice carefully to understand what we do. |
| What? | The types of personal information we collect, and share, depend on the product or service you have with us. This information can include<br><br>• Social Security number and checking account information<br>• Payment history and income<br>• Employment information and wire transfer instructions<br>• Wire transfer instructions |
| How? | All financial companies need to share customers' personal information to run their everyday business. In the section below, we list the reasons financial companies can share their customers' personal information; the reasons Green Funds Group DBA GFX chooses to share; and whether you can limit this sharing. |

| Reasons we can share your personal information | Does Green Funds Group DBA GFX share? | Can you limit this sharing? |
|---|---|---|
| For our everyday business purposes - such as to process your transactions, maintain your account(s), respond to court orders and legal investigations, or report to credit bureaus. | Yes | No |
| For our marketing purposes – to offer our products and services to you | Yes | No |
| For joint marketing with other financial companies | No | We do not share |
| For our affiliates' everyday business purposes – information about your transactions and experiences | Yes | No |
| For our affiliates' everyday business purposes - information about your creditworthiness | Yes | Yes |
| For our affiliates to market to you | Yes | Yes |
| For non-affiliates to market to you | No | We do not share |

| To limit our sharing | • Call 1-833-381-1202 - our menu will prompt you through your choices or<br>• Visit us on the web at www.GreenFundsExpress.com<br>• Contact us via email at clientservices@greenfundsexpress.com<br><br>**Please note:**<br><br>If you are a new customer, we can begin sharing your information 30 days from the date we sent this notice. When you are no longer our customer, we can share your information as described in this notice. *However, you can contact us at any time to limit our sharing.* |
|---|---|
| Questions? | Call 1-833-381-1202 or go to www.GreenFundsExpress.com |

**PRIVACY POLICY CONTINUED**

| Who we are |
|---|
|  |

| Who is providing this notice? | Green Funds Group DBA GFX, is providing this privacy policy. |

| **What we do** | |
|---|---|
| How does Green Funds Group DBA GFX protect my personal information? | To protect your personal information from unauthorized access and use, we use security measures. These measures include computer safeguards and secured files and buildings. |
| How does Green Funds Group DBA GFX collect my personal information? | We collect your personal information, for example, when you<br><br>• Apply for a loan<br>• Give us your income information<br>• Give us your contact information<br>• Tell us where to send the money<br>• Provide account information Provide employment information<br><br>We also collect your personal information from others, such as credit bureaus, affiliates or other companies. |
| Why can't I limit all sharing? | You have the right to limit only:<br><br>• sharing for affiliates' everyday business purposes - information about your creditworthiness<br>• affiliates from using your information to market to you sharing for non-affiliates to market to you |
| What happens when I limit sharing for an account, I hold jointly with someone else? | Your choices will apply to everyone on your account. |

| **Definitions** | |
|---|---|
| Affiliates | Companies related by common ownership or control. They can be financial and non-financial companies.<br><br>*Our affiliates include other business entities of the Green Funds Group DBA GFX* |
| Non-affiliates | Companies not related by common ownership or control. They can be financial and non-financial companies. |
| Joint marketing | Companies related by common ownership or control. They can be financial and non-financial companies.<br><br>*A formal agreement between non-affiliated financial companies that together market financial products or services to you.* |

**ESIGNATURE:** By typing your name and today's date and clicking the "I Agree" button below you are electronically signing this Agreement you represent and warrant you had an opportunity to read and complete the application, as well as procure a completed copy for your records; that you have read and understand all of the terms of this Agreement, including the Dispute Resolution Process, the Consent to Electronic Communications, the Consent to Receive Text Messages; that no representations or promises other than those contained in this Agreement have been made, and; you specifically authorize repayment of your loan via the payment method in the Disbursement and Payment Choice Authorization provision;

TYPE YOUR NAME: Malcolm Bennett                    DATE: 06/06/2024

■ [I AGREE]

Application #: 334181
Date: 06/06/2024
Time: 12:53:22
IP: 107.115.108.11

# COMPLAINT EXHIBIT C

## Donna D'Elia's 2023 Green Funds Express Loan Agreement

**INSTALLMENT LOAN AGREEMENT**

ENSURE YOU SCROLL THROUGH, READ, AND UNDERSTAND ALL PARTS OF THIS UNSECURED INSTALLMENT LOAN AGREEMENT

| LENDER INFORMATION | BORROWER INFORMATION |
|---|---|
| Green Funds Group DBA GFX<br>12 Simon Road, Kanesatake, QC, J0N-1E0<br>Customer Service: 1-833-381-1202<br>Email: clientservices@greenfundsexpress.com<br>Website: www.GreenFundsExpress.com | Donna Delia<br>Borrower ID: 103099<br>Redacted<br>Borrower Phone: Redacted<br>Borrower Email: Redacted |
| **LOAN INFORMATION** | **LOAN DETAILS** |
| Loan No: 253305<br>Application Date: 09/29/2023<br>Fund Disbursement Date: 10/03/2023<br>First Repayment Date: 10/12/2023 | Amount Financed: $1,000.00<br>Borrower Financial Institution for ACH Transfers:<br>ABA: 263183049<br>Account: 156257 |

**TRUTH-IN-LENDING DISCLOSURES**

ALL AMOUNT ARE IN UNITED STATES DOLLARS

Please Review all the terms of this Installment Loan Agreement for any additional information about nonpayment, default, and repayment in full before the scheduled date and any prepayment penalties

| ANNUAL PERCENTAGE RATE<br>The cost of your credit as a yearly rate. | FINANCE CHARGE<br>The dollar amount the credit will cost you. | AMOUNT FINANCED<br>The amount of credit provided to you or on your behalf. | TOTAL OF PAYMENTS<br>The amount you will have paid after you have made all payments as scheduled |
|---|---|---|---|
| 686.60% | $2,114.05 | 1,000.00 | $3,114.05 |

**Prepayment:** If you pay off early, you will not have to pay a penalty. Review this entire Agreement for additional information
**Security:** This Loan is unsecured.

**Your payment schedule will be:**

| Number | Date | Amount Due |
|---|---|---|
| 1 | 10/12/2023 | $259.53 |
| 2 | 10/26/2023 | $259.53 |
| 3 | 11/09/2023 | $259.53 |
| 4 | 11/22/2023 | $259.53 |
| 5 | 12/07/2023 | $259.53 |
| 6 | 12/21/2023 | $259.53 |
| 7 | 01/04/2024 | $259.53 |
| 8 | 01/18/2024 | $259.53 |
| 9 | 02/01/2024 | $259.53 |
| 10 | 02/15/2024 | $259.53 |
| 11 | 02/29/2024 | $259.53 |

| 12 | 03/14/2024 | $259.22 |

Total Payments: $3,114.05

If you have any questions about this statement, your Loan or the related terms and conditions, you can call us toll-free at 1-833-381-1202, or write to us at the address noted above.

**Disbursement Authorization:** You authorize us to disburse the proceeds of you Loan, totaling $1,000.00, subject to the terms and conditions of this Agreement, as follows:

- $0.00 to pay off outstanding amounts owing on prior loan(s), loan number(s) N/A, including any outstanding principal, accrued interest and other fees and charges, if any, as of (date of loan).
- $1,000.00 deposited to your checking account identified in the ACH Authorization herein

## INSTALLMENT LOAN AGREEMENT TERMS

The following terms and conditions are between you the Borrower (sometimes referred to as "Borrower" "you" or "your") and Green Funds Group DBA GFX as the Lender (sometimes referred to as "Lender" "us" "we" or "our") and forms part of your loan agreement with us, and sets out a summary of the key terms of your Installment Loan (hereinafter "Loan").

You agree to accept a copy of this disclosure statement and the related terms and conditions together with the Loan (hereinafter the "Agreement") in electronic form and agree that any electronic disclosures have the same meaning and effect as if provided to you in writing, in paper form. You also agree to carefully review this Agreement and all related documents in full, before agreeing to the Loan; and to retain a copy of this Disclosure Statement and related terms and conditions for your records and future reference.

**IMPORTANT – GOVERNING LAW:** YOU UNDERSTAND THAT THE LENDER IS A MOHAWK OR FIRST NATIONS ENTITY, LOCATED ON THE MOHAWK TERRITORY OF KAHNAWAKE AND IS SUBJECT TO THE LAWS OF KAHNAWAKE AND THOSE OF THE FIRST NATIONS OF CANADA. YOU AGREE TO BE BOUND BY SUCH LAWS IN ALL ACTIONS RELATING TO THIS LOAN, THE REPAYMENT OF THE LOAN, OR THIS AGREEMENT. THIS MEANS THAT YOUR LOAN IS GOVERNED BY THE LAWS OF A SOVEREIGN GOVERNMENT. BORROWER AGREES TO BE BOUND BY THE COURTS OF THE PROVINCE OF QUEBEC AS THE SOLE AND EXCLUSIVE JURISDICTION TO FILE COURT-RELATED PROCEEDINGS BEFORE A COURT OF JUSTICE TO DECIDE THE FINAL OUTCOME OF ANY DISPUTE AND/OR CONFLICT, AND ONLY AFTER ALL ELSE PROVIDED WITHIN THE "DISPUTE RESOLUTION" PROVISION HAS FAILED. WE DO NOT HAVE A PRESENCE IN ANY STATE OF THE UNITED STATES OF AMERICA. NEITHER THIS AGREEMENT NOR THE LENDER IS SUBJECT TO THE LAWS OF ANY STATE OF THE UNITED STATES. THE LAW OF KAHNAWAKE RELATING TO LENDING DOES NOT LIMIT THE RATE OF INTEREST OR FEES THAT MAY BE CHARGED; YOU MAY LIVE IN A STATE THAT RESTRICTS THE RATE OF INTEREST OR FEES THAT MAY BE CHARGED ON A CONSUMER LOAN; YOU MAY WISH TO FIND A DIFFERENT LENDER THAT COMPLIES WITH THOSE RESTRICTIONS. IN THE EVENT OF A BONA FIDE DISPUTE BETWEEN YOU AND US, THE LAWS OF KAHNAWAKE AND THOSE OF THE FIRST NATIONS OF CANADA AND APPLICABLE FEDERAL LAW SHALL EXCLUSIVELY APPLY TO SUCH DISPUTE.

You must electronically sign this Agreement and submit it with your application. Upon signing this Agreement, pursuant to these terms and conditions, we agree to lend to you the amount set out in the above disclosures at the annual interest rate set out therein. This agreement become effective immediately upon signing (hereinafter the Effective Date").

## SPECIAL NOTICES

- THIS LOAN IS GOVERNED BY THE LAWS OF KAHNAWAKE AND THOSE OF THE FIRST NATIONS OF CANADA
- THIS IS AN EXPENSIVE FORM OF BORROWING.
- YOUR LOAN IS DESIGNED TO ASSIST YOU IN MEETING YOUR SHORT-TERM CASH NEEDS. IT IS NOT A SOLUTION FOR LONGER TERM FINANCIAL PROBLEMS.
- ADDITIONAL FEES MAY INCUR IF A LOAN IS ROLLED OVER OR REFINANCED
- CREDIT COUNSELING SERVICES MAY BE AVAILABLE IN YOUR AREA IF YOU ARE EXPERIENCING FINANCIAL DIFFICULTIES

**TRUTH-IN-LENDING DISCLOSURES**The disclosures above are provided to you so that you may compare the cost of this loan to other loan products you might obtain. All numerical disclosures are estimates and are calculated based on the date the loan funds are deposited into your bank account. The loan funds are assumed to be deposited into your bank account one business day after this Agreement is signed. The inclusion of these disclosures does not mean that we or any subsequent holder of this Agreement agree to the application of state or federal law.

**PROMISE TO PAY:** You promise to pay us the amount financed and finance charges, fees, or costs according to the payment schedule in the Truth in Lending Disclosures plus all other amounts owed to us under this Agreement. You agree that your finance charges will be calculated at the annual percentage rate in the Truth in Lending Disclosures. You agree to make your payments using the method in the Disbursement and Payment Choice.

**CANCELLATION:** You may cancel your payment obligations under this Agreement, without cost or finance charges, no later than 3 days immediately following the Effective Date ("Cancellation Deadline"). To cancel your payment obligations on this loan, you must inform us in writing, by or before the Cancellation Deadline by email to clientservices@greenfundsexpress.com that you want to cancel the future payment obligations on this loan. If we timely receive your written notice of cancellation before the loan proceeds have been deposited into your bank account, then we will not debit your bank account and both your and our obligations under this Agreement will be rescinded.

If we receive your notice of cancellation on or before the Cancellation Deadline but after the loan proceeds have been deposited into your bank account, then you authorize us to effect a debit to your bank account or your debit card for the principal amount of this Agreement. If we receive payment of the principal amount via the debit, then all obligations under this Agreement are immediately rescinded. If we do not receive payment of the principal amount by the debit, then this Agreement remains in full force and effect.

**INTEREST:** There are no interest free grace periods. Interest shall accrue on the outstanding principal balance of the Loan and all other amounts due to Lender under the Loan Documents commencing on the date that the proceeds of the Loan are deposited into your bank account. Interest shall be computed on the actual number of days elapsed, based on a 360-day year. In calculating your payments, we have assumed you will make each payment on the due date and in the amount due. This continues until all amounts payable under this Agreement, including interest, are paid back in full. Late payments made after the due date will result in additional interest charges.

**DISBURSEMENT:** If your loan is approved, we will disburse your loan proceeds within two business days. You authorize us to use commercially reasonable efforts to initiate a credit entry by depositing the proceeds of your loan into the bank account that you first authorized in your Disbursement and Payment Choice Authorization. Delays caused by bank holidays, the processing schedule of your individual bank, inadvertent processing errors, natural disasters, or acts of terror may extend the time for the deposit.

**PAYMENT TERMS:** You must repay this Loan according to the Payment Schedule set forth above in the Truth-in-Lending Disclosure. including any additional fees accrued based on late or nonpayment. The Truth-in-Lending Disclosures are calculated based on the assumption that you will make each payment on the date it is due. To the extent that any payment due to us under this Agreement would exceed the maximum rate permitted by law, the payment shall be amended and replaced with the maximum lawful amount.

*REPAYMENT:* You agree to make payments in the manner selected in your Disbursement and Payment Choice Authorization until your loan, including principal, finance charges and other charges.

*ESTIMATES:* All numerical disclosures in the Truth-in-Lending Disclosures are estimates and assume the Disbursement Date is the business day after your loan is approved. The actual amount of your required payment of interest and principal may vary from the amount shown.

*APPLICATION OF PAYMENTS:* We will apply all payments we receive in the following order: (1) finance charges and fees; (2) accrued and unpaid interest; and (3) principal.

*PREPAYMENT:* You may prepay all or part of the amount that you owe under this Agreement at any time without penalty. Finance charges are not precomputed so you will not be entitled to a refund of any finance charge if you make a prepayment. Regular Payments in the amounts and on the dates set out above will continue to be drawn from your designated bank account until your Loan is repaid in full.

*DUE DATE:* While every effort will be given to take the payment on the due date, due dates are just an estimate and the actual withdrawal may occur within 2 business days before or after the due date. In the event your due date is on a day your bank is not open we will process your payment on the next business day after your due date, and we will credit any payment received on that business day as if it were received on the due date. In the event a payment is not received for any reason, you authorize us to attempt to obtain the payment or resubmit a rejected payment as soon as reasonably possible after the due date at any time, and as many times as lawfully allowed, during the next ten business day.

*RETURNED ITEM AND LATE FEES:*If your payment method is stopped, denied or dishonored for any reason, including due to insufficient funds in your bank Account, you agree to pay us a fee of $30.00 . You authorize us and our agents to make a one-time withdrawal from your bank account to collect this fee. Your financial institution may also impose a fee. If your payment needs to be moved or is 1 day or more days late, may charge you a Late Fee

*BORROWER'S BANK CHARGES:* You will not hold us or our agents responsible for any fees imposed by your banking institution in connection with this Loan or Agreement.

*ALL SUMS DUE:* If you fail to make your payments when due we can require you to pay your unpaid balance in full. We can also require you to pay your unpaid balance in full if you break any promise you made in this Agreement, default in this Agreement, or if any statement made in your application is untrue or becomes untrue and you do not tell us, or in the event we discover fraud of any sort.

**DEFAULT:** It is a default under this Agreement if you: (1) fail to make a payment when such payment is due; (2) become bankrupt or insolvent or make an assignment in favor of your creditors; (3) have in connection with this Agreement, made a statement or representation or provided us with any information that was false, misleading or inaccurate; (4) violate, fail to or are unwilling to comply with any provision of this Agreement; or (5) die. In the event of a default under this Agreement, upon demand by us in accordance with applicable laws, all amounts owing under this Agreement will become immediately due and payable at our option following any required notice period.

*CONSEQUENCES OF DEFAULT:* Should you default on any of your obligations under this Agreement, we may, at our option, do any one or more of the following: (1) we can choose to declare all principal, earned finance charges and other amounts that you owe us to be immediately due and payable in full; (2) you agree that, without further notice, we can debit your bank account or debit card, as applicable, for the full amount that you owe us; (3) submit your name to a collection agency; (4) report the incident to a consumer reporting agency database, which may negatively impact your ability to write checks or to receive loans or advances from other companies, and (5) pursue all legally available means to collect what you owe us. By choosing any one or more of the above options, we do not waive our rights to use any other alternative methods available to us to collect the money you owe us.

**CONSUMER REPORTS & VERIFICATION:** You authorize us to obtain consumer reports about you from one or more consumer reporting agencies now or in the future as long as you owe us money under this Agreement. We may use the consumer report for any purpose authorized by applicable law in connection with a credit transaction involving you and involving the extension of credit to you or review or collection of your account, including by not limited (i) for authentication purposes; to verify your identity; (ii) to make credit decisions; and (iii) to determine your debt-to-income ratio. We reserve the right to withhold funding of this Loan, at any time prior to disbursement, to allow us to verify the information you have provided to us.

**CREDIT REPORTING:** We may submit negative credit information about you to a credit reporting agency if you fail to satisfy the terms of this Agreement. We may report information about your account to any credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

**CREDIT DISPUTES; IDENTITY THEFT:** If you believe that any information, we have furnished to a consumer reporting agency about your loan

is inaccurate, or if you believe that you have been the victim of identity theft in connection with any loan made by us, contact us immediately at 1-833-381-1202 or write us at clientservices@greenfundsexpress.com.

**MILITARY LENDING:** By signing this Agreement, you certify that you are not, nor are you the spouse or dependent of a regular reserve member of the Army, Navy, Marine Corps, Air Force or Coast Guard, serving on active due under a call or order that does not specify a period of 30 days or fewer, or servicing on Active Guard or Reserve Duty. (Dependents include the member's spouse, children under the age of 18 years old, or an individual for whom the member provided more than one half of their financial support for 180 days preceding the date of this Agreement).

**BANKRUPTCY:** You represent and warrant that you are not currently a debtor in any bankruptcy proceeding, you are not contemplating bankruptcy, have no intention to file a petition for relief under any chapter of the U.S. Bankruptcy Code, and you have not consulted with an attorney regarding a potential bankruptcy filing in the past six months. You must provide any notice(s) of any future bankruptcy petition and all subsequent filings, motions, orders or correspondence to us at 12 Simon Road, Kanesatake, QC, J0N-1E0.

**SOVEREIGNTY:** It is the express intent of the Lender that this Agreement and all related documents be governed by the jurisdiction of the Lender, and Lender in no way is submitting itself to the laws of any United States jurisdiction. Lender is not a U.S. based business, you will be limited as to what claims, if any, you may be able to assert against us. To encourage resolution of consumer complaints, any complaint may be submitted by you or on your behalf to us for review as described under the Dispute Resolution provision below.

**DISPUTE RESOLUTION PROCESS:** Prior to Borrower being able to seek legal action, Borrower agrees to take the following steps to attempt resolution of any conflict and/or dispute relating to the Loan, this Agreement, or anything related to the business between you and us: (1) Borrower shall contact the Lender directly in the event of a dispute in each instance in an attempt to seek resolution thereof. Upon receipt thereof, the Lender will do everything within its power to resolve the dispute or conflict in an expedited manner; (2) In the event that the foregoing dispute or conflict cannot be resolved on an expedited basis, the Borrower shall then be referred to the "First Nations Lenders' Authority" ("FNLA") to have the dispute decided according to its dispute resolution process adopted specifically for complaints filed by individual Borrowers. The dispute resolution process can be found here: http://fnla.ca/dipute-resolution-policy/; (3) In the event that Steps 1 and 2 herein have not resulted in a resolution of any dispute or conflict involving the Borrower and the Lender, to the satisfaction of each of the parties to the Agreement, within sixty (60) days dating from the receipt of the complaint by the FNLA, the Borrower shall then have the option, as part of the present due process, to file a complaint with the Courts of the Province of Quebec having jurisdiction in this matter. **YOU AGREE TO FOLLOW THIS DISPUTE RESOLUTION PROCESS FULLY**.

> _CLASS ACTIONS:_ As forming part of the "Dispute Resolution Process", the parties hereto further waive any rights to participate in an arbitration process and any right to join and/or participate in an alleged class-action lawsuit.
> _RIGHT TO OPT OUT:_ If you do not agree to the Dispute Resolution process, as defined above herein, in accordance with the terms and conditions of this Agreement, you may advise us in writing either by providing us with written notice by either mailing a letter to Green Funds Group DBA GFX, 12 Simon Road, Kanesatake, QC, J0N-1E0, or email a letter to clientservices@greenfundsexpress.com no later than ten days following the date of this Agreement. Your opt-out correspondence must clearly print or type your name, Account ID and Loan Number and state that you reject dispute resolution. Your rejection of dispute resolution will not be effective if it is not in writing or is dated later than ten days following the date of this Agreement. It is not sufficient to telephone us. In the event you opt out of the Agreement to Dispute Resolution, any Disputes shall nonetheless be governed under the laws of the of Kahnawake and those of the First Nations of Canada.
> _SURVIVAL OF DISPUTE RESOLUTION:_ This agreement for Dispute Resolution will survive: (1) the cancellation, payment, charge-off, or assignment of this Agreement; (2) the bankruptcy of any party; and (3) any transfer, sale, or assignment of this Agreement, or any amounts owed under this Agreement, to any other person or entity

**COMMITMENT TO CUSTOMER SERVICE:** Please direct any questions, issues or disputes in the first instance to us at www.GreenFundsExpress.com or 1-833-381-1202 and we will do our best to help you quickly to efficiently address and resolve the matter. If you have already contacted Customer Service in an attempt to resolve an issue or concern and still need additional assistance, please contact FNLA here: http://fnla.ca/dipute-resolution-policy/.

**CONSENT TO ELECTRONIC COMMUNICATIONS** The following terms and conditions govern electronic communications in connection with this Agreement and the transaction evidenced hereby (hereinafter "Consent"). By electronically signing this Agreement and entering your name below, you are confirming that you have agreed to the terms and conditions of this Consent and that you have the ability to download or print a copy of this Consent for your records. You agree that:

- Any disclosure, notice, record or other type of information that is provided to you in connection with your transaction with us, including but not limited to, the Agreement, this Consent, the Truth in Lending Disclosures, Privacy Policy, Privacy Notice, notices of adverse action, and other applicable brochures and disclosures (collectively, "Communications"), may be sent to you electronically by posting the information at our website, www.GreenFundsExpress.com or by sending it to you by email at the address provided in your application, from us or any vendor contracted through us at any time. You understand and agree that we have no obligation to notify you of the communications posted on our website.
- We will not be obligated to provide any Communication to you in paper form unless you specifically request us to do so.
- You are free to withdraw your Consent at any time and at no charge. If at any time you wish to withdraw your Consent, you can send us your written request with the details of such request. If you decide to withdraw your Consent, the legal effectiveness, validity, and enforceability of prior electronic disclosures and Communications will not be affected.
- You agree to provide us with your current email address for Communications. We will use the email address you gave us to contact you unless you timely notify us of a change. If your email address, telephone number(s), or residence address changes, you must notify us of your new address/telephone number(s), email address by sending us an email, before the change, or as soon as reasonably possible to ensure that you continue to receive timely Communications about your loan.

In order to receive electronic communications in connection with this transaction, you will need a working connection to the Internet. Your browser must support the Secure Sockets Layer (SSL) protocol. You must have your own Internet service provider. We may amend (add to, delete or change) the terms of this Consent to electronic communication.

*CONSENT TO RECEIVE TEXT MESSAGES* As used in this text consent, "Text Message" means any text messaging, SMS, or similar communication from us to you pertaining to your Loan. All Text Messages from us in electronic format to you will be considered "in writing." In order to access, view, and retain Text Messages that we make available to you, you must have: (1) a Text Message-capable mobile phone, (2) an active mobile phone account with a communication service provider; and (3) sufficient storage capacity on your mobile phone. There is no service fee for Text Messages, but you are responsible for all charges imposed by your communications service provider. Consult your mobile service carrier's pricing plan to determine the charges for sending and receiving Text Messages. Message frequency is not determined. You agree that we may send any Text Messages related to your loan through your communication service provider. You agree to indemnify, defend and hold us harmless from and against all claims, losses, liability, cost and expenses (including reasonable attorneys' fees) arising from your provision of a mobile phone number that is not your own or your violation of applicable law, regulation or ordinance relating to Text Messages. Your obligation under this paragraph shall survive termination of this Agreement. You agree that Text Messages are provided for your convenience only. We will not be liable for losses or damages arising from any disclosure of account information to third parties, non-delivery, delayed delivery, misdirected delivery or mishandling of, or inaccurate content in, the Text Messages sent by us. We may modify or terminate our Text Messaging services from time to time, for any reason, with or without notice, and without liability to you, any other user or third party.

### PROMOTIONAL PHONE CALLS AND TEXT MESSAGES.

❏ To help speed up the funding process and to keep me up to date on my loan status and future promotions, I am providings express consent to be contacted by GreenFundsExpress.com on my provided telephone number, 8132448805, via email, SMS-Text Message, and auto dialed / pre-recorded phone calls. This consent is optional and not a condition of obtaining lending.

**ADDITIONAL INFORMATION ON MARKETING AND PROMOTIONAL MESSAGE.** Once you opt-in, we will send a text to your number confirming your agreement to receive texts and calls described in this Agreement. To receive texts, you will need: (1) a text capable phone; (2) an account with a communication service provider that offers text services; and (3) sufficient storage capacity on your cell phone. Standard carrier charges may apply.

**OPT-OUT or STOP.** You do not have to agree to receive calls or texts in order to obtain credit or any other services. Your consent is voluntary. You may withdraw your consent at any time by: (1) replying "STOP" to any text message we send you, (2) calling us at 1-833-381-1202, or (3) emailing us at clientservices@greenfundsexpress.com .

You can stop receiving all texts, including messages about payment due dates or missed payments, by typing and sending "STOP ALL" in a reply text. Your request to stop text messages will be effective in one Business Day. We may modify or terminate text messaging at any time, for any reason, without notice, and without liability to you or anyone else.

### DISBURSEMENT AND PAYMENT CHOICE AUTHORIZATION

By electronically signing this Disbursement and Payment Choice Authorization below, you voluntarily authorize us to initiate disbursement credits and payment debits. Unless you notify us in writing otherwise, payments will be made through automatic payment from your bank account. You authorize us to process payment debit entries out of your bank account by using any commercially available methods we choose, such as (but not limited to) ACH entries, wire transfers, remotely created checks, or transactions through your debit card accessing your bank account according to the Payment Schedule above, plus any late charges, returned payment fees and, if you are in default, all principal, finance charges and other amounts due to us as provided in the Agreement. You authorize us to re-process debit entries for the same amounts if any attempted payment transaction is dishonored for any time within the following ten (10) business day. You understand that any re-processing will not change or alter future scheduled payments and that they will continue as scheduled.

> *Disbursements to Your Bank Account*: You authorize us to process your loan proceeds with a credit deposit to your following bank account:

| Bank Name: | TRAX CREDIT UNION |
|---|---|
| Transit ABA Number: | 263183049 |
| Deposit Account Number: | 156257 |

**IMPORTANT:** Payments by Cashier's Check or Money Order. If you opt to make your payments by cashier's check, money order or bill pay services through your bank, you must notify us in writing and revoke your ACH. All payments must be received no later than your payment due date to: clientservices@greenfundsexpress.com.

> *NOTICE OF VARYING AMOUNTS:* Please note that you have the right to receive notice of all withdrawals from Your Bank Account by an ACH Debit that vary in amount. However, by agreeing to let us withdraw the money from Your Bank Account, you agree we only have to tell you the range of withdrawals that we can make. The range of withdrawals will be either an amount equal to your payment or an amount equal to the outstanding balance under the Loan (which may be greater than or less than an installment payment based upon your payment history). Therefore, by signing this Agreement below, you acknowledge that you will only receive notice when a withdrawal exceeds the amount in the specified range. You authorize us to vary the amount of any withdrawal as needed to repay installments due on the Loan as modified by any partial prepayments you make.

You agree that this Payment Choice Authorization will remain in effect until your loan, including principal, finance charges and other charges, is paid in full. You may only revoke the above authorizations by contacting the financial institution that holds Your Bank Account as well as us directly. If you revoke your authorization, you agree to provide us with another form of payment acceptable to us such as a cashier's check or money order. Any payments already processing at the time or a revocation will continue to process.

**NON-WAIVER, ASSIGNMENT, OTHER RIGHTS:** Lender expressly reserves the right to enforce any of these terms at any time. Failure to

enforce any term does not constitute a waiver of the term and Lender may choose to enforce the term at any time. Should a court of competent jurisdiction and authority over Lender find any term in this agreement unenforceable, the offending term shall be struck from the agreement and recrafted to the term most closely relating to the term of the Agreement that is enforceable, if possible. Should this not be possible the term shall be struck, and the remaining terms will remain in full force and effect. We can enforce this Agreement against your heirs and legal representatives. We may assign this Agreement and our rights under it without notice and without your consent.

**ENTIRE AGREEMENT:** This Agreement together with the application and notices herein, contains the entire agreement between you and us relating to your Loan. Any change to this Agreement must be in writing and signed by us or posted on our website.

**ATTORNEY FEES AND COLLECTION COSTS:** If the Loan is in default for any of the reasons described above, and we pursue collection efforts against you, subject to applicable law. You agree to pay all reasonable collection agency fees, court costs and other collection costs actually incurred by us and our agents, successors and assigns. If we refer you Loan to an attorney who is not our salaried employee for collection or enforcement of this Agreement, you agree we may charge you reasonable attorney fees that we incur.

**PRIVACY POLICY**

Reviewed 09/2020

| FACTS | WHAT DOES Green Funds Group DBA GFX DO WITH YOUR PERSONAL INFORMATION? |
|---|---|
| Why? | Financial companies choose how they share your personal information. Consumers have the right to limit some but not all sharing. This notice tells you how we collect, share, and protect your personal information. Please read this notice carefully to understand what we do. |
| What? | The types of personal information we collect, and share, depend on the product or service you have with us. This information can include<br><br>• Social Security number and checking account information<br>• Payment history and income<br>• Employment information and wire transfer instructions<br>• Wire transfer instructions |
| How? | All financial companies need to share customers' personal information to run their everyday business. In the section below, we list the reasons financial companies can share their customers' personal information; the reasons Green Funds Group DBA GFX chooses to share; and whether you can limit this sharing. |

| Reasons we can share your personal information | Does Green Funds Group DBA GFX share? | Can you limit this sharing? |
|---|---|---|
| For our everyday business purposes - such as to process your transactions, maintain your account(s), respond to court orders and legal investigations, or report to credit bureaus. | Yes | No |
| For our marketing purposes – to offer our products and services to you | Yes | No |
| For joint marketing with other financial companies | No | We do not share |
| For our affiliates' everyday business purposes – information about your transactions and experiences | Yes | No |
| For our affiliates' everyday business purposes - information about your creditworthiness | Yes | Yes |
| For our affiliates to market to you | Yes | Yes |
| For non-affiliates to market to you | No | We do not share |

| To limit our sharing | • Call 1-833-381-1202 - our menu will prompt you through your choices or<br>• Visit us on the web at www.GreenFundsExpress.com<br>• Contact us via email at clientservices@greenfundsexpress.com<br><br>**Please note:**<br><br>If you are a new customer, we can begin sharing your information 30 days from the date we sent this notice. When you are no longer our customer, we can share your information as described in this notice. *However, you can contact us at any time to limit our sharing.* |
|---|---|

| Questions? | Call 1-833-381-1202 or go to www.GreenFundsExpress.com |
|---|---|

**PRIVACY POLICY CONTINUED**

| Who we are | |
|---|---|
| Who is providing this notice? | Green Funds Group DBA GFX, is providing this privacy policy. |
| **What we do** | |
| How does Green Funds Group DBA GFX protect my personal information? | To protect your personal information from unauthorized access and use, we use security measures. These measures include computer safeguards and secured files and buildings. |
| How does Green Funds Group DBA GFX collect my personal information? | We collect your personal information, for example, when you<br><br>• Apply for a loan<br>• Give us your income information<br>• Give us your contact information<br>• Tell us where to send the money<br>• Provide account information Provide employment information<br><br>We also collect your personal information from others, such as credit bureaus, affiliates or other companies. |
| Why can't I limit all sharing? | You have the right to limit only:<br><br>• sharing for affiliates' everyday business purposes - information about your creditworthiness<br>• affiliates from using your information to market to you sharing for non-affiliates to market to you |
| What happens when I limit sharing for an account, I hold jointly with someone else? | Your choices will apply to everyone on your account. |
| **Definitions** | |
| Affiliates | Companies related by common ownership or control. They can be financial and non-financial companies.<br><br>*Our affiliates include other business entities of the Green Funds Group DBA GFX* |
| Non-affiliates | Companies not related by common ownership or control. They can be financial and non-financial companies. |
| Joint marketing | Companies related by common ownership or control. They can be financial and non-financial companies.<br><br>*A formal agreement between non-affiliated financial companies that together market financial products or services to you.* |

**ESIGNATURE:** By typing your name and today's date and clicking the "I Agree" button below you are electronically signing this Agreement you represent and warrant you had an opportunity to read and complete the application, as well as procure a completed copy for your records; that you have read and understand all of the terms of this Agreement, including the Dispute Resolution Process, the Consent to Electronic Communications, the Consent to Rece e Text Messages; that no representations or promises other than those contained in this Agreement have been made, and; you specifically authorize repayment of your loan via the payment method in the Disbursement and Payment Choice Authorization provision;

TYPE YOUR NAME: Donna Delia                                 DATE: 10/02/2023

■ **[I AGREE]**

Application #: 253305
Date: 10/02/2023
Time: 17:20:30
IP: 166.199.100.118

# COMPLAINT EXHIBIT D

## Charter of The First Nation Lenders' Authority

# CHARTER OF THE
# FIRST NATIONS LENDERS' AUTHORITY

## Section I – Authority:

1.1. Whereas First Nations people have consistently and historically exercised ultimate and exclusive jurisdiction over their respective Territories.

1.2. Whereas the First Nations peoples of Canada have existing, inherent and inalienable rights which includes the right of self-determination; the right to control economic development within their respective Territories; and the right to promote and preserve peace, order and good governance within their respective Territories;

1.3. Whereas the aforementioned right of self-determination has been recognized by the Canada Constitution Act, 1982;

1.4. Whereas on the basis that short-term lending service businesses have a significant impact on economic development and peace, order and good governance within First Nations Territories, the First Nations Peoples of Canada have the right to conduct, operate and regulate short-term lending service businesses within their respective Territories.

1.5. Whereas the regulation of short-term lending service businesses within First Nations Territories falls within the right of self-determination and is recognized by requirements of the constituting laws of Canada;

1.6. Whereas the conduct and operation of short-term lending service businesses is a legitimate means of generating revenue to address the foregoing needs in pursuit of the goal of economic development and self-determination.

1.7. Whereas legitimately operated short-term lending service businesses, and the regulation thereof, is consistent with applicable laws and regulations within First Nations' Territories and the promotion of self-government and economic self-sufficiency.

1.8. Whereas the oversight and regulation of short-term lending service businesses within First Nations' Territories is good public policy and shall provide consumers with protections, to ensure fairness, transparency, and efficiency.

1.9. Whereas it is essential that the First Nations peoples of Canada have oversight on short term lending service businesses operating within their respective Territories, in a manner commensurate with applicable laws and regulations.

1.10. Whereas it is essential for the sustainable growth of the short-term lending services operating within First Nations' Territories that public confidence in in their industry be maintained through the creation of a regulatory body which oversees the activities of its members;

1.11. Whereas the adoption of the foregoing Charter is a necessary condition for the legitimate operation of short-term lending service businesses within First Nations' Territories and is in the best interests of the First Nations people of Canada.

1.12. Whereas the establishment of a "First Nations Lenders' Authority" and a Board of Governance is integral to the oversight of the "First Nations Lenders' Authority" and to uphold the goals of self-government and economic self-sufficiency within First Nations' Territories.

1.13. Whereas this Charter was read, deliberated upon and passed on February 15, 2019, in the Mohawk Territory of Kahnawake.

### Section II – Purpose:

2.1. The purpose of this Charter is to:

a) Create an independent body known as the **"First Nations Lenders' Authority"** (the "Authority") and to provide it with the mandate to oversee short-term lending service businesses within First Nations' Territories as a means of promoting and supporting economic development, self-sufficiency and peace, order and good governance within First Nations' Territories;

b) Ensure that short-term lending service businesses within First Nations' Territories are operated honestly, equitably and in the best interests of consumers and the First Nations peoples of Canada

### Section III – Application:

3.1. This Charter applies to all short-term lending service businesses that operate within and from a First Nations' Territory, and to all persons and vendors located within the respective Territory that may be in the business of providing short-term lending services. Short-term lending services include the business of providing goods, services, or credit to customers from or within the Territory in exchange for interest, finance charges, fees, rent, or other forms of consideration in the Territory, including transactions originating from or within the Territory. Short-term lending services includes installment loans.

### Section IV – Creation of the Board of Governance:

4.1. The Authority hereby charters, creates and establishes the Board of Governance (the "Board"). The Board has the mandate of implementing this Charter relating to short-term lending service businesses.

4.2. The Board will have the rights and responsibilities set forth in this Charter and will oversee that short-term lending service businesses are conducted in the best interests of First Nations peoples and in accordance with the applicable laws and regulations within their respective Territories and with the utmost principles of honesty and integrity.

4.3. The Board shall maintain its initial principal place of business and office within the Mohawk Territory of Kahnawake. The Board may, however, with a majority vote from its members, establish other places of business in such other locations as the Board may, from time to time, determine to be in the best interests of its members.

**Section V – Structure of the Board:**

5.1. The Board will consist of three (3) persons from a recognized Indigenous group in Canada (i.e., First Nations, Inuit, Metis).

**Section VI – Eligibility:**

6.1. No person is eligible for appointment, or to continue service on, the Board, who:

a) Is not a member of recognized Indigenous group, over the age of eighteen (18) years of age;

b) Has any financial interest in, or management responsibility for, an establishment involved in short-term financial service businesses or related service businesses within a First Nation's Territory, or;

c) Has been convicted of an indictable offence, except if a full pardon has been granted.

**Section VII – Interim Board:**

7.1. Until members of the Board are elected pursuant to the provisions of First Nation's Elections laws, a body of not more than three (3) persons will function as an interim board. The Interim Board will have all the rights and responsibilities provided herein.

**Section VIII – Chairperson:**

8.1. The Board will, by majority vote, appoint one (1) of its members as Chairperson. The Chairperson will preside over meetings of the Board and will ensure that the Board follows the principles and procedures provided herein.

**Section IX – Vice-Chairperson:**

9.1. The Board will, by majority vote, appoint one (1) of its members as Vice Chairperson. The Vice-Chairperson will serve as Chairperson during meetings of the Board in the absence of the Chairperson.

9.2. The Chairperson and Vice-Chairperson will be considered as members of the Board for all purposes provided for herein.

**Section X – Term of Board:**

10.1.  The Board shall have uninterrupted existence and succession in its own name, unless dissolved by the Authority pursuant to applicable laws.

10.2.  Members of the Board shall serve a term of office of three (3) years.

10.3.  Upon expiry of a member's term of office, subject to the other provisions of this Charter, the member is eligible to be re-appointed for another term. There is no limitation on the number of consecutive terms a member may serve.

**Section XI – Removal from Board:**

11.1. A Board Member may be removed from office before the expiry of his or her term by unanimous resolution of the other members.

**Section XII – Resignation from Board:**

12.1. A Board Member may resign from office before the expiry of his or her term by providing written notice to the Board at least thirty (30) days before the date on which the resignation becomes effective.

**Section XIII – Quorum:**

13.1. A quorum will be a simple majority of the total number of its members, one (1) of whom must be either the Chairperson or Vice-Chairperson.

**Section XIV – Meetings:**

14.1.  The Board will meet at the call of the Chairperson or a majority of its members, but, no less than once every quarter or every ninety (90) days.

14.2.  Notice of a Board meeting, with particulars of the agenda, will be provided to all Board Members, not less than ten (10) business days before the date of the meeting.

**Section XV – Rights and Responsibilities of the Board:**

15.1. In addition to any of the rights and responsibilities that may be provided herein, the Board will have the authority:

a) To establish the strategic direction for the Authority's lending operations;
b) To fulfill its oversight responsibilities with respect to the members' lending and credit functions;
c) To monitor and inspect all financial service businesses and short- term lending service businesses operating within the Territory;

d) To take such steps as are necessary to ensure the provisions of this Charter and the applicable laws and regulations are observed; and

e) To address any other matters necessary to carry out the functions of the Authority.

## Section XVI – Compensation:

16.1. Board Members shall be compensated for the time required to provide the services associated with their offices, as determined by the Authority.

## Section XVII – Administrative Support:

17.1. The Board may employ support staff and will retain professional and legal assistance that is required to fulfill its mandate.

## Section XVIII – Hiring Preference:

18.1. Short-term lending service businesses will in recruiting, training and hiring employees, give preference to qualified persons who are Mohawks of Kahnawake in all job categories, particularly management positions.

## Section XIX – Operating Procedures:

19.1. The Board may adopt certain procedures as it considers necessary to implement the principles of this Charter and to maintain conformity with applicable laws and regulations, including procedures respecting:

a) the type of loans that may be provided in a short-term lending service business;

b) the days and hours during which a short-term lending service business may operate;

c) the terms and conditions for each loan, including, but not limited to, time, loan periods, minimum payments, pre-payments, and late fees or penalties;

d) the maximum amount that may be borrowed in the form a short-term loan;

e) the maintenance of public order, security and the safety of persons in and around short-term lending establishments involved in short-term financial service businesses;

f) the maximum rate of interest and fees that may be imposed for short-term loans;

g) the minimum hiring standards required for short-term lending businesses' personnel and employees;

h) the identification of those activities that will, for the purposes of applicable laws and regulations, be deemed to be "short-term lending related activities";

i) the background and security investigations and credential verifications employed to determine an applicant's eligibility for a loan based on the applicant's income, credit history and identification;

j) the background and security investigations and credential verifications of personnel, staff, vendors and companies contracted to conduct business with or on behalf of short-term lending service businesses;

k) any other procedures necessarily related to the conduct and operation of short-term lending service businesses or related activities within the Territory.

## Section XX – Lending Guidelines:

20.1. The Board sets forth the following Lending Guidelines applicable to all short-term lending service businesses operating within the Territory ("Lenders"):

a) To maintain a complaint policy and respond to customer complaints in a timely manner. Customers who are not satisfied with the response from the Lender may avail himself or herself of an appeal process with the Authority;

b) To disclose all interest rates, finance charges and fees in a transparent manner to the customer;

c) To provide a means for customers to notify the Lender that he or she would like to be removed from any mailing or call lists;

d) To be transparent in all written correspondence, either through email, text message or otherwise, to customers;

e) To be transparent in all advertising materials distributed to the customer;

f) To refrain from employing a threatening or harassing tone with customers whose accounts are found to be in arrears;

g) To respect the privacy of customers and not share or disseminate private or confidential information to third parties without obtaining prior consent from the customer, according to the Lender's Privacy Policy;

h) To not discriminate against or refuse the provision of a loan or credit to an applicant for any reason other than what affects his or her ability to repay the loan;

i) To provide loans to customers who can repay the loan, as determined by verifying the customer's income and credit history, as applicable;

j) To refrain from providing a loan or credit to an applicant who appears on a "Government Watch List" or whose identity seems questionable after appropriate verification of the applicant's credentials;

k) To allow customers to pre-pay the principal amount to reduce his or her total loan payments. The Lender must inform the customer of this option before entering into any loan agreements;

l) To maintain records of all customer accounts for a minimum of five (5) years. The Authority reserves the right to examine the Lender's records at any time; and

m) To obtain the consent from the customer before processing any electronic debits of his or her subject account.

## Section XXI – Certification Process:

21.1. The First Nations Lenders' Authority, acting with a minimum quorum of two (2) out of three (3) members of the Board of Governance, shall have the sole and exclusive right to grant certification within the First Nations Lenders' Authority based on "best practices of the industry" and the appropriate due diligence being performed by the First Nations Lenders' Authority, upon receipt of an application for certification to grant official status under their seal of approval.

Upon the granting of certification status by the First Nations Lenders' Authority, the Board of Governance, duly authorized, shall issue a formal Certificate in recognition of that status, acknowledging that the recognized member complies with all the rules and regulations of the Charter of the First Nations Lenders' Authority.

Membership Application Forms are to be submitted to the First Nations Lenders' Authority for approval and ultimate certification.

## Section XXII – Penalties:

22.1. A breach of any applicable laws or regulations in the Territory is an offence punishable by a fine or imprisonment, or both, and may be referred to the officially recognized Police Service, responsible for enforcement of laws in the Territory, known as the "Kahnawake Peacekeepers".

**AND HERETO INTERVENED THE THREE (3) FOUNDING MEMBERS OF THE BOARD OF GOVERNANCE, WHO, BY THEIR SIGNATURES, ENACT THE CHARTER OF THE "FIRST NATIONS LENDERS' AUTHORITY".**

FEBRUARY 15th, 2019

**COMPLAINT EXHIBIT E**

**License Issued by The FNLA to Strategic Solutions Services d/b/a Arrow
Mountain Funding**



# COMPLAINT EXHIBIT F

## The FNLA Member Application



<table>
<tr><td></td><td>"FIRST NATIONS LENDERS' AUTHORITY"<br><br>**APPLICATION FOR**<br>**CERTIFICATION**</td></tr>
</table>

**First Nations Lenders' Authority ("FNLA")**
*"Promoting a positive environment for bringing private capital to First Nations for lending purposes"*

---

**Application Process:**

1. **Certification**: There are three (3) types of certification granted by the "FNLA": (1) General Member, which is an entity involved directly in the lending industry; (2) Affiliate Member, which is an entity that assists lenders licensed by the "FNLA"; and (3) Approved Vendor, which is an entity that provides business solutions, consulting, accounting and marketing services to Certified Members (General and Affiliate) and any matters incident thereto.

   **Member**: Criteria: (1) First Nations Private Money Investors, who regularly works in the private lending industry; any other First Nations entities carrying on business in the private lending industry on First Nations' Lands; and service providers that the "FNLA" has deemed to meet its qualification standards in the lending industry.

2. **Application:** Please fill out this Application and Disclosure, sign & date both the Application and the attached "Code of Conduct".

   a. A **non-refundable** application fee of $250.00 USD must accompany each application for membership.

3. **Dues**: The annual fee for General Members shall be $20,000.00 USD per entity; the fee for Affiliate Members shall be $7,500.00 USD; and the fee for Approved Vendors shall be $5,000.00 USD

4. **Mail your application**: Please mail the following items:

   ☐ Complete Applicant Background & Disclosure;
   ☐ Signed "FNLA Code of Conduct";
   ☐ Cheque for the $250.00 USD non-refundable application fee.

   Please mail these to:
   Travis Jacobs, Secretary – "FNLA"
   No. 1 Patton Road, P.O. Box 2012
   Kahnawake, Quebec, J0L 1B0

| APPLICANT BACKGROUND AND DISCLOSURE |
|---|

**Name:** _____

**Company Name:** _____

**Present Address:** _____

_____

**E-mail:** _____

**Telephone:** _____

**Cell: (optional)** _____

**Fax: (optional)**

**The following questions must be answered. Disclosure is required if you answer "Yes" to any of Questions 6 through 12; however, answering "Yes" to any of those questions will not in and of itself disqualify you from Certification. Full disclosure is important as part of the overall decision-making process by the FNLA's Board of Governance.**

1. What is your company's approximate annual dollar volume of loans originated? (indicate one)

   ❑ None    ❑ Less than $20 Million    ❑ $20 - $50 Million    ❑ $50 Million or More

2. Are you licensed in other locations?

   ❑ Yes    ❑ No

3. Please state the total number of years of direct experience you have in the private lending field. _____

4. Please list the professional and/or industry associations or trade groups in which you have been certified or of which you are a member.
   a.
   b.
   c.

5. Please list the professional credentials you currently possess.

   _____

   _____

6. In what location is your Head Office?

   _____

7. How many employees does your company have: _____

2

| | |
|---|---|
| 8. Does your company, or a related company, manager/operate one (1) or more lending entities?<br><br>❑ Yes    ❑ No | |
| 9. Have you ever had any professional license (including ones outside the private money lending business) revoked, suspended or denied?  If so, please attach a detailed explanation with your application.<br>❑ Yes    ❑ No | |
| 10. Have you ever been charged with or convicted of a misdemeanor or a felony (summary or indictable offenses in Canada) in connection with (1) the misappropriation of a client's funds; (2) fraud; or (3) misleading an investor?  If so, please attach a detailed explanation with your application.<br>❑ Yes    ❑ No | |
| 11. Have you ever been subject to administrative action by a regulatory authority?  If so, please attach a detailed explanation with your application.<br>❑ Yes    ❑ No | |
| 12. Has your company ever been subject to administrative action by a First Nations or Tribal regulatory authority?  If so, please attach a detailed explanation with your application.<br><br>❑ Yes    ❑ No | |
| 13. Has your company ever been subject to administrative action by a regulatory body of any Province of Canada?  If so, please attach a detailed explanation with your application.<br><br>❑ Yes    ❑ No | |
| 14. Have you ever been convicted of a criminal offense involving physical violence against another person? If so, please attach a detailed explanation with your application.<br>❑ Yes    ❑ No | |
| 15. Have you read and agree to abide by the Charter of the First Nations Lenders' Authority?<br><br>❑ Yes    ❑ No | |
| 16. Do you understand that failure to provide accurate and complete information in this form may constitute an offense under the Charter of the First Nations Lenders' Authority and may be grounds for the First Nations Lenders' Authority to deny an application, or to suspend, or revoke a Certification that has been issued based on the inaccurate or incomplete information.<br>❑ Yes    ❑ No | |
| 17. You agree that the General or Affiliate Member Certification granted by the First Nations Lenders' Authority must be appended to a valid Approved Vendor Certification.<br>❑ Yes    ❑ No | |

3

| PLEASE READ CAREFULLY |
|---|

**FIRST NATIONS LENDERS' AUTHORITY ("FNLA")**

## Code of Conduct

In consideration of the Application for Certification by the **First Nations Lenders' Authority**, a Non-Profit Association, all applicants agree from this date forward to abide by the following Code of Conduct, to the extent applicable to them;

☐ Strive to maintain a good reputation in the First Nations business community;

☐ Be in compliance with the rules and regulations applicable in the First Nations community in which you operate and/or service, in the course of making private money loans;

☐ Truthfully account for all monies in a loan transaction;

☐ Do not accept fees for services that were not performed, except for any non-refundable application fees;

☐ Strive to be responsive to all communications from borrowers, including in the event of a loan default;

☐ Strive to be responsive to all communications from investors, including in the event of a loan default;

☐ Do not disparage another certified lender of the association to investors or the general public; provided however, it shall not be considered a violation of this provision to discuss anything in the public record;

☐ Consider the welfare of investors before themselves.

Agreed to and acknowledged by Applicant:

Date: _____

Signature: _____

Print Name: _____

4

## FIRST NATIONS LENDERS' AUTHORITY ("FNLA")
# APPROVED VENDOR GENERAL SERVICES AGREEMENT

In consideration of the Application for Certification by the **First Nations Lenders' Authority**, a Non-Profit Association, all applicants/certified members agree from this date forward to contact and work with the exclusive independent online lending consultant and payment processing service provider (i.e., the Approved Vendor appointed by the First Nations Lenders' Authority), for the purposes of accessing, utilizing and installing the services provided solely by the "Approved Vendor" including but not limited to the following:

☐ Facilitating the sales processes of the First Nations Lenders' Authority memberships with the applicant/certified member;

☐ Payment processing solutions (in which case a separate EFT/ACH Services Agreement will be executed between the applicant/certified member and the "Approved Vendor";

☐ Third-party payment processing solutions for the applicant/certified member;

☐ Management and consulting services to the applicant/certified member with regard to the online lending industry (in which case a separate "Managed Services Agreement" will be executed between applicant/certified member and the "Approved Vendor");

☐ Facilitating banking relationships for the applicant/certified member;

☐ Assist with the on-going monitoring and auditing of the portfolio(s) and advise on compliance and lending laws and regulations in Canada and the United States, as applicable;

Applicant/Certified Member agrees to provide a copy of any agreements between the Applicant/Certified Member and the "Approved Vendor", to the First Nations Lenders' Authority upon request ☐

Agreed to and acknowledged by Applicant/Certified Member:

Date: _____

Signature: _____

Print Name: _____

5